UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

R.W.,

      Plaintiffs,

v.                           CASE NUMBER: 5:16-cv-00045-WTH-PRL

BRUCE A. KISER, JR.
in his individual capacity,

      Defendant.

_____/

## <u>DEFENDANT BRUCE A. KISER, JR.'S MOTION FOR SUMMARY JUDGMENT</u>

COMES NOW, Defendant BRUCE A. KISER, JR. ("KISER"), by and through his undersigned counsel, hereby files this, his Motion for Summary Judgment, and states as follows:

1. Plaintiff R.W. filed this single-count 42 U.S.C. § 1983 civil rights action arising from an alleged hazing ritual among statutorily-classified youthful offender inmates within the Florida Department of Corrections ("DOC"). The ritual is referred to as the "Test of Heart" ("TOH").

2. Plaintiff alleges that he was attacked by a group of fellow inmates in the bathroom area of F-Dorm at Sumter Correctional Institution. F-Dorm is an open bay building where inmates sleep on bunks in open rooms; there are no individual cells. During the attack, the assailants allegedly used sharpened items fashioned into weapons and applied a mop handle to Plaintiff's rectum.

3. The crux of Plaintiff's theory is that KISER, as the lone officer on duty in F-Dorm at the time, was actually aware of the attack as it occurred and consciously took no action. If true, KISER concedes that he would be liable under § 1983.

1

4. But KISER can only be liable if he had actual knowledge of the attack and intentionally ignored it. KISER has denied any knowledge of the attack until well after the fact. The case is really that simple; KISER either knew about the attack as it occurred or he did not.

5. Discovery has not played out in the manner Plaintiff might have hoped. None of the several eyewitness inmates can offer admissible testimony supporting Plaintiff's theory. Critically, Plaintiff himself testified that he intentionally kept quiet throughout the ordeal so that he could "pass" the TOH.

6. It would therefore constitute not only rank speculation but fancifully unreasonable inferences that might lead a jury to find the requisite subjective intent necessary to hold KISER liable under § 1983. KISER is entitled to summary judgment because a reasonable jury could not properly render a verdict in Plaintiff's favor. He is additionally entitled to qualified immunity on this record.

WHEREFORE, Defendant BRUCE A. KISER, JR. hereby respectfully requests that final summary judgment be entered in his favor.

## MEMORANDUM OF LAW

### I.   Summary judgment standard.

The Rule 56 summary judgment standard is well established. The moving party must demonstrate "that this is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The court must view the evidence and the inferences from that evidence in the light most favorable to the movant." *Stein v. Ala. Sec'y of State*, 774 F.3d 689, 692 (11th Cir. 2014). "A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a <u>reasonable</u> factfinder to return a verdict in its favor." *Id.* (emphasis added). If the movant meets its evidentiary burden, the burden shifts to

the nonmoving party to establish, with evidence beyond the pleadings, that a genuine dispute material to each of its claim for relief exists." *Id.*

This case involve a host of contradictory and mutually exclusive testimony.  "[W]hen conflicts arise between the facts evidenced by the parties, they must credit the nonmoving party's version."  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013).  It therefore follows that where Plaintiff's version of events conflicts with that of other inmates, Plaintiff's version must control.  After all, summary judgments may not be denied because of a suggested fact pattern "that [is] contrary to the laws of nature."  *Id.* at 1253.

## II.   Officer liability in the context of inmate-on-inmate violence under § 1983.

Section 1983 provides civil relief to citizens who have suffered a deprivation of their federal rights at the hands of persons acting under color of state law.  *See* 42 U.S.C. § 1983. Prisoners have an Eighth Amendment right to be free from cruel and unusual punishment.  "We accept that an excessive risk of inmate-on-inmate violence at a jail creates a substantial risk of serious harm; occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, but confinement in a prison where violence and terror reign is actionable."  *Harrison v. Culver*, 746 F.3d 1288, 1299 (11th Cir. 2014) (citation omitted).

As a result of this unsurprising statement of the law, "[p]rison officials have an obligation to protect prisoners from violence inflicted upon them by other prisoners."  *Id.* at 1298.  "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."  *Id.*  (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  "Only a prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment."  *Id.* (citation omitted).

Establishing a claim in this context is a two-step process. First, the plaintiff must "demonstrate an objectively substantial risk of serious harm to prisoners." *Id.* (citation omitted). "Then, the plaintiff must show that the defendant was deliberately indifferent, which requires the following: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." *Id.* (citation omitted).

Most if not the overwhelming majority of decisional authority in this field examines the liability of wardens, supervisors, and other prison administrators. *See*, *e.g.*, *Franklin v. Curry*, 738 F.3d 1246 (11th Cir. 2013) (where officer allegedly sexually assaulted pretrial detainee, all Eleventh Circuit analysis was devoted to the liability of superiors). It is therefore imperative to confine our analysis to the singular claim at issue – KISER's potential liability as an on-duty corrections officer with direct oversight of one prison dorm and nothing else. The Complaint is rife with rhetoric concerning prison death rates, that DOC prisons are "particularly inappropriate place[s] for youth," and "the pervasive culture of brutality" within DOC facilities. (Doc. 1 ¶¶ 9-16.) These vague allegations *might* be relevant in an action against the DOC as a whole, but Plaintiff has chosen only to sue KISER personally. The broad generalizations are therefore not only utterly irrelevant but inflammatory in the context of what KISER actually had the ability to control.

Similarly, Plaintiff claims that he was placed in deplorable isolation conditions after the attack in violation of state regulations and the Prison Rape Elimination Act. (Doc. 1 ¶¶ 58-67.) There is no evidence that could possibly suggest that KISER had anything to do with Plaintiff's housing assignment, or *any* inmate's housing assignment, anywhere within the DOC system at any time. The allegations are so far removed from relevance that they would be appropriately stricken.

As a result, and after distilling the relevant allegations from the hyperbole, the two-step objective risk/deliberate indifference test outlined above is easily applied.  An ongoing gang assault is plainly an "objectively substantial risk of harm," and an officer who is actually aware of the attack and chooses to ignore it has had, by definition, subjective knowledge of the risk and disregarded it.  Finally, KISER happily concedes that such despicable official behavior "is more than gross negligence."  As stated above, then, the sole question before the Court is whether a reasonable jury could properly find that the record evidence could substantiate a finding that KISER was aware of and ignored Plaintiff's Test of Heart.  They could not.

## III.    A note on qualified immunity.

As a government official sued in his personal capacity, KISER enjoys qualified immunity from suit "so long as [his] conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."  *E.g.*, *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002) (citation omitted).  An official seeking qualified immunity must first show that he or she was acting within their official discretionary authority.  *Id.*  There is no question that KISER, in carrying on the day's duties overseeing F-Dorm, was acting within the discretion of his command at the time of Plaintiff's attack.  *See*, *e.g.*, *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003) (summarily finding that all prison officials were acting within their discretionary authority during fatal inmate-on-inmate violence).

Once the discretionary function test is satisfied, the burden shifts to the plaintiff to demonstrate: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation.  *E.g.*, *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).  While this two-prong test can itself be approached in either order, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), in the context of the present motion the

second prong is more or less irrelevant.  Specifically, if the Court finds that a jury could properly find that a constitutional deprivation occurred, KISER agrees that the violated right was clearly established.

The qualified immunity analysis is therefore probably academic – either the record supports a potential verdict finding a civil rights violation or it does not.  But the existence or lack of KISER's qualified immunity does have two practical impacts; first, it places an affirmative burden on Plaintiff to establish the constitutional violation (though this burden is already shifted as part of the normal summary judgment procedure); and second, a denial of qualified immunity is immediately appealable under the collateral order doctrine.  *See*, *e.g.*, *Jones v. Fransen*, 857 F.3d 843, 850 (11th Cir. 2017).  This is not to say that KISER even intends to appeal a denial of the present motion, but the failure to expressly raise the qualified immunity defense could result in a waiver of appellate rights as a matter of preservation.  *See*, *e.g.*, *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1352 (11th Cir. 2017).  It would be foolhardy to potentially waive those rights now.  Therefore, KISER technically moves for summary judgment on two independent grounds – that the record cannot support a proper verdict against him and that he is entitled to qualified immunity from suit.

### IV.    <u>The evidence cannot sustain a verdict in Plaintiff's favor.</u>

Much discovery has been completed, but only limited portions of the record could possibly bear on the resolution of this motion.  This is because summary judgments are limited to admissible evidence, Fed. R. Civ. P. 56(c)(1-2); *see also McMillian v. Johnson*, 88 F.3d 1573, 1584-85 (11th Cir. 1996), and therefore only eyewitnesses to Plaintiff's attack can competently testify as to what happened.   Absent exceptions KISER cannot fathom, other testimony purporting to describe KISER's activity during the attack amounts to base hearsay.  Notably, this

includes the testimony of the parties' prison experts, who both suppose to harbor "opinions" as to whether KISER was or was not aware of the attack.[1]   These "opinions" are merely factual conclusions in disguise which necessarily arise from the experts' review of documents and discussions with actual witnesses.   For completeness, this includes the testimony of Plaintiff's damages expert, Dr. Heather Holmes, whose understanding of the attack was likewise derived from her conversations with Plaintiff.   The experts can have no bearing on this motion.

The appropriately considered depositions are limited to those of Plaintiff R.W., Defendant KISER, and the following inmates that were in F-Dorm at the time: Daquavious Cobb, Wilgens Guillaume, and Nathanial King.   The testimony varies wildly on a host of topics, and Plaintiff's version must control over that of the other inmates.   Aside from Cobb's totally incredulous recount, the best Plaintiff and King can do is to suggest that the attack was so loud that KISER must have heard.   But as will be shown, this irrational "argument" offends common sense in light of Plaintiff's repeated testimony that he and other inmates took efforts to keep quiet during fights – including Plaintiff's own TOH – to avoid being caught.

### A.   Kiser's testimony.

Despite the unassailable rule that summary judgment evidence must be viewed in a light most favorable to the nonmoving party, it helps to begin with KISER's own description of events.   In a vacuum, KISER's testimony would unequivocally entitle him to judgment, so it is from that backdrop that Plaintiff must carve out a genuinely disputed question of fact to survive to trial.   In short, he denies any knowledge, recognition, or suspicion of Plaintiff's attack at the time it occurred.

---

[1] The experts also offer competing theories as to whether KISER was or was not reasonable at the time of Plaintiff's attack.   This is not a negligence case.   As explained in other filings, KISER believes that liability expert testimony is entirely out of place in this action.

KISER began employment with the DOC in August 2007.  (Dep. KISER p. 14.)  It was his first job in either law enforcement or corrections.  (*Id.*)  After initial training and the four-month academy, KISER became a corrections officer and has maintained that status ever since.  (*Id.* at pp. 13-15, 18.)  He has remained stationed as Sumter Correctional Institution ("Sumter") for the duration of his DOC career.  (*Id.* at p. 19.)

Sumter did not house youthful offenders, or "YO's" as they are frequently referred to, when KISER began work as a corrections officer.  (*Id.* at p. 23.)  The YO scheme is established by § 958.011 of the Florida Statutes, and it is undisputed that R.W. was classified as a YO at all material times.  KISER recalls the YO's arriving to Sumter around 2012-13, and he did not receive any additional training for supervising the younger inmates.  (Dep. KISER pp. 24-25.)  KISER was told by his superiors that specialized training was not required for him as a dorm officer even though extended day officers received a 40-hour training program.  (*Id.* at pp. 25-28.)  KISER was instructed to "run it like an adult camp, how you normally run an adult dorm."  (*Id.* at p. 27.)

KISER explained that there were no material differences in how he ran adult dorms versus YO dorms, though he described the YO's as "more up running around, you know, they're more energetic, I want to say, compared to the adults."  (*Id.* at p. 31.)  But unlike adult camps, a single officer was required to be inside YO's dorms at all times.  (*Id.* at p. 32.)  When issues arose within dorms, officers were trained to attempt to deescalate the situation first and to radio for backup if that failed.  (*Id.* at 36.)  Where inmates were discovered fighting, officers were trained not to intervene until backup arrived and then to either pepper spray the inmates or place them in hand restraints.  (*Id.* at pp. 38-39.)  KISER has radioed in two or three fights over the ten years of his service, though he has successfully deescalated others as well.  (*Id.* at pp. 140-41.)

8

KISER has never stood by and observed a fight or sexual assault, and he has helped and protected inmates on many occasions who have come to him for assistance. (*Id.* at pp. 176-77, 182-83.)

It is undisputed that Plaintiff's attack took place in one of F-Dorm's bathrooms the morning of July 24, 2013. At the time, KISER was assigned to the 7:00 a.m. to 7:00 p.m. shifts in F-Dorm. (*Id.* at pp.60, 63.) E-Dorm, another YO dorm immediately adjacent to F-Dorm, was closed for maintenance, and its inmate population was placed into F-Dorm. (*Id.* at pp. 70-71.) This left KISER with roughly 80 inmates under his watch, and his request for extra officer assistance given the doubled inmate count was declined. (*Id.*) "There was a lot more inmates, so it was more to watch for one person." (*Id.* at p. 72.)

At this point it helps to establish the dorm layouts. A series of photographs taken within F-Dorm, including perspectives from inside and outside the officer station (or "bubble"), are attached to KISER's deposition as Exhibit 2. However, the pictures are recent, and minor modifications to partitions have been completed since the event. (*See* Dep. R.W. p. 62.) A schematic floor plan of the dorm is attached to R.W.'s deposition as Exhibit 3. The schematic shows that the bubble is centrally located within the building. An officer situated in the middle of the bubble can look either to his or her front left or right to observe either of the large symmetrical bays. The bays hold 46 bunks each (the central bunks are single bed, the bunks against the walls have upper and lower beds). The dayroom, consisting of several benches and tables, is directly in front of the bubble. The two bathrooms both have a wall of showers, two urinals, and three toilets. The utility room, where the mops and other cleaning supplies are kept,

is accessible from directly within one bathroom.  The bubble also contains a hallway to a back exit that allows for officer access without physically entering the housing area of the dorm.[2]

KISER performed security checks every thirty minutes that required him to physically walk throughout the dorm.  (Dep. KISER. pp. 89-90.)  He would look into the bathrooms, but he would not physically observe every inch of the bathrooms except during formal inmate counts which occurred a handful of times per shift.  (*Id.* at pp. 86-88.)  The majority of the time KISER would remain in the bubble, where he could generally see out into the dorm space as well as observe camera surveillance throughout the dorm.  (*Id.* at pp. 104-06.)  However, KISER himself did not rely on the cameras for supervision.  (*Id.* at p. 105.)

The bubble allows ample but far from complete viewing of the dorm areas.  (*Id.* at pp. 120-22.)  In addition to the human inability to observe in a nearly 360° angle at any given time, multiple areas of the bathrooms are hidden from view within the bubble.  (*Id.*)  And as the schematic and photographs depict, the bathrooms would be over the officers' back shoulders if he or she were observing the dayroom.  It is not possible to observe both bathrooms at the same time, nor is it possible to observe a bathroom at the same time as the opposite bay and vice versa.

Prior to Plaintiff's attack, KISER had only learned of the Test of Heart from one earlier incident.  (*Id.* at p. 126.)  That TOH also took place in F-Dorm but before KISER was assigned there.  (*Id.*)  KISER understood that the earlier TOH took place in the mop closet, and Sumter changed its policies to require mop closets to be locked while inmates mop the dorms.  (*Id.* at pp. 128-29.)  KISER understood that TOH's were done either as a gang initiation or in response to

---

[2] A video taken during the attack is available and will be physically filed separately due to its unusual software format.  However, the video is minimally probative because it does not show the actual shower area.  KISER can be seen in two brief interludes, but given that we do not know exactly for how long or when the attack occurred, it is impossible to tell what he might have perceived at the time.  KISER therefore does not rely on the video for purposes of this motion, but he will provide it to the Court in case the Court has any interest.

refused demands to provide canteen, clothes, or other assets.  (*Id.* at p. 131.)  KISER was told

that the prior TOH involved the application of a broomstick into the victim's rectum.  (*Id.* at p.

129.)  KISER himself has never witnessed a TOH.  (*Id.* at pp. 132-33.)

Plaintiff's TOH took place while the inmates were performing their morning dorm

clearing.  Five to six inmates cleaned at a time.  (*Id.* at p. 148.)  The process began with KISER

either accepting volunteers ("a lot of them have nothing to do, they're bored, so most of them

will come and volunteer") or assigning duties on a day-to-day basis.  (*Id.* at p. 135.)  KISER

retrieved the cleaning supplies from the mop closet, physically handed them out to the inmates,

and instructed them on where to clean.  (*Id.*)  The inmates used shower water to clean, and

"when they do it it's so hot in the [non-air-conditioned] dorm, and the steam from the shower a

lot of times will fog up the windows from the bubble."  (*Id.* at pp. 147-48, 159.)  When cleaning

was completed, KISER collected the supplies and locked them back up.  (*Id.* at p. 135.)  The

process typically took an hour to ninety minutes depending on the day's tasks.  (*Id.* at p. 137.)

Cleaning was not directly supervised "because you still have to watch the rest of the dorm and all

the other inmates, so you assign it to one area, and as you're doing your security checks, your

walk around, your visual check, you're just glance to see – make sure they're doing what they're

supposed to be doing."  (*Id.* at pp. 137-38.)

KISER specifically recalled receiving five or six volunteers to clean on the day of

Plaintiff's attack.  (*Id.* at p. 148.)  "And during that time when they're cleaning, the inmates

come and go into the bathroom also using the bathroom."  (*Id.*)  Inmates are permitted to use the

toilets without limitation during the daytime.  (*Id.* at pp. 148-49.)

Because sound is a major factor in this motion, Plaintiff's questioning of KISER relating

to what he could and could not hear from within the bubble is worth repeating in its entirety:

Q   When you're inside the bubble are the doors closed?

A   Yes, ma'am.

Q   So when they come up – when a prisoner comes up to ask for something, do they knock on the door?

A   If I see them walking up sometimes I'll open the door, or if they knock then I'll open the door.

Q   Can you hear anything that's happening in the dorm?

A   You can but it's muffled.  At that time there were so many inmates; there was just a lot of noise in general, but it's very – it's not – I can't say that you can't hear, you can hear, but it's a muffled sound, it's hard to understand, so you have to open the door.  If they yell through the window and they're standing right there, you can make out what they're saying a little bit, or you have to open the door to understand what they're saying.

Q   So otherwise it's sort of just a generally loud dorm?

A   Yes, ma'am.  There's always noise in there.  And because there was two dorms in one, there was over 80 inmates that day, it was just generally loud in there just because they are loud.

(*Id.* at pp. 144-45.)  There is no contrary record evidence describing officers' ability to hear dorm sounds from within the bubble.

During the morning when the attack took place, KISER recalls "glanc[ing] in [to the bathroom], and from my recollection the inmates were cleaning and using the bathrooms as normal operation." (*Id.* at 156.)  He recalls a separate incident that morning involving two inmates "shadow boxing," or play fighting, which he promptly broke up.  (*Id.* at pp. 156-57, 173.)  In summary, "I never seen a fight or anything in the bathroom that made me think that something was not happening that was supposed to." (*Id.* at p. 157.)  Nor does KISER recall R.W. entering or exiting the bathroom.  (*Id.*)  Similarly, he does not recall any inmate exiting with an unusually wet uniform, though he would not have thought anything of that anyway because many of them "use the sink as their laundry." (*Id.* at p. 158.)

After the time the attack undisputedly took place, KISER was sent for "rover" duty from 11:00 a.m. to 3:00 p.m., and he learned about the attack upon his return to F-Dorm.  (*Id.* at pp. 150-52.)  KISER was told that R.W. was the victim, but KISER did not "have any recollection of him being in the dorm."  (*Id.* at p. 153.)  "I don't recall having any interaction with him at all, other than counting and, 'Okay.  You need to line up for chow,' or something."  (*Id.*)

KISER never saw R.W. again, and he did not learn details of the attack for another week.  (*Id.* at pp. 159-60.)  KISER complied with the internal investigation, and he was not disciplined upon its conclusion.  (*Id.* at p. 160-6, 1652.)  When asked if KISER "regret[ted] what happened, KISER responded that "I didn't see what happened, so I can't regret it, but I generally feel bad if the kid was attacked the way they're saying he was attacked."  (*Id.* at p. 167.)  "If I had [observed Plaintiff's alleged sexual assault], I would have reported it.  I would have gone on the radio and asked for assistance, and I would have stopped the altercation."  (*Id.* at p. 172.)  "And at no point in time did he ever come to me and say that he was assaulted and asked me for help."  (*Id.*)  Succinctly, KISER neither noticed nor had anyone bring to his attention anything that would have remotely alerted him to the attack.  (*See id.* at pp. 173-76.)

**B.  R.W.'s testimony.**

R.W. was arrested for carrying a concealed weapon as a minor.  (Dep. R.W. p. 20.)  Because he was on probation at the time, he was direct filed as an adult and eventually accepted a plea for a five year prison sentence.  (*Id.* at pp. 21-22, 24-25.)  He was transferred from county jail to central booking to the Lake Butler Reception & Medical Center before finally landing at Sumter, intended as a long-term placement.  (*Id.* at pp. 30-31, 34-35.)  R.W. was assigned to F-Dorm after a routine two-week orientation session.  (*Id.* at pp. 35-36.)

R.W. spent approximately three weeks in F-Dorm prior to the date of the incident in July 2013. (*Id.* at 43.) He was seventeen at the time. (*Id.* at p. 10.) R.W. agrees that F-Dorm was "full," unlike C-Dorm where he had received his orientation. (*Id.* at 39.) He described the general F-Dorm environment as follows:

> It was hot. It was – it was just crazy. People was fighting all the time. It was people getting cut every day. People was getting hit with locks and bricks every day. The police [guards] was allowing it.

(*Id.* at p. 43.)

R.W. testified that fights are often mutually planned by inmates, but that inmates get jumped as well. (*Id.* at p. 44.) "Both are planned. When somebody is getting jumped, it has been planned." (*Id.*) According to him, and certainly disputed among other testifying inmates, "like 50/50" of officers allow fighting. (*Id.* at p. 46.) "Some officers allow it, some officers don't put up with it." (*Id.*) R.W. acknowledges that some inmates yell for help, but he never has. (*Id.* at p. 47.) He has been in more than twenty fights while in custody, with the total number somewhere around fifty. (*Id.* at p. 48.) However, the incident at issue was his first fight at Sumter. (*Id.* at p. 49.)

R.W. was familiar with the term Test of Heart prior to his arrival at Sumter. (*Id.*) He understood the phrase to mean "that a group of inmates get together and see how much pressure they can put on you before you break and tell them, 'Yeah, I'll pay my money.'" (*Id.*) He had witnessed prior TOH's at Lake Butler and at Sumter. (*Id.* at pp. 50-51, 54.) According to R.W., most inmates endure a TOH. (*Id.* at p. 92.) Inmates who fail become "jizles," which are "somebody that pays rents or wash clothes." (*Id.*) An inmate might "fail" if they "scream, tap out, anything, you'll fail." (*Id.* at p. 108.) R.W. therefore had an express motivation to "pass" the test.

R.W. testified that the TOH's at Sumter "mostly" took place in the bathrooms "because it's off camera."[3] (*Id.* at pp. 60-61.) He believes, "There's no way the officer could miss all this action going on. It's real loud." (*Id.* at p. 61.)

R.W. never spoke to KISER, does not remember any interactions with him, and could not think of any reason KISER would have had a reason to be upset with him. (*Id.* at p. 64.) R.W. testified that inmates would communicate with each other through sign language "if we didn't want the officers to know what we were talking about." (*Id.* at p. 66.) This specifically included communication to coordinate fights, and to <u>distract officers so fighting can go on unnoticed</u>. (*Id.* at pp. 66-67.)

R.W. directly claimed that KISER "was one of the officers who let people fight." (*Id.* at p. 67.) However, upon elaboration, this testimony was itself based purely on hearsay:

Q    And how did you know that?

A    Because you can hear people talk. People get in arguments saying – they would say it out loud, "Wait till Kiser gets back. Wait till Kiser gets back. We're gonna open up the mop closet. Wait till Kiser gets back," stuff like that.

(*Id.* at p. 67.)

R.W. recalled several photographs of his attackers, but he could not provide specifics as to who did what to him. (*See generally id.* at pp. 75-91.) He the beginning of his TOH as "they was cleaning the bathroom, … [and that] One of them came into the bathroom, and he was like, 'So, what's up up? You're gonna pay?' I was like, 'Nah.' So he hit me in my face. So we started fighting." (*Id.* at pp. 93-94.) R.W. was near the sink, and after the initial swing, the

---

[3] Video surveillance of the area immediately outside the bathroom during the attach has been filed for completeness. However, it only shows KISER step out of the bubble for brief moments to apparently address specific inmates and does not include sound. It is therefore of nominal probative value for summary judgment. It

attacker moved into to shower area.  (*Id.* at p. 95.)  "And that's when I followed him over there" to where R.W. was "lured inside the bathroom."  (*Id.* at pp. 95-96.)  In other words, R.W. specifically intended to fight the attacker, but he did not anticipate the group attack.  (*Id.* at p. 96.)  He agreed that the remaining participants were at least ostensibly cleaning.  (*Id.*)

R.W.'s recollection of the remainder of the attack is not entirely clear, in part because he was "choked out" to unconsciousness more than once.  (*Id.* at pp. 99-100, 104.)  He agrees that he fought back as much as he could.  (*Id.* at pp. 99.)  He also acknowledges that while the fight began with them standing up, he was taken to the ground at some point where he was choked and stabbed.  (*Id.* at pp. 99-101.)  The attack included the use of "pokers," or sharpened pieces of chain link fence, "bricks inside a canteen bag" fashioned from sidewalk concrete, and soap that "don't break for nothing in the world."  (*Id.* at p. 82.)  The blows were directed at his body; facial wounds can lead inmates to be sent to confinement, which is not a goal of a TOH.  (*Id.* at p. 83.)  R.W. estimates that the attack lasted ten to fifteen minutes, though most TOH's only last three to five.  (*Id.* at p. 103.)

R.W. awoke bloody and naked.  (*Id.* at p. 104.)  And critically, "I wasn't trying to tell on nobody, because there's nothing worse than being a snitch or having a sex charge in prison.  … [Y]ou're not gonna be able to survive like that."  (*Id.*)  In other words, R.W. <u>actively hid his injuries and the event from the officer on duty</u> – KISER.  R.W. passed his TOH.  (*Id.* at pp. 106-08.)  Moreover, R.W. was clear that no participants were actually yelling or screaming; all associated sound was generated by the "rumbling and thumping against the walls."  (*Id.* at p. 108.)

R.W. treated his wounds with the help of other inmates and what can fairly be described as rudimentary first aid.  (*Id.* at p. 110.)  He then again, and emphatically, acknowledges that he

escaped detection of his wounds until the evening: "But for lunch – <u>I got past lunch</u>, because I wasn't trying to tell on nobody."  (*Id.* at p. 111.)  But on the way back from dinner, "I guess somebody had gave word out that something happened and the officers stopped me, pulled me out of line in front of everybody."  (*Id.*)  That officer, Sgt. Cruz, discovered R.W.'s wounds, "freaked out," and took R.W. to the infirmary.  (*Id.*)  R.W. never saw KISER or F-Dorm again.  (*Id.* at p. 132.)  R.W. admits to lying during the post-incident investigation "[b]ecause I didn't want to snitch," *id.* at p. 131, further evincing his perhaps understandable desire to avoid reporting the event for fear of repercussions.

Finally, R.W. never testified that KISER saw the attack; he relies on the sound alone.  R.W testified in the general sense that KISER was "a good officer, like, he wouldn't put his hands on you or nothing like that, but he just allowed TOH's, he allowed fighting, he allowed stuff like that."  (*Id.* at p. 124.)  This general statement, even if true, does not substantiate a claim that <u>R.W.</u> had his constitutional rights violated by KISER.  Instead, R.W.'s foggy memory of the event, forgivable given his unconsciousness, requires bolstering from other eyewitnesses to present a triable question of fact.

R.W. identified inmate Cobb as an assailant and inmates King and Guillaume as witnesses.  (*Id.* at pp. 70-71, 76.)  Cobb was a "leader" who would "orchestrate whatever is going on; who is gonna fight, how it's gonna happen, what shift it's going down on."  (*Id.* at p. 66.)  R.W. also identified non-testifying witnesses Jaron Crowell and Junior Alce as assailants, and he added that other unidentified attackers were involved as well.  (*Id.* at pp. 78, 81-82, 90-91.)  Cobb's, King',s and Guillaume's testimonies will be examined next.

### C. **Daquavious Cobb's testimony.**

Cobb began his testimony by feigning ignorance to virtually everything.  (Dep. COBB pp. 4-8.)  And despite summary judgment paradigmatically not being the forum to resolve credibility, in this case the word "feigning" is more than appropriate – Cobb's testimony changed dramatically once he learned that the undersigned represented KISER.  (*Id.* at pp. 9-10.)  His "memory loss," *id.* at p. 6., evaporated, and he began providing specifics related to R.W.'s TOH.

After apparently "remembering" the phrase Test of Heart, Cobb testified that officers at Sumter "used to let us TOH, would let TOH go down."  (*Id.* at p. 15.)  He continued that he remembers R.W.'s TOH.  (*Id.* at p. 16.)  Cobb describes his recollection as follows:

Q   Okay.  Did you ever see an officer witness a TOH and do nothing?

A   Yep.

Q   And –

A   A white dude.

Q   All right.   And do you remember which – do you remember who the
    inmate was?

A   Yeah.

Q   Who was the inmate?

A   R.W. was one of them.

Q   So you do remember watching R.W. get TOH'd?

A   No, I didn't watch him get TOH'd.  I was just so happened in the area.

Q   So how do you know the officer saw R.W. get TOH'd?

A   Because he was standing at the window looking.

Q   Where were you?

A   In the bathroom at the urinal.   And I came out.   I came out.   I can't
remember.   My memory is kind of like in and out.   But I remember some
parts.

(*Id.* at pp. 15-16.)   On redirect, Cobb clarified not only that he did not see the attack on R.W., but

that it was possible that the attack took place behind the shower wall:

Q   I think you just told Counsel that you know that the officer witnessed
R.W.'s TOH.   Are you sure about that?

A   When I was coming out of the restroom, I seen him at the window.

Q   But you didn't see the TOH yourself, right?

A   No.   I heard it going on.

Q   Is it possible that it was going on behind the shower wall?

A   Yeah.

Q   Do they do that on the ground sometimes?

A   I don't know.   I've never been in one.

(*Id.* at pp. 30-31.)

The evidentiary problem with this testimony, even if taken as true, is that it entirely

contradicts R.W.'s own testimony.   R.W. was clear that Cobb attacked him.   Their testimonies

are mutually exclusive.   Accepting both R.W.'s and Cobb's testimonies would accept a series of

events offensive to "the laws of nature."   *See Feliciano*, 707 F.3d at 1253, *supra*.

Cobb could not have attacked R.W. while simultaneously and harmlessly using the

bathroom, yet still managing to observe KISER look towards the attack.   The mental imagery

conjures Dali-esque absurdity.   Because this is Plaintiff's case, Plaintiff's testimony must

control, and Cobb's testimony cannot be relied upon to defeat summary judgment.

### D. **Wilgens Guillaume's testimony.**

Guillaume was familiar with the TOH practice, and he had observed many. (Dep. Guillaume pp. 7-8.) Regarding R.W.'s TOH, Guillaume recalls, "it was supposed to be a fight, from what I know, but it turned out to be a test of heart." (*Id.* at 8.) "When it began, I was actually – I turned my back. I went somewhere else." (*Id.* at p. 9.) "And then they went in the bathroom." (*Id.*) Guillaume was sent to confinement as part of the investigation, but both R.W. and he denied that he was involved. (*Id.* at p. 9; Dep. R.W. p. 76.)

Guillaume has no recollection about what KISER was or was not doing at the time R.W. entered the bathroom to fight. (*Id.* at p. 17.) He learned everything about the attack from the investigating officers. (*Id.* at pp. 23-24.) However, Guillaume did note that he has never known guards to allow inmates to fight. (*Id.* at p. 15.) Rather, "Officer sometimes wouldn't see it." (*Id.* at p. 36.) And Guillaume agreed that inmates use sign language to keep information from officers. (*Id.* at p. 37.)

Guillaume's testimony therefore entirely corroborates KISER's, and Plaintiff cannot rely on Guillaume at summary judgment.

### E. **Nathanial King's testimony.**

King testified that he observed R.W.'s TOH, including the "broom in his ass." (Dep. King p. 10.) King explained that R.W. had agreed to pay aggressive inmates (contrary to R.W.'s testimony), and when R.W. decided he would not pay, he received the TOH. (*Id.* at pp. 11-12, 52-53.) King stopped watching when he saw the broom. (*Id.* at p. 15.)

Importantly, King testified that KISER was "sitting down" during the attack. (*Id.* at p. 19.) King then insists that KISER knew about the attack, *id.* at p. 21, but when pressed, it was clear that King was merely speculating:

> If you're sitting in a booth with a window that faces towards the bathroom, you
> can easily turn around. I mean, this is loud. This is not just no quiet little hush-
> hush. This is loud. So if you're kicked back like you just don't hear anything,
> which I know you hear this. Come on, man, you know what I'm saying?

(*Id.* at p. 24.)

King continued, in direct contradiction to R.W.'s testimony, that "I mean, loud. He
screaming. The kid is, you know what I'm saying, screaming. He's on the ground getting beat
and sodomized. He's screaming. I know you hear this, there's no way." (*Id.* at p. 25.) King's
version of the attack included R.W. on the ground, and he specifically identified Cobb as the
"broom guy." (*Id.* at p. 58, 61.) King also described R.W. attempting to run away during the
attack before being dragged back into the shower area. (*Id.* at p. 72.) R.W. offered no such
testimony.

King's testimony therefore flatly contradicts R.W.'s. King describes a merciless attack
against a screaming victim attempting to run away, while R.W. swore that he continually fought
back and never yelled to ensure that he would pass the Test of Heart. King's inference that
KISER must have heard the screaming is therefore based on a fact that Plaintiff himself denies.
King's testimony does not create a genuine question for trial.

## ANALYSIS AND CONCLUSION

KISER disputes any knowledge of the attack as it occurred. To create a genuine issue for
jury resolution, Plaintiff must proffer facts that a reasonable jury could accept to infer that
KISER has lied to the Court. Plaintiff himself acknowledges that he remained quiet, that he did
not yell for help, and that he took numerous steps to hide his attack for fear of discovery by
officers. It is simply irrational to believe that Plaintiff would hide his injuries from KISER if
KISER did not care about fighting.

Guillaume's testimony is entirely benign.  Cobb's testimony is so out of sync with Plaintiff's that it cannot be used for any purpose in opposition to this motion.  Cobb's testimony may not be surprising considering that both Plaintiff and King have identified Cobb as an assailant, if not the primary assailant.  And King's inference that KISER must have known about the attack is premised on his testimony that Plaintiff was screaming throughout the event.  Plaintiff has refuted that, eviscerating King's inference.

This is a simple case amid a sea of otherwise complex constitutional law.  Our record does not support any reasonable inference that KISER deliberately ignored R.W.'s Test of Heart.  KISER is entitled to summary judgment.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by Electronic Mail to Miriam Haskell, Esq., Alia Al-Khatib, Esq., and Shalini Goel Agarwal, Esq., Southern Poverty Law Center, Post Office Box 370037, Miami, FL 33137, miriam.haskell@splcenter.org, alia.alkhatib@splcenter.org, shalini.agarwal@splcenter.org on this **22d** day of August, 2017.

*/s Derek J. Angell*
RONALD L. HARROP, ESQ.
Florida Bar Number: 260584
rharrop@oconlaw.com
DEREK J. ANGELL, B.C.S.
Florida Bar Number: 73449
dangell@oconlaw.com
O'CONNOR & O'CONNOR, LLC
840 S. Denning Drive, Suite 200
Winter Park, FL  32789
(407) 843-2100
(407) 843-2061 Facsimile