# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION


R.W.,

    Plaintiff,

vs.                     Case No.
                  5:16-cv-00045-WTH-PRL
BRUCE A. KISER, JR., in
his individual capacity,

    Defendant.

_____/


DEPOSITION OF:       JAMES R. UPCHURCH

TAKEN ON BEHALF OF:     The Plaintiff

DATE:            Wednesday, June 28, 2017

TIME:            Commenced at 1:12 p.m.
                 Concluded at 4:20 p.m.

LOCATION:          1334 Timberlane Road
                 Tallahassee, Florida

REPORTED BY:        TERRY WILHELMI, CCR
                 Court Reporter and Notary
                 Public in and for the
                 State of Florida at Large

1

2

3

4      APPEARANCES:

5

6        FOR THE PLAINTIFF:

7          MIRIAM HASKELL, ESQUIRE
           ALIA AL-KHATIB, ESQUIRE
           Southern Poverty Law Center
8          P.O. Box 370037
           Miami, Florida  33137-0037
9
                and
10
           CARLA LAROCHE, ESQUIRE
11           Southern Poverty Law Center
           P.O. Box 10788
12           Tallahassee, Florida  32302-2788

13
         FOR THE DEFENDANT:
14
           DEREK J. ANGELL, ESQUIRE
15           O'Connor & O'Connor, LLC
           840 South Denning Drive
16           Suite 200
           Winter Park, Florida  32789
17

18                * * * * *

19

20

21

22

23

24

25

James Upchurch
June 28, 2017                                    3

1

2

3
                    I N D E X
4

5   WITNESS                          PAGE

6   JAMES R. UPCHURCH

7   Examination by Ms. Haskell              4

8

9

10

11

12

13

14            E X H I B I T S

15
     NUMBER          DESCRIPTION          PAGE
16
    Exhibit 1      Mr. Upchurch's report      11
17   Exhibit 2       Security Post Charts        33
     Exhibit 3      Dorm floor plan        48
18   Exhibit 4       Photographs          84

19

20

21

22

23

24   CERTIFICATE OF OATH              107
     CERTIFICATE OF REPORTER            108
25   ERRATA SHEET              109

James Upchurch
June 28, 2017                                                        4

1              PROCEEDINGS

2        The following deposition of JAMES R. UPCHURCH

3   was taken on oral examination, pursuant to notice,

4   for purposes of discovery, for use as evidence, and

5   for such other uses and purposes as may be permitted

6   by the applicable and governing rules.  Reading and

7   signing of the deposition transcript by the witness

8   is NOT waived.

9              *  *  *

10  Thereupon,

11            JAMES R. UPCHURCH

12  was called as a witness and, having been first duly

13  sworn, was examined and testified as follows:

14            EXAMINATION

15  BY MS. HASKELL:

16    Q    Good afternoon.

17    A    Good afternoon.

18    Q    My name is Miriam Haskell and I represent

19  the plaintiff in this matter.  Could you state your

20  full name for the record?

21    A    James Ray Upchurch.

22    Q    And you have been offered by defendant as an

23  expert in this matter, correct?

24    A    Yes.

25    Q    And you have given depositions before?

1    A    Yes.

2    Q    Do you know approximately how many?

3    A    I guess probably 20, 25 maybe.

4    Q    Okay.  So I'll assume that you are generally

5    familiar with the rules, you know that the court

6    reporter is taking down what we're both saying?

7    A    Have mercy on her.

8    Q    And, for that reason, please answer out

9    loud.  We should both make an effort not to talk over

10   each other, so I'll try to do that for you if you try

11   to do that for me.

12   A    Um-hum.

13   Q    If you don't understand any of my questions,

14   please let me know and I'll rephrase.

15   A    Okay.

16   Q    And if you would like a break at any point

17   when there's not a question pending, I'm happy to do

18   so.

19   A    Okay.

20   Q    All right.  Mr. Upchurch, did you bring

21   anything with you today?

22   A    Yes.  I brought this, it's my most

23   up-to-date resume.

24   Q    Okay.  And has this changed since the resume

25   that I was given before, which presumably is the

James Upchurch
June 28, 2017                                        6

1    earlier version you gave to counsel?

2       A    I'm not absolutely sure, but I think I have

3    added three additional cases that -- on my resume I

4    don't put just the ones that I have been deposed or

5    testified in, I put the ones that I have been a

6    consultant or an expert witness in.  And I have got

7    three additional ones that I have been retained in

8    that I have added to the list of consulting expert.

9    But other than that, I don't think there's any other

10   changes.

11      Q    Okay.  And did you bring your file in this

12   case?

13      A    Yes, this is my file (indicating).

14      Q    Okay, thank you.  May I?

15      A    Sure.

16      Q    Okay.  So I see the complaint.  I see a copy

17   of the I.G. report.  A letter indicating that you

18   received the surveillance video from the incident in

19   question.  A copy of your report.

20         MS. HASKELL:  So this security post chart,

21      which I think may have been provided by email

22      today, is that right?

23         MR. ANGELL:  I'm not sure what was provided.

24      I think it was copies of his handwritten notes I

25      think we got from him for the past several weeks.

1    And I would just confirm with you also, either we

2    had sent it along and apparently either we hadn't

3    or the assistant couldn't tell if we had, so I

4    made sure that we got it to you before we

5    started.

6        MS. HASKELL:  Okay.

7  BY MS. HASKELL:

8     Q    Performance planning and evaluation

9  documents for Officer Kiser.  The dorm room for the

10  day in question.  Post order number nine.  Okay.  And

11  what looks like some payment, okay, and I see an

12  invoice.  Is this the only invoice you have submitted

13  so far?

14    A    Yes.  There was a $1,000 retainer, but there

15  was no invoice for that.

16    Q    Okay.  I apologize, I think I put these out

17  of order a little bit.  Let me get them back right.

18    A    That's okay.  I'm not sure they are in a

19  perfect order.

20    Q    I'm going take one more look at this maybe

21  when we take a break.

22    A    Okay.

23    Q    Take a closer look.

24    A    Sure.

25    Q    Thank you.

1    A    A CD is in there, too.

2    Q    I see that, thank you.

3    A    Two of them.  One with the photographs that

4  I had taken while I was on tour and then there is the

5  surveillance video.

6    Q    Okay, thank you.  Thank you for bringing

7  this.

8         All right.  And what is your compensation

9  rate in this case?

10    A    It's $150 an hour for document review,

11  report preparation, those kind of activities.  It's

12  $300 an hour for deposition testimony, with a minimum

13  of $1,200 a day.  Then for travel days it's $500 a

14  day if I'm going somewhere, plus travel expenses.  I

15  don't know that it's there, but I have a fee

16  schedule.

17    Q    I think I have it.

18    A    I think you do, too.

19    Q    Is that your typical fee schedule?

20    A    Absolutely.

21    Q    Okay.  So this case isn't getting a higher

22  or lower rate?

23    A    Oh, no.

24    Q    Okay.  I've looked at your invoice, have you

25  done any additional invoice on this case that you

James Upchurch
June 28, 2017                                                    9

1   have not billed for yet?

2      A    Preparation for this, reviewing, because I

3   did that report I think in April, so I reviewed these

4   documents.

5      Q    Okay.  And you reviewed the documents in

6   your file?

7      A    Um-hum.

8      Q    Did you look at anything else in preparation

9   for today's deposition?

10     A    No.

11     Q    Have you reviewed any deposition

12  transcripts?

13     A    Oh, I'm sorry, pardon me, I did.  I received

14  the deposition of Ron McAndrew, I guess it was a -- I

15  don't know if it was a deposition, but a second

16  report in addition to his initial expert report.  And

17  then Mr. Kiser's deposition, Officer Kiser, I

18  reviewed that.  That was received a couple of days

19  ago, two or three days ago.

20     Q    And, I'm sorry, I misunderstood.  Did you

21  receive Mr. McAndrew's deposition transcript as well?

22     A    No.

23     Q    Just the supplemental report?

24     A    Just the supplemental report is all I

25  recall, yes.

James Upchurch
June 28, 2017                                          10

1      Q    And had you previously reviewed

2   Mr. McAndrew's initial report?

3      A    You know, I don't have a copy of it and I

4   don't remember if I did or not.

5      Q    Okay.

6      A    But I operate from my house and so when

7   things are sent to me, you know, in email, I

8   sometimes, depending, if they are not very long, I

9   don't print them off to read them, so I may have

10   gotten it and reviewed it.  I don't remember getting

11   it, but I could have.

12      Q    Okay.  But you did review his supplemental

13   report?

14      A    Yes, I did.

15      Q    Okay.  Other than Mr. Kiser's deposition

16   transcript, any other deposition transcripts that you

17   have reviewed for this case?

18      A    I think that's the only one.  I can't

19   remember any others.  I think I would remember.

20      Q    And did you review the report of a Dr.

21   Heather Holmes, a psychologist retained by plaintiff

22   in this matter?

23      A    No.

24      Q    And you prepared a report dated April 6th in

25   this matter, which I'm going to go ahead and mark as

1   Exhibit No. 1.

2        (Deposition Exhibit No. 1 was marked for

3     identification.)

4   BY MS. HASKELL:

5     Q    Have you prepared any other reports in this

6   matter?

7     A    No.  I prepared a draft, but I think that's

8   basically the same as the draft.

9     Q    Okay.  And you didn't do a supplemental

10  report?

11    A    No, I did not.

12    Q    Mr. Upchurch, I know you have a long history

13  in corrections.  How did you first become involved in

14  corrections?

15    A    My father was in corrections and his first

16  cousin was in corrections.  They were actually the

17  superintendent and assistant at Parchman, Mississippi

18  back in 1950s and '60s -- back in the '60s actually.

19    Q    I've been to Parchman.

20    A    Yeah.  And that's where I started working

21  there part-time.  Then my dad and cousin supported

22  the wrong governor, so they were ousted, but I

23  continued to work there part-time while I went to

24  school.  You know, that's the way it worked back in

25  those days.  And so I worked part-time while I was

1   going to college, both at Ole Miss and at Delta

2   State, as an officer and as a -- basically as an

3   officer.  We weren't call an officer then, we were

4   called a guard, but I did that.

5        And then I got -- you didn't ask me this,

6   but I got drafted in '69 while the Vietnam war was

7   going on and I came back after that in '72 and

8   started back working at the prison and going to

9   school, working at night and going to school at Delta

10  State, where I got my master's degree.  And I worked

11  as an officer and as a physician's assistant, because

12  when I was in the military, I was trained to do a lot

13  of laboratory and medical stuff and so I worked in

14  that capacity.

15       And when I finished school, they offered me

16  a job, I think it was in like '75 or so, while they

17  were just creating a new Department of Corrections in

18  Mississippi.  Parchman, before that, was the only

19  facility and there was no Department of Corrections

20  and the superintendent at Parchman was it.  So the

21  new Commission of Corrections they brought in, he was

22  looking for people who happened to have education and

23  since I had just graduated and several other of us,

24  he promoted me to associate warden and I was given

25  responsibility for nine prison units, I believe it

James Upchurch
June 28, 2017                                                13

1   was nine, and I was responsible for managing those.

2   I believe that was from -- you know, it's hard to --

3   in the mid '70s.  And from there I was promoted

4   again.

5       Q    And then how did you end up coming to

6   Florida?

7       A    I was a warden in Arizona.  I took that job

8   in 1982 based on the fact that, honestly, they paid a

9   lot more and so I went out and applied and I got a

10  job at a new prison out there as warden, Santa Cruz

11  Unit at Perryville, which is Arizona Department of

12  Corrections and I worked at that for I think like 14

13  years or so.

14          And a friend of mine, well, he's a friend

15  and he worked for me when I was the warden of the

16  Arizona State Prison Complex in Florence, he had come

17  to us from Florida and he was assistant, he became a

18  unit warden.  We had unit wardens and complex

19  wardens.  Well, he was the unit warden for the

20  central unit, so he stayed for a while and worked for

21  me and then he left and got back to Florida.  When he

22  got to Florida, he got elevated to Assistant

23  Secretary of Institutions and he called me and said

24  he needed somebody to take over the Bureau Chief of

25  Security Operations job, which appealed to me because

James Upchurch
June 28, 2017                                              14

1    I like that particular job and the fact that I was

2    within driving distance, reasonable driving distance

3    to my parents, who were getting older and I never saw

4    them anymore, and so I took the job.

5        Q    And what is that job, Security Operations?

6        A    It's Bureau Chief of Security Operations.

7    It's basically having responsible for the security

8    program for the department.  We managed staffing

9    utilization.  We prepared the budgets for staffing,

10   for equipment, for security equipment.  We did

11   security inspections.  I had a security audit section

12   that went out and did security audits on all the

13   prisons.  We developed the security audit standards.

14   We provided security expertise to any of the other

15   areas within those departments, central office, you

16   know, like programs and stuff about developing

17   programs and what kind of security issues they might

18   encounter and that we could help them deal with and

19   that kind of stuff.  There's a much better

20   description on my resume, but in general it was

21   responsible for the security program.

22       Q    Okay.  And what other positions did you hold

23   with the Florida Department of Corrections?

24       A    I was -- I went from there to it was

25   variously called Director of Operations or Deputy

James Upchurch
June 28, 2017                                                    15

1   Assistant Secretary, whichever way, you know, some of

2   these titles there's working titles and then there's

3   personnel titles and so variations.  But, anyway, I

4   was over -- instead of just being over the Bureau of

5   Security Operations, I was over that bureau plus the

6   Bureau of Classifications, the Bureau of Maintenance

7   and Facilities Management, and Population Management,

8   which was responsible for moving inmates around.  So

9   there was four bureaus and I was over those and

10  worked with the Assistant Secretary of Institutions,

11  along with the Regional Directors who were the actual

12  direct line supervisors for the prisons.

13     Q    And did I see on your resume that you had

14  also served as a warden in Florida?

15     A    I did.

16     Q    And how did that come about?

17     A    We went -- during my tenure, I served under

18  nine different secretaries and one of the secretaries

19  who came was brought in from out of state and we did

20  not necessarily see eye-to-eye on some of the -- he

21  was a change agent and he wanted to do some stuff

22  with staffing and other things that I did not agree

23  with and they gave me the opportunity to go to the

24  field as a warden, and to me it was kind of like Brer

25  Rabbit in the Briar Patch, you ever hear that story?

James Upchurch
June 28, 2017                                                    16

1        So I went to Carrabelle as the warden of the

2   Franklin Correctional Institution and I was there for

3   about five or six months before that secretary and

4   his group were ousted and a new secretary was

5   appointed, who called me back and brought me back in

6   as the Director of Operations again.

7      Q     Who was the secretary that got you sent to

8   Franklin or offered you that opportunity?

9      A     Offered me that opportunity.  Bus, Ed Buss,

10  and his deputy was Dan Ronay.  And the gentleman who

11  brought me back was Mr. Tucker.

12     Q     What, just generally, what sorts of changes

13  was Secretary Buss interested in that you butted

14  heads over?

15     A     Mostly dealing with staffing reductions.

16     Q     He wanted to make reductions?

17     A     Oh, yes.  It was a -- and they made

18  reductions after I left.  It was part of this change

19  agent saving money.  This was -- a lot of this

20  happened during the time you're probably familiar,

21  all of us remember, 2009 and '10 when we had the big

22  recession and the state revenues decreased

23  significantly and everybody was -- you know, there

24  wasn't any money.  And so we started looking for ways

25  to -- and we had already done some reductions and he

James Upchurch
June 28, 2017                                                    17

1   wanted to do some more that I thought were

2   inappropriate and we had a mutual parting of the

3   ways.

4       Q    And then you left the DOC in 2015, is that

5   right?

6       A    March, March 30th of 2015, 30th or 31st of

7   2015.

8       Q    And why did you leave, did you retire?

9       A    I was -- are you familiar with the DROP

10  program?

11      Q    Yes.

12      A    I started the DROP program when I turned 62,

13  which is the latest you could start it, and at the

14  end of five years from there, then you have to

15  retire.  So mine was up on March 31st and I retired,

16  so I'm not sure -- well, I don't know, I didn't have

17  to face that question.

18      Q    Whether you would have retired then or not?

19      A    Yeah.  I was not -- there was no indication

20  I was being forced out, if that's what you mean.

21      Q    No, I understand.  I used to be a public

22  defender and we lost a lot of experienced people

23  through the DROP program.

24      A    Right.  Well, now it's not as beneficial to

25  get in the DROP program, so a lot of people don't do

James Upchurch
June 28, 2017                                                    18

1    it anymore.

2        Q    And then you started a consulting business

3    or had you been doing that all along?

4        A    I have been, since about '96 or '97, I got

5    permission to use my time off, I could take annual

6    leave to work with the National Institute of

7    Corrections and I started working with them doing a

8    security audit program, which basically was a couple

9    of things.

10           We would -- we had TA's, technical

11   assistance programs, where we would actually get

12   invited into a state and we would go and assess a

13   particular institution's security posture and try to

14   help them benefit from that and then teach them the

15   NIC methodology for doing security audits.

16           And then we had another program that we did

17   three or four times a year which would bring teams of

18   three from different departments and jails from

19   around the country and usually we would have about 18

20   to 21 of them on a group and then we would divide

21   them up and we would do a hands-on -- we would have a

22   day of classroom activity.  They would get the

23   security audit instrument and the instructions and

24   stuff on how to do it and then did a day of

25   instruction and interaction.

James Upchurch
June 28, 2017                                    19

1        And then we actually went out to the

2   institution and did a three-and-a-half day security

3   audit and assessment and then we report out to their

4   agency head.

5        I did that program -- the majority of the

6   states that I listed on my report introduction, were

7   that program, although I did also do staffing

8   analysis program, did one of the first in-class

9   presentations on staffing analysis for prisons and

10  corrections systems.

11    Q   So is the National Institute of Corrections

12  an accrediting agency?

13    A   No.

14    Q   Okay.  Can you give me some more background

15  on what that is?

16    A   It's part of the -- it used to be part of --

17  now it falls under the auspices of the Bureau of

18  Prisons, but it used to be more directly under NIJ,

19  National Institute of Justice, but they moved them

20  under -- I'm not sure why, that's been several years

21  back.  They were created a long time ago.  They

22  actually were created as a result of the disturbance

23  at Aticca, which happened back in the seventies, I

24  think, and so they started providing more training,

25  you know, provision for providing corrections

1   training.  And they do training in a lot of areas,

2   not just the ones that I participated in.

3        And we also did, in addition to the training

4   programs that I have talked about, we also did these

5   technical assistance programs where we, like, for

6   example, they had a correctional officer who was

7   murdered in a prison in South Dakota, a correctional

8   officer that was murdered in the state of Washington,

9   and they asked for NIC to send in some people to, not

10  investigate, but to look at potential contributing

11  factors and offer them some suggestions of things

12  they might do operationally to preclude it happening

13  again.  So I've done a number of those and -- did I

14  answer your question?  Did I ramble too much?

15    Q    Yeah, that example helps.  Are there other

16  topics that you have focused on with the National

17  Institute of Corrections?  And you worked as a

18  trainer in what subject areas?

19    A    Security.  The security audit instrument

20  that we used to assess prisons was very -- pretty

21  much all encompassing.  You know, security is a big

22  function in prison management, so we looked at -- I'm

23  trying to remember, there were about 20 areas that we

24  would look at and divide the team up to actually

25  audit or assess, including use of force, including

1   how they kept account of their keys, how they handled

2   visitation from a security perspective, how they

3   would do tool control, how they would keep up with

4   things that were poisonous and flammable.  There were

5   about -- as I say, it's been cut down a little bit,

6   not necessarily -- all the areas are pretty much

7   still covered, but they have been kind of collapsed

8   into about 12 or 14 areas now instead of the

9   20-something we had.

10       But when I did an assessment, I had an

11  opportunity to see every -- almost every facet,

12  because we also looked at segregation, we looked at

13  confinement units and how they ran those and that

14  stuff.  So we pretty much did just about every phase

15  of the operation of prisons, but with primary focus

16  on security.  We would even look at the education and

17  jobs programs, but from the perspective of how they

18  were managed from a security concern.

19     Q    And did you do any of those audits in

20  Florida facilities or always outside of Florida?

21     A    I actually, when I came to Florida in '96,

22  we established a security audit program in Florida

23  and that security audit program, the standards that

24  we used, the audit standards we created, were to some

25  extent the ones that were sort of modeled -- the NIC

James Upchurch
June 28, 2017                                                    22

1    instrument modeled after.

2        Q    But did you actually do any NIC audits in

3    Florida ever?

4        A    No, if you're -- well, I take that back.

5    Not in Florida Department of Corrections.

6        Q    Okay.

7        A    No, I didn't, we didn't do our own state.

8        Q    And the security audit that you put in place

9    in the 1990s, is that still used in the Florida DOC?

10       A    Yes, it is.

11       Q    Does it have a title?

12       A    It's just -- it's still under the Bureau of

13   Security Operations and it's just a security audit

14   process, I'm not sure.

15       Q    How often are those audits conducted?

16       A    They are done -- they do a security audit

17   with four to five or six, it depends, it fluctuates a

18   little over the years, auditors, who are selected

19   from out in the field who have the rank of

20   lieutenant, captain or major, who have a good

21   security background, you know, they are carefully

22   selected.  We do half of the prisons each year,

23   utilizing teams of auditors out of that five or six

24   who go in and do, for a week, do an audit.

25           The other half of the institutions not done

1   that year get a, we call it a management review

2   process, which is where the regional director

3   establishes a security audit team and they use like

4   captains and majors and lieutenants and so forth from

5   their region, from other institutions, they form a

6   team and they go in and do it.  On those kind of

7   deals, there's one of the central office security

8   auditors who leads the team.

9          So every institution gets a security audit

10  once a year.  The difference is the one that comes

11  out of central office, that half, that's an

12  unannounced, that's a surprise inspection.  The one

13  that's done from the region is announced.  They know

14  that one is going to be coming.  Otherwise, the

15  standards utilized and so forth are the same and we

16  pay great attention to making sure that the

17  department's security policies and procedures include

18  requirements for all of the standards in the audit

19  instrument, so we're not surprising people.  We want

20  to catch them doing things right is the way we like

21  to say it.

22     Q   Okay.  And have you testified in court as an

23  expert?

24     A   Yes.

25     Q   How many times?

James Upchurch
June 28, 2017                                                24

1    A    I can't give you a definitive number.  I'm

2   guessing, I would say probably five or six, maybe

3   seven.

4    Q    And approximately how many expert reports

5   have you written?

6    A    Expert reports?

7    Q    Yes, sir.

8    A    Ten or twelve.

9    Q    Have you ever served as an expert hired by

10  the plaintiff's side in a case?

11   A    I had not until recently.  I added -- I have

12  three cases now where I have been retained as

13  plaintiff expert.  And that's not because I have any

14  aversion to doing that, it's because I don't

15  advertise as an expert.  I don't have a website and I

16  don't go out and solicit.  My work has come,

17  basically since I retired, has come to me.  And the

18  work that I did, the vast majority of the work I did

19  before, expert work I did before I retired, I did on

20  behalf of the department.

21   Q    The Florida Department?

22   A    Florida Department.

23       So I haven't -- it's not my goal to be an

24  expert witness for a long period of time or to have a

25  whole lot of cases.  I enjoy it, it keeps me active.

James Upchurch
June 28, 2017                                                        25

1   I'm selective, I try to pick the cases that I think,

2   you know, are appropriate.

3        Right now I feel like I may have overdone it

4   a little bit, but I'm going to back off on that,

5   because I'll be 70 next year and so I'm going to slow

6   down.

7   Q    What are the three cases for which you are

8   working for the plaintiff?

9   A    One of them is Melissa Johnson, that's this

10  last one here, versus Rutherford County, Tennessee.

11  I've been retained, now I haven't -- I just submitted

12  a report, I don't think it's been filed or anything.

13       And then Jacqueline Smith versus Harris

14  County.  That one also is in the been retained, but

15  the report has not been.

16       And then Purnell Jackson.

17  Q    Okay.  And so what is that Melissa Johnson

18  case generally about?

19  A    It's about -- let me get them straight in my

20  mind here.

21       It has to do with an inmate who was

22  assaulted by his cellmate.

23  Q    Melissa Johnson's case?

24  A    Yes.

25  Q    And then the Jacqueline Smith case?

1    A    It's about a suicide.

2    Q    In a facility?

3    A    In a facility, yes.

4    Q    And Purnell Jackson?

5    A    It was about an assault perpetrated on the

6  plaintiff by other inmates.

7    Q    And you said, I think, that you don't

8  advertise, it's word of mouth that's getting you

9  business?

10    A    I guess you'd call it getting me business,

11  yes.

12    Q    Keeping you busy?

13    A    Yes.

14    Q    How did you hear about this case, was it

15  from the Department of Corrections?

16    A    This case?

17    Q    Yes, sir.

18    A    I was contacted, yes -- oh, not by the

19  Department of Corrections, no.

20    Q    By Mr. Angell's firm?

21    A    Yes.

22    Q    All right.  And what areas do you consider

23  yourself to be an expert in?  And I should say an

24  expert for purposes of litigation.

25    A    I think corrections operations, prison

James Upchurch
June 28, 2017                                              27

1   operations, that kind of stuff.  Anything to do with

2   prison security operations, corrections operational

3   issues.

4         I would not consider myself to be an expert

5   in specific institutional programming or

6   rehabilitation type of like cognitive, different kind

7   of -- specific program kind of offerings and stuff

8   like that, I wouldn't do that, or medical I wouldn't

9   be an expert.  But just about anything that deals

10  with managing or operating or what occurs inside a

11  prison, I think I could qualify as an expert because

12  of all my experience.  I have worked in just about

13  every kind of facility that you can work in and

14  managed them and been involved for 40 years.

15   Q    And, to your knowledge, have you ever been

16  offered as an expert in a case and had the courts

17  find that you were not qualified as an expert?

18   A    No.  No, I have not.  I have been -- and I

19  know in one of the cases that's listed on my resume,

20  I was actually -- and I -- again, I'm sort of a

21  novice, but I was actually certified to give expert

22  testimony even by the judge from the bench.  I guess

23  you know how that works, so I -- but I have never

24  been declined, no.

25   Q    So I saw on your resume a couple of cases I

1   think that relate to the first amendment, like Prison

2   Legal News?

3      A    Right.

4      Q    In those cases, were you still an expert

5   from a security perspective, I mean, it had nothing

6   to do with the -- well, actually I shouldn't say

7   that.  Tell me what your involvement was in that

8   case, Prison Legal News?

9      A    It's been a long time now, quite a while,

10  but my recollection is it had to do not with the

11  content or the issues with Prison Legal News, it had

12  to do with basically the advertisements, the stuff

13  that they were including in there that would allow

14  inmates to be able to circumvent the department's

15  rules.

16     Q    So you were still approaching it from a

17  security perspective?

18     A    Security perspective.  It was a security

19  perspective, yes.

20     Q    Have you ever been hired as an expert in a

21  case related to use of force and found the force to

22  be excessive?

23     A    No, not that -- I'm trying to remember, I

24  want to be sure I'm accurate.  The three that I'm

25  doing for the plaintiff are not that.  No, I have

James Upchurch
June 28, 2017                                                      29

1    not. I'm not sure how many of those cases are

2    actually use of force cases, but I don't recall ever

3    being where I found -- I'll tell you, in fact, as I

4    said, I try to be and I am selective about the

5    programs, the ones that I do, and when I was with the

6    department, I was certainly selective because I had a

7    lot of information and if I felt in any way that

8    there was excessive force or that there was evidence,

9    you know, that substantiated that excessive force, I

10   wouldn't take the case and I have declined.

11        And part of the reason that I get the $1,000

12   retainer is as a commitment and a retainer, but I

13   have them provide me with at least initial documents

14   that I can review to make a determination, at least

15   preliminary, as to whether I think it's something I

16   want to do or not.

17   Q    And what, in this case, did you review

18   initially to make that determination?

19   A    I don't remember exactly what I reviewed,

20   but I know that I did review some stuff.

21   Q    So there was --

22   A    I think the investigation was part of it and

23   I'm not sure what else.

24   Q    The inspector general's report?

25   A    Yeah, and the complaint.

1    Q    And going to that inspector general's

2  report, was what you have the extent of what you were

3  provided?  You didn't receive any transcripts of

4  interviews, for example, that were in the I.G.

5  report?

6    A    No, all I got was these, if you notice,

7  there's two reports here.  There's one that I think

8  is redacted, the other one is not, but I think other

9  than that, they are the same.  But I didn't receive

10  anything else, no.

11    Q    Do you know Ron McAndrew?

12    A    Yes.

13    Q    And how would you describe your relationship

14  with him?

15    A    I think it's good.  I've known Ron a long

16  time and we've -- as with most people, we have had

17  our differences of opinions about things, but I think

18  he's genuine, goodhearted, good person.

19    Q    Do you consider him an expert in the field

20  of corrections?

21    A    I think he is, yes.  Again, we from time to

22  time have different opinions.

23    Q    I'm sure.  What are the sorts of things that

24  you have disagreed with Mr. McAndrew about?

25    A    Oh, I don't know.  He's -- I know he's very

1    opposed to the death penalty and I am not.  I wish

2    there was another way, but I'm not opposed to it.

3    And I think -- I don't know, that's a pretty

4    significant difference and so I guess I would have to

5    say that.  And I'm sure that there are other things,

6    too, but I don't --

7       Q    I'm sure there are plenty of things that,

8    you know, if you start making a list with anyone,

9    you'll find something.

10      A    Yeah.

11      Q    Have you ever done work with Mr. Angell's

12   firm before this case?

13      A    No.

14      Q    Now, I saw in your file the -- now I forget

15   the term, but the evaluation, personnel evaluation

16   documents for Officer Kiser?

17      A    Um-hum.

18      Q    Did you receive or did you review his

19   complete personnel file?

20      A    I did and I have it somewhere at home.  The

21   ones that are in here, my recollection is are the

22   ones that I cited or quoted from I think in my

23   report.  That's my recollection.

24      Q    Sure.  And are there any other documents?

25   We have talked about the personnel file, the

1   documents that are in your folder, the deposition

2   transcript from Mr. Kiser, and Mr. McAndrew's

3   supplemental report.  Any other documents you have

4   looked at for this case?

5      A    None other than what I have in here that I

6   have shown you.  The post charts were in here.  The

7   post order which, you know, I was involved for years

8   in developing that, so I have a pretty good knowledge

9   of that post order.  Now, recollection-wise, after

10   two years I'm not sure, but let me see if there's

11   anything else.  Oh, there's the diagram of the dorm

12   that was in here that I received a copy of, I'm

13   almost certain I received that when I was doing my

14   tour.

15      Q    And where did you -- I think you called them

16   post charts, where did you receive those post charts?

17      A    I got them from one of the employees at the

18   department.

19      Q    And who was that?

20      A    Wes Kirkland.

21      Q    And did you request them specifically

22   because of this case?

23      A    I asked him to look at them, yes.

24      Q    And why was that?

25      A    Because I wanted to see, confirm what I

James Upchurch
June 28, 2017                                                    33

1   believed to be the staffing plan for that facility.

2     Q    All right.  Can you pull those out of your

3   folder?

4     A    Sure.  Actually it looks like there's only

5   one of them that is really current.  I mean, not

6   current, excuse me, during the time period that this

7   occurred.

8     Q    All right.  And I'm going to mark these as

9   Exhibit 2.  We'll either try to make a copy of them

10  here or have to get them later.

11    A    This one is --

12    Q    7/2/12 is the date?

13    A    Yes.  And this one is 8/20/13.  This one is

14  after the incident, so I guess this is the one that

15  would be.

16        (Deposition Exhibit No. 2 was marked for

17    identification.)

18  BY MS. HASKELL:

19    Q    Now, can you explain this to me?  I have

20  never seen this document before, just tell me what

21  I'm looking at?

22    A    Well, it describes -- it's like an executive

23  summary of the staffing plan for a prison.  It starts

24  off with the chief of security, the captains, the

25  lieutenants, sergeants and corrections officers.  It

James Upchurch
June 28, 2017                                              34

1   tells you in this case there's two 12-hour shifts,

2   there's a 6:00 a.m. to 6:00 p.m. and a 6:00 p.m. to

3   6:00 a.m.  And this is the number of staff that are

4   allocated to deal with, to address those positions.

5   The same thing in the rest of these like that.

6          These are eight hour addendums or posts that

7   are filled that would allow for these officers to

8   kind of fill gaps, work in high activity periods and

9   that kind of stuff, so that's what these are for.

10          Then you have got the people over here on

11   this five day post who work in the support, like this

12   is your extended day program officers, there's three

13   of those.  This is your security officer for the

14   laundry, supplies and laundry.  Utilities, people

15   that pick up things that others can't get to.  The

16   wellness program, which would be recreation and so

17   forth, officer assigned to that.  Vehicle gate, one

18   to cover the gates, so forth.

19          So you go down to the end and it tells you

20   how many posts there are, these are the posts.  And

21   then you have to figure out how many people you have

22   to have to keep that post covered seven days a week,

23   so you have what we call a relief factor, so you

24   multiply by the relief factor.  So it would be these

25   plus the people who cover when they're on their days

James Upchurch
June 28, 2017                                              35

1   off or annual leave or holiday or something.  So then

2   you end up with what your total complement is.

3       Q    All right.  So then if I'm looking at this,

4   let's see, I'm trying to look at one that's just one

5   unit, so like dorm N here, it's got one eight-hour

6   shift and then one person assigned for each shift, so

7   one person 6:00 a.m. to 6:00 p.m. and one person 6:00

8   p.m. to 6:00 a.m., is that right?

9       A    Yes.  They have 24-hour coverage, two

10  12-hour shifts with one person.  And these here, like

11  this day shift one, would generally work during the

12  time when most of the activity is going on.  That

13  could be -- they have flexibility from what hours

14  they are going to work, but they work eight hours,

15  would be during the day when the inmates are out.

16  And this would be, in the evening shift would be a

17  second person that would be there like from say 3:00

18  in the afternoon until 11:00, for example, when they

19  go to bed, so that would give you an extra person

20  there.

21      Q    Okay.  And then for the housing sergeant for

22  dorms D, E, F, that's the same thing, one person is

23  there for 24 hours?

24      A    One person is there 24 hours, yes.

25      Q    Covering D, E and F?

1    A    Covers three dorms, right.

2    Q    Okay.  And so then housing officer D, E, F

3  is three people, 24 hours, so a total of six people?

4    A    Yes.  There should be one officer in each

5  dorm all the time.

6    Q    Okay.

7    A    And then there's this other one that they

8  could put -- it shows it on this swing shift, so that

9  would mean it would probably be in the evenings and

10  that would be kind of floating between the three.

11    Q    And let's see, you have two different sheets

12  here, one 8/20/13 and one 7/2/12.  How often would

13  these charts get updated?

14    A    Depends on if, for example, there's a change

15  in the -- like we take a building completely off

16  line, shut it down, don't use it anymore, then we

17  change it.  If we adjust the population in a certain

18  place, we might change it.  If for some reason, as I

19  was talking about, say a new secretary wants to cut

20  positions, then they could be adjusted.

21    Q    And when you asked Mr. Kirkland for these

22  charts, what time period did you ask for?

23    A    I asked primarily -- I asked for the period

24  from around this incident, which is what that --

25  that's why I say only one of them is really --

James Upchurch
June 28, 2017                                    37

1    Q    So do you think there's one for a date

2  between these two dates?

3    A    Oh, no, no.

4    Q    Okay.  So it would have been updated on

5  7/2/12 and then not again until 8/20/13?

6    A    That's right.  I can't say that for sure,

7  but he would have sent it to me.

8    Q    And you also visited Sumter in preparation

9  of this report?

10    A    I did.

11    Q    And why did you choose to do that?

12    A    Because I wanted to -- I've been in

13  practically -- I don't think there's a dorm in

14  Florida that I haven't been in at one time or

15  another, but I wanted to refresh my memory of what it

16  looked like and what the sight lines were and how

17  they were being used at the time that, you know,

18  how -- what kind of -- I'm not sure, Sumter -- you

19  know, missions change in the department and sometimes

20  an institution that houses elderly inmates will all

21  the sudden will move the elderly inmates and they

22  will end up with the general population cross

23  section.  So we move admissions around and when you

24  do, sometimes the way you operate that section will

25  change, depending on population or how you would

1    manage it.

2         And, you know, the wardens they have some

3    discretion in, you know, I'm not saying -- there's

4    policies and department mandates and so forth, but

5    they have some discretion in how they manage their

6    institution, so I wanted to see what it looked like

7    and kind of refresh my memory.

8      Q    How long do you think it had been since you

9    had been to Sumter?

10     A    I would have to really speculate on that.  I

11   mean, I have no -- I can't remember a specific reason

12   that I would have been, other than I do vaguely

13   remember, I think, when we were considering putting

14   youthful offenders there, we made some changes and we

15   fenced off some areas, created some more education

16   program space and some things like that.  There were

17   several changes that were being contemplated and I

18   went down and looked at those.

19     Q    And about when would that have been?

20     A    I have no -- I could not -- I would have to

21   just --

22     Q    I mean, more than 10 years ago?  I guess is

23   it fair to say it was before the youthful offenders

24   got moved to Sumter?

25     A    Yes, yes, absolutely.

James Upchurch
June 28, 2017                                                        39

1    Q    All right.  So you wanted to refresh your

2    recollection about the dorm?

3    A    Yeah, I wanted to go look at what I was

4    going to be talking about.

5    Q    Did you request the inspection?

6    A    Yes.

7    Q    Other than F dorm at Sumter, had you been in

8    dormitories that were the same layout or that same

9    floor plan that you talked about?

10   A    The department has -- and, again, I hesitate

11   to speculate, but the department has literally

12   hundreds of dorms like that, that general layout.

13   These dorms are -- the ones that -- the majority of

14   the dorms that are laid out like that actually hold

15   144 inmates, they have a 72 -- approximately 72

16   inmates per side capacity.  And these two dorms

17   obviously are smaller, but the design, as best I can

18   tell, is the same.

19   Q    Now, those dorms that hold 144 people, are

20   they the same size in terms of square footage?

21   A    Oh, no, no.  They would be -- they couldn't

22   be, because we have square footage minimums that we

23   have to have for each inmate for living space and so

24   forth in terms of establishing capacity, so they are

25   bigger than this.

James Upchurch
June 28, 2017                                                40

1      Q    And with the 144 person bed capacity, would

2   it have the same officer ratio, I guess one officer

3   per dorm at any time?

4      A    In the majority of cases with the 144, no,

5   it would be -- the way it's staffed now, it would be

6   two officers on duty, according to the post chart,

7   two officers authorized, from in the morning through

8   the time that the inmates are in bed, and then there

9   would be one at night, plus there would be a sergeant

10   assigned to that dorm.

11      Q    And a sergeant would rotate between that

12   dorm and other dorms?

13      A    No, be assigned to that dorm.

14         That's if -- that's the design and the post

15   chart and the way it is designed to be staffed.  The

16   difference here is if we say on this post chart we

17   need this many people, but we're told that we don't

18   have enough money to pay those people, we have to

19   reduce that, so what is on the post chart that's

20   needed may not actually be there.  It's really -- do

21   you want to hear all this?

22      Q    I just want to understand this document and

23   the capacity of the F dorm.

24      A    The deal is is that at 80 it was determined

25   that we felt like at the time -- now, I'm not sure,

1   when I say we felt like, that could mean we felt like

2   or that was what we had available, we were making

3   hard choices to decide what to put where, but we

4   ended up thinking that because they only had 80, that

5   we could put one officer in that dorm and a sergeant

6   rotating.

7         A lot of these, the 144's that we're talking

8   about, they will operate because of staffing

9   shortages from time to time with just one officer.

10   Q    Well, what were you referring to when you

11   said at 80?

12   A    The capacity of this dorm, if it's filled

13   up, is 40 on each side, approximately 80.

14   Q    So the one officer with the rotating

15   sergeant?

16   A    Yes.

17   Q    That's what had been contemplated for

18   staffing?

19   A    But I'm not sure that that was contemplated

20   with the idea that that was going to be youthful

21   offenders.  My recollection is that that was based on

22   that population and that may have been, and I don't

23   recall and I can't say for sure, that may have been

24   the staffing when there were adults in here.  And I

25   would say considering the fact that my understanding

James Upchurch
June 28, 2017                                              42

1    is now that there's -- they operate these dorms with

2    just over 40 inmates in them, that managing 80

3    youthful offenders in this kind of dorm with one

4    officer is very difficult.

5       Q    Well, what is your understanding that these

6    dorms typically have 40 youthful offenders in them,

7    what is that based on?

8       A    Based on my discussions when I made my tour

9    and the -- I think there was an assistant warden,

10   Mr. Valez, was with me and Mr. Kiser and (indicating

11   to counsel).

12      Q    Mr. Angell?

13      A    Yes.

14      Q    Okay.  Anyone else, Assistant Warden Valez,

15   Mr. Kiser and Mr. Angell, anyone else on your tour?

16      A    There were other officers, I don't remember

17   what exactly their functions were, but we ended up

18   they came into the dorm while we were there and we

19   did talk to them and came into control.  I don't

20   remember their names or what their role was, what

21   post they were on when we saw them.  They had some

22   reason to be there, but I can't remember what it was.

23      Q    And how long did you spend touring Sumter?

24      A    I think about two hours.  I'm not positive,

25   but I think.

1    Q   And other than that floor plan --

2    A   And the picture.

3    Q   And the photographs, were you provided with

4  any other documents during your tour?

5    A   Not that I recall.

6    Q   And when you got to Sumter, did you sit down

7  and talk with anyone or did you go directly into your

8  tour?

9    A   No, I went in and talked to the warden that

10  was there, whose name I cannot recall.  It was not a

11  warden that I was familiar with.  I mean, I knew him

12  vaguely from another position.  But I went in and

13  always when I go to a prison, I go in and talk to the

14  warden, it's protocol, so I went and spoke to him and

15  Mr. Valez was there and I don't know who all else was

16  in the room.

17    Q   Was Mr. Kiser there then?

18    A   I don't know.  I don't remember.

19    Q   Did you speak with the warden -- at that

20  time did you speak with him about the incident in

21  question in this case?

22    A   I don't remember any discussion.  I

23  probably, you know, I don't remember, but I'm sure I

24  told him why I was there.

25    Q   And then did you ask him about Officer

1  Kiser, what kind of officer he was or anything?

2    A    Huh-uh, no, I didn't.

3    Q    What about the Assistant Warden Valez, did

4  you ask him about Officer Kiser?

5    A    I may have.  I don't recall.  I remember

6  spending a lot of time walking with him, but I think

7  the time that I was with him, I was also with

8  Mr. Kiser, so I probably wouldn't right in front of

9  him have said what kind of officer is he, and I don't

10  think I was alone with him.

11    Q    Okay.  So did you not meet with Mr. Kiser

12  alone?

13    A    No.

14    Q    Did you ever, you know, sit down and talk

15  with Mr. Kiser or did you just talk to him while you

16  were walking around?

17    A    As we were walking, he walked beside me and

18  I just talked to him about -- I didn't interrogate

19  him, I just talked to him in general about his work

20  and what he did and all that kind of stuff, just

21  general conversation about his job and about him.

22  Just trying to, as much as is possible, you know, in

23  a short period, relatively short period of time, just

24  kind of gauge where he was coming from.

25    Q    And why were you doing that?

James Upchurch
June 28, 2017                                                45

1      A    I wanted to feel comfortable that -- you

2   know, I had reviewed his record.

3      Q    His personnel record?

4      A    Yes.  And I had, as I indicated in my

5   report, I had noted the evaluations that he had

6   received and I just wanted to kind of feel him out.

7   Quite frankly, in my opinion, if a person, in my

8   opinion, is sick enough to know about and let

9   somebody be treated the way R.W. was and not

10  intervene, there should be some kind of -- possibly

11  be a signal, some kind of indication that, from being

12  around 69 years and talking to a lot of inmates and

13  staff, that I might be able to pick up.  So in an

14  informal way, that's what I tried to do.

15     Q    So you used that conversation with Mr. Kiser

16  to determine if he was, to use your words, sick

17  enough to know this was happening and to ignore it?

18     A    To make at least -- to add to what I already

19  knew about him based on that review of his record.  I

20  wanted to -- I know that personal interpretations of

21  people or what you believe them to be can be wrong,

22  but they can also be valuable and I wanted to add

23  that to what I had already been able to pick up and

24  review in his record, just so I could feel more

25  comfortable in feeling that it didn't appear to me

1  that he could do that.

2      Q    And what did you take away from your

3  conversation with Mr. Kiser?

4      A    I got the -- I didn't -- it was more what I

5  didn't see.  I didn't see an agitated, angry,

6  somebody who appeared to be hiding something.  He was

7  very open in our discussions and talked very

8  straightforward to me.  And the way -- just that and,

9  again, combined with what I had read about him and

10 what I had seen in his record, I saw nothing in him,

11 about him or in his record that to me would support

12 or justify his doing what he was accused of doing.

13     Q    And did you view that as your sort of role

14 or assignment in this case, to make an ultimate

15 determination as to whether Officer Kiser saw the

16 attack of R.W. and ignored it?

17         Actually let me ask a more open question.

18 What was your task in this case?

19     A    I think, as I understand it, it was to

20 determine, which I am fairly familiar with as a lay

21 person and from my experience over the years, if he

22 was deliberately indifferent.  Did he know that this

23 was happening and not do anything about it.  I guess

24 that's kind of -- and I guess to establish the

25 possibility or the probability of whether he could

James Upchurch
June 28, 2017                                                    47

1   have been where he was and did what he did and not

2   have known.  So I basically was getting to whether he

3   knew and did nothing.

4       Q    And you said you spent about two hours at

5   Sumter?

6       A    I believe that's right.

7       Q    How much time did you spend actually in F

8   dorm?

9       A    I think the majority of that time, but I'm

10  not sure exactly how much.

11      Q    Did you see any other areas of the prison,

12  any other dorms?

13      A    I saw them from the outside.

14      Q    Right, you didn't go into any other dorms?

15      A    No.

16      Q    Did you go into confinement?

17      A    No.

18      Q    And what were your impressions of F dorm?

19  I'm sure it was really tidy when you went in for your

20  visit.

21      A    It was extremely tidy, so you picked up

22  exactly, yeah.  It was very clean, very orderly, very

23  put together.  I'm not sure what you mean by

24  impressions, I mean, those things for sure.

25      Q    Okay.  You said that there are possibly

James Upchurch
June 28, 2017                                                    48

1    hundreds of dorms in the DOC that are the same style

2    as F dorm in terms of the layout?

3        A    Back in the early nineties in the

4    department, there was this population boom in inmates

5    in the state and we had to -- I was not here then,

6    but they had to build a whole lot of bed space very

7    quickly and so they -- these are not really -- this

8    prototype, so to speak, now, this is a small

9    prototype, but the larger prototype, it has wood

10   trusses, it's a wooden building, so it was very easy

11   and quick to construct, so as a result, there were a

12   large number of those built.  And I could be -- I

13   know there's more than a hundred -- I know there's

14   less than 500 probably and more than 150, but

15   somewhere there's a large number of them around the

16   state in different prisons.  Don't pin me down to it.

17       Q    That's my job.

18       A    I know it is, but this is my job.

19       Q    I'm going to attach floor plan as Exhibit 3

20   so we can keep that clear if we keep referring to it.

21       A    Okay.

22           (Deposition Exhibit No. 3 was marked for

23   identification.)

24   BY MS. HASKELL:

25       Q    What is the purpose of this sort of design,

James Upchurch
June 28, 2017                                              49

1   other than building it fast, is there a method to the

2   layout?

3      A    It's to try to -- as opposed to putting the

4   control room at one end or the other end or in an

5   office where you can't see, it's supposed to be so

6   that you can have some visibility of what's going on

7   in the prison.

8      Q    I think the words you used in your report

9   were optimum visibility?

10     A    It's supposed to, yes.

11     Q    Okay.  Why do you say supposed to?

12     A    Well, if you looked at the pictures, the

13  control room, because of the design, has to be fairly

14  long, and because there's an entrance back here in

15  the back that you come into and out of, there's

16  things that have to fit in behind it and so it ends

17  up being rather long.  And then to try to get the

18  sight lines, it looks like in here that you have got

19  this -- you know, that you can just see everywhere,

20  but I knew before I went down there that that's not

21  the case, from having been in a lot of these, that

22  there are things you can't see.  It doesn't look like

23  in this picture that you -- you can't see any of the

24  bunks on this side and because it distorts the

25  reality, I mean, you can walk over here a little bit

James Upchurch
June 28, 2017
                                                              50

1   and you can see and you can walk over here and you

2   can see.  And it makes it look like in here that

3   somebody standing right here has this -- that window

4   looks really huge.

5       Q    And you're pointing to the officer's

6   station, so when you said you can walk over here and

7   see, you're saying you can walk to areas in the

8   officer's station and see over here to the back of

9   the dorm?

10      A    Right.

11      Q    Whereas in other areas of the officer's

12  station, you might not be able to see?

13      A    Right.

14      Q    But the officer's station generally is

15  designed so that you can walk around the officer's

16  station and get a view of all the different parts of

17  the dorm?

18      A    Almost all, yeah.

19      Q    Okay.  What are the areas that you can't

20  see?

21      A    Well, there's areas back in here that you

22  can't see (indicating).

23      Q    What are you pointing to?

24      A    Back behind the plumbing chase wall.

25      Q    So the back of the bathroom?

James Upchurch
June 28, 2017                                                51

1    A   Yes, that you can't see.  Behind some of

2  these walls here (indicating).

3    Q   The walls dividing the toilets?

4    A   Yes, I'm sorry.

5    Q   And the urinals?

6    A   You're doing my job for me, thank you.

7        But, otherwise, you have a pretty good view.

8  Now, the other thing to remember about that is at the

9  same time that the officer -- and we thought about

10  doing this at one time, but we didn't for another

11  reason, but at the same time that the officer can

12  walk around and see all this, all the inmates can see

13  him walking, they know where he is.

14    Q   Sure.  What are the responsibilities of the

15  dorm officer?

16    A   Oh, my gosh, well, you have a copy of the

17  post order.

18    Q   I do.

19    A   Okay.  And there are a myriad of other

20  responsibilities.  Probably the biggest one is to see

21  and be seen, but there are also responsibilities

22  associated with maintaining and accounting for all

23  the equipment in the dorm, answering phone calls,

24  radio communication, answering questions from inmates

25  on both sides who that frequently happens.  Trying,

James Upchurch
June 28, 2017                                              52

1    if you see an inmate violating a rule, like sitting

2    on another inmate's bed or invading another inmate's

3    space or you see two or three of them hanging out

4    here back in the corner and they look like they are

5    doing something, you check on it, or in some cases

6    you can knock on the window and get their attention

7    and call them back.

8         At the time I was at Sumter, I did notice

9    that there were no locks on the inmate's footlockers

10   and that's very problematic in terms of theft and

11   trying to keep an eye on them in case of theft.

12   Q    So the dorm officer is kind of trying to

13   keep his eyes --

14   A    On everything.

15   Q    On everything, okay.

16   A    And not leave any space totally unattended

17   for too long if you can avoid it.  Recognizing that

18   if you go to a small space, that you can very likely

19   leave a large space open.

20   Q    So are they moving around a lot?

21   A    They should.

22   Q    Well, I saw on the dorm logs, I think, that

23   they are doing rounds every, I think Officer Kiser

24   testified every half hour or so?

25   A    Yeah.

James Upchurch
June 28, 2017                                                  53

1    Q   Is that right?

2    A   Yes, approximately.

3    Q   By is that right I don't mean is that what

4  Officer Kiser said in his deposition, I mean is that

5  what is typically expected?

6    A   Yeah, that's right, not what he said, but

7  that's right.  But with the understanding that, you

8  know, that can be an issue that's come up before, you

9  know, you're supposed to do them every 30 minutes,

10  but there may be something happening you don't get it

11  done right then and you have got another time or

12  whatever, but generally it's the 30 minute round.

13    Q    And if you don't get it done in 30 minutes

14  because something came up, so say there's a 45 minute

15  gap between those rounds, the log would show the 45

16  minutes, right?

17    A   It should.

18    Q   You would -- if you were the officer doing

19  that round, you would note the time of the actual

20  rounds that you did?

21    A   You should.

22    Q    You gave an example of, you know, three

23  prisoners may be up to something on the dorm as

24  something that might attract the dorm officer's

25  attention or that he should investigate?

James Upchurch
June 28, 2017                                                    54

1    A    It would depend on what it appeared they

2   were doing.  If there was a locker open and they

3   looked like they were pilfering, then, yes, but just

4   because there's three of them talking, I mean, they

5   do congregate and hang out together.  You know, you

6   have to kind of get to know, as an officer you sort

7   of get to know your inmates and, you know, their

8   normal movements and who they normally hang out with

9   and that kind of stuff.

10    Q    Okay.  So a group of prisoners congregating

11   could be something that would arouse suspicion or

12   require additional investigation or it could be

13   something that was --

14    A    It could be just part of normal.

15    Q    But it could be something that requires

16   investigation?

17    A    Yes.

18    Q    How much time would you expect a dorm

19   officer to spend in the officer's station during

20   their shift?

21    A    I don't know that I could put a time on that

22   because, you know -- I guess it would depend on what

23   he is doing, but when he is -- you know, there's only

24   certain facilities that we even let the officer leave

25   the officer's station.

1    Q    So in a facility like Sumter or in F dorm in

2    particular, the officer is doing rounds, correct?

3    A    Should be, yes.

4    Q    So he does leave the officer's station?

5    A    He does, yes.

6    Q    So would you expect that at the end of a 12

7    hour day, a dorm officer would have spent more time

8    in the officer's station or more time outside the

9    officer's station?

10    A    My expectation of what I know about what a

11    normal officer would do, probably more in the

12    officer's station.

13    Q    More inside the officer's station?

14    A    Yes, significantly more.

15    Q    And why is that?

16    A    Just because of my 40 years experience in

17    doing a lot of reviews and checking and walking

18    around institutions.  I don't expect from them

19    anymore than when I was an officer and I don't expect

20    them to be out there walking around all the time

21    anymore than -- I mean, it's just not realistic.

22    Q    All right.  So they can do their dorm

23    management from the officer's station, in large part?

24    A    A lot of it, yes.

25    Q    What are the responsibilities of an officer

1    in charge?  OIC, is that a term you're familiar with?

2      A    I'm familiar with OIC.

3      Q    And we can narrow it to this specific, you

4    know, Sumter youthful offender.  Would the OIC be

5    someone who is on the security post chart, for

6    example?

7      A    Usually the reference to OIC, I mean, that

8    I'm familiar with, it could either be the sergeant or

9    lieutenant or it could be, you know, whoever is over

10   the shift or it could be someone acting in that

11   person's capacity is the officer in charge.  So it's

12   the person that's -- it would be the officer in

13   charge of whatever the designation he is in charge

14   of, which I'm not sure, I mean, I'm not sure what

15   exactly you mean by that.

16     Q    Well, in this case, I do know that in the

17   inspector general's report?

18     A    Yes, ma'am.

19     Q    One of the officers, I think -- now don't

20   quote me on this, but I think it was Captain Boyd,

21   but I can find it, had referred to himself as I was

22   the officer in charge that day or the OIC on that

23   day?

24     A    Okay.  Well, in that context he means that

25   he was the senior officer and he was in charge of the

James Upchurch
June 28, 2017                                                     57

1   facility that day.

2       Q    In charge of all of Sumter that day?

3       A    Yeah, that's the way I would interpret what

4   he just said, but I don't -- I'm not sure there's an

5   all encompassing officer in charge definition, I

6   mean, there's just one.  Officer in charge could be

7   different things.  It's just somebody in charge of

8   whatever.  They could go in and say there's four

9   officers doing something and one of them could be the

10  officer in charge of that.

11          But I think in the terms you're talking

12  about, it would be the person that's responsible for

13  the institution operations.

14      Q    Okay.

15          MS. HASKELL:  Can we go off the record?

16          (Brief recess taken.)

17  BY MS. HASKELL:

18      Q    Mr. Upchurch, can you please tell me what

19  your opinions are in this case?

20      A    Well, the ones that I put in my report.  I

21  guess the most significant one is that I was just

22  unable to determine that there was factual support

23  for the idea that Officer Kiser observed this

24  happening and did nothing about it.  Not that --

25  especially considering that he denies that he saw it.

James Upchurch
June 28, 2017                                          58

1    I don't see enough factual information to convince me

2    that he is lying.

3         I don't know what he was doing in the 30

4    minutes when that was occurring, or part of that time

5    was occurring, because we don't know how long it

6    actually occurred, but he very well could have been

7    doing something work related or unwork related or in

8    the control room and did not see or know that this

9    was happening.  And I don't think there's enough or

10   there is sufficient factual basis to affirmatively

11   say that he knew this was happening and he did

12   nothing about it.

13     Q    But can you say conclusively that he did not

14   know this was happening?

15        MR. ANGELL:  Form.

16     A    No, no, I don't think anyone can, other than

17   him.

18   BY MS. HASKELL:

19     Q    And you said that he denied that he saw the

20   attack on R.W.  Did he make that statement to you?

21     A    No.  What I'm talking about is in his

22   reports he says that he did not see anything, which

23   to me is the same thing as denying that he saw it.

24     Q    Now, in your report, I believe you state the

25   opinion that Officer Kiser was not deliberately

1    indifferent to what happened to R.W.?

2        A    And that's based on what I just said.

3        Q    And we talked a bit about this already, but

4    that's also based on your review of Officer Kiser's

5    personnel file and your conversation with Officer

6    Kiser?

7        A    That contributed to it as well.

8        Q    And is it your opinion that Officer Kiser

9    wishes that he had been aware of the attack on R.W.?

10       A    It is my opinion.

11       Q    And what is that based on?

12       A    Based on my conversation with him.

13       Q    You asked him that?

14       A    Not that specifically, no.

15       Q    Okay.  What --

16       A    Just talking about the incident, he was not

17   flippant or he didn't approach it in a way that

18   was -- he took it very seriously and I did not get

19   the impression that he was -- that it didn't mean

20   anything to him.  I didn't ask him straight out, no.

21       Q    Okay.  So you base that opinion on --

22       A    My observation and conversations.

23       Q    Okay, your observation and conversations

24   with him.

25            Prior to this case, had you ever heard the

James Upchurch
June 28, 2017                                                    60

1   phrase test of heart?

2      A    Yes.

3      Q    Okay.  And where did you hear it?

4      A    I heard it when I was working in the

5   department.  I heard the -- and because I have -- and

6   since I have been involved in this, I have banged my

7   head there trying to put times and time frames and

8   stuff with it.

9      Q    And what did you come up with?

10     A    Not much.  I just -- when you're responsible

11  for 56 prisons and 20,000 officers and approximately

12  100,000 inmates all over the state, there are things

13  happening all the time, good things and bad things,

14  and I do remember that term.

15        A lot of things that were happening in

16  individual institutions, things that happened in an

17  individual institution, the initial person

18  responsible for addressing it was the warden, and

19  along with the warden was the inspector general's

20  office who would follow up.  And until -- while the

21  investigation is in process, particularly if it's a

22  criminal investigation, the warden was excluded, I

23  mean, the investigation was relatively confidential.

24        But once that is completed, there's a review

25  and there's an assistant regional director, there's a

1   regional director, there's various levels that deal

2   with these things before they would get up to me.

3       I don't remember it being like a recurring

4   type of issue.  Now, that's just my recollection.

5   I'm not going to speculate anymore.  I will tell you

6   that I have heard that term.

7       Q    Okay.  And what does the term refer to?

8       A    It's like proving who is the baddest, you

9   know, sort of a physical macho kind of thing.  As I

10  said in my report, it's almost -- it could be related

11  to hazing, you know, another term for it was

12  bulldogging, where you physically threaten people to

13  get things from them.  And test of heart I guess is

14  just proving your, from what I gathered from reading

15  here, proving your willingness to stand up for

16  yourself.  That's all I know.

17      Q    Do you know if test of heart typically

18  involves weapons?

19      A    Not that I'm familiar with, no.  That

20  wouldn't surprise me, though.

21      Q    Okay.  Why do you say that?

22      A    Because if weapons are available and there

23  is a test of heart to see who is going to dominate

24  then, yes, they would probably be used, but I'm not

25  saying it from any particular knowledge of the

James Upchurch
June 28, 2017                                                    62

1   process.

2      Q    While we're on the subject of weapons, I

3   think you mentioned in your security audits the

4   subject areas of tool control?

5      A    Yes.

6      Q    And keeping flammable items in particular

7   areas?

8      A    Lots of things, yes.

9      Q    Okay.  What is the proper protocol for

10  storing mops and brooms in a dorm?

11     A    When they are not in use, they should be

12  secured.

13     Q    Under lock and key?

14     A    Yes, when not being used, yes.

15     Q    And who keeps the key to where the mops and

16  brooms would be?  Is there a cleaning closet

17  typically?

18     A    Yes, janitor's closet.

19     Q    Who would have the key to that?

20     A    The correction officer.

21     Q    I think you mentioned that the dorm officer

22  is responsible for equipment and keys and things?

23     A    The ones that they accept responsibility for

24  when they take the shift?

25     Q    Right.

James Upchurch
June 28, 2017                                                    63

1     A    Yes, they are responsible for those things.

2    And my knowledge is that they have a key that will

3    open the janitor closet.

4     Q    Do you know if test of hearts are more

5    common at youthful offender facilities than at adult

6    facilities, if you know?

7     A    I don't know, but youthful offender

8    institutions are prone to more fights and to more

9    macho kind of who is the baddest and all that kind of

10   stuff and so I would not be surprised that there

11   would be more of that at a youthful offender unit.

12   Most of the adults have already established which

13   ones are the baddest.

14    Q    And why are those things more common in Y.O.

15   facilities?  I mean, is it because it's already been

16   established at the adult facilities or are there

17   other differences?

18    A    Well, just they are young, they don't have

19   experiences to -- you know, they want to settle

20   things out and then they have got all this

21   testosterone and, you know, they are all amped up and

22   they come from environments where they, you know,

23   fittest and who is the toughest.  And so there are

24   certainly, in my experience, certainly more fights

25   and more assaults in youthful offender units and

James Upchurch
June 28, 2017                                                    64

1   juvenile institutions even than there are in -- the

2   older the prison gets, the less trouble and the less

3   trouble they cause and the less trouble they are to

4   each other in general.

5       Q    Well, as a result of that difference, do the

6   Y.O. dorms require a different type of supervision

7   than the adult dorms?

8       A    Ideally they should be more closely

9   supervised.

10      Q    What does that mean in terms of more closely

11  supervised?

12      A    Well, I guess one of the questions that came

13  to mind for me when I was there was, you know, they

14  had closed one dorm to do renovations and moved the

15  inmates over to that other dorm, so they had

16  basically doubled the population that was in there.

17  I didn't ask the question, but I kind of got an idea

18  that I would guess what the answer is, why they

19  didn't move an officer over there with them.  Because

20  if that dorm had been open, they would have had to

21  have an officer in that one and one in that one and

22  there would have been two people there, which in that

23  scenario, which is the much better scenario, you have

24  someone to run the control room and you have someone

25  who -- and they can alternate -- who can walk around

James Upchurch
June 28, 2017                                                              65

1  constantly, interact with the inmates, talk to them,

2  supervise them and that kind of stuff.

3       The basics for that design is to have two

4  people.  It's supposed to be -- there's two ways of

5  managing a prison housing unit.  There's direct and

6  indirect supervision.  Indirect being that someone is

7  in the control station and that they are viewing and

8  watching.  Direct supervision, which is practiced in

9  a lot of, especially in a lot of jails, is the staff

10  member, there is no control, separate control module

11  where people are just observing.  The person is out

12  on the floor and they are constantly moving and

13  interacting with the inmate population.  In practice,

14  they end up sitting at a desk that's on the floor a

15  lot instead of moving.

16       But the way we designed this to work,

17  ideally there would be two people.  That's why when

18  we, as I told you with the 144 standard housing, you

19  have two officers and a sergeant.

20  Q   But I thought you said that there were some

21  dorms like this where the dorm officer wasn't even

22  permitted to leave the officer's station?

23  A   Yes, and that would -- that's what I'm

24  saying.  If you have one of the bigger dorms, not

25  these, where the inmates are an HO4, HO5, the more

James Upchurch
June 28, 2017                                                        66

1   risk level inmates, then the officer stays in the

2   officer's station and you have an officer out here.

3   The idea is, for security purposes, is that the

4   officer on the floor carries no keys, and if they

5   don't carry keys, then they are not a target.  They

6   can also walk around and if they are out there and

7   somebody attacks them, this officer in the bubble, in

8   the control, is watching their back, so they can

9   immediately call for support if someone were to

10  attack them.  Or if they, you know, obvious from

11  watching them, that they are having some kind of a

12  confrontation.  So ideally there would be two people.

13      Q    Okay.

14      A    Having one there to keep up with that

15  particular population, with the kind of things that

16  they do, would be difficult.

17      Q    Well, what do you mean by that particular

18  population?

19      A    The youthful offender population.

20      Q    And what do you mean by the kind of things

21  that they do?

22      A    Well, like, for example, most institutions

23  do not have -- have not taken the locks away from

24  their inmate's footlockers.  The reason they did it

25  in this one is because they were putting them in

1   their socks and hitting each other with them, which

2   makes a terrible weapon.  Most institutions don't

3   have the kind of fighting and things that I talked

4   about before that I think if you talk to anybody,

5   including Ron, he will tell you that this population

6   is difficult to manage.

7         I think it's reflected here, kind of, the

8   recognition of that to a certain extent, although I

9   can't say that I was involved in doing it, because I

10  wasn't, I've been gone, that they only had 40 in this

11  dorm and 40 in this other one, when they could have

12  had 80, is that they recognized how difficult it was.

13  Q    So they recognized that --

14  A    That it's difficult.

15  Q    -- fights are more common?

16  A    Yes.

17  Q    And that these test of heart attacks could

18  happen?

19  A    Yeah, whether they were called that or not.

20  Q    These sorts of hazing?

21  A    Yes.

22  Q    Macho fights?

23  A    Yes.

24  Q    To prove who is on top?

25  A    Yes.

James Upchurch
June 28, 2017                                        68

1    Q   Okay.  So is it fair to say that Officer

2  Kiser should have been familiar with that culture as

3  well?

4    A   Since he worked in there, I would think so.

5    Q   Okay.  Now, presuming, for argument's sake,

6  that Officer Kiser did see a bunch of youthful

7  offenders going into the bathroom and knew that it

8  was because a test of heart or this attack was going

9  to happen, if he had seen that and knew that, what

10  should he have done in that situation?

11    A   He should have moved immediately to a

12  position where he could observe what was happening

13  from the best vantage possible and get on his radio

14  and call for backup, for support.

15       We have what we call an ICS type of a

16  program for emergency response and if he would have

17  called for the A team, that team to back him up,

18  there would have been a number of people there very

19  quickly.  That would be the normal response,

20  especially involving multiple -- if it involved

21  multiple inmates.

22       If it was a one-on-one fight or something

23  like that and he knew the inmates and he felt that he

24  could go out there and disband them, he would

25  probably still call to make sure that people know

1   that he was leaving his station and that he was

2   going, but he would go out there and try to just

3   discourage them or break it up himself.  That's

4   taking a little risk, but sometimes they do it.

5       Q    And what if he had learned about the attack

6   after the fact, is there anything he should have done

7   then?  Say like later in the day if he had learned

8   that R.W. was attacked -- let me rephrase.

9          For the sake of argument, say he had

10  observed R.W. with injuries, is there something that

11  he should have done then?

12      A    Later in the day?

13      Q    Yes.

14      A    He should have done what -- if he had

15  observed it, he should have done what the officer in

16  the chow line did.  The thing that's important here,

17  though, is the officer in the chow line did not

18  observe him having -- initially did not observe him

19  to have injuries.  He observed him being evasive.  He

20  caught his eye because R.W. was trying to get by him

21  in a quick way and he picked up on that sign to stop

22  him.  And it could have been because of injuries or

23  it could have been because he had something on him he

24  wasn't supposed to have, it could have been a lot of

25  reasons, but he did stop him and check on him.

James Upchurch
June 28, 2017
70

1    Q    Okay.  So officers are trained to recognize

2    those sorts of behaviors or changes in behaviors and

3    respond?

4    A    Well, they are trained to a certain extent,

5    but some of it's just, you know, if you have got --

6    that's one of the reasons why when we move people

7    around on the compound or take them to the dining

8    hall and stuff, we -- not march them, but they go two

9    abreast, and in the youthful offender unit sometimes

10   they do march them.  But if one of them is -- if

11   they're going by you and all the sudden one of them

12   starts to duck to the side, it doesn't take a whole

13   lot of training to figure out that you might want to

14   figure out what he is doing.

15   Q    When I asked you if Officer Kiser had seen

16   the fight or seen the fight about to happen, what he

17   should have done and you described calling on the

18   radio for backup, getting to a vantage point where he

19   could see, is that response something that's specific

20   to the youthful offender dorm or would that be the

21   case in any dorm?

22   A    That would be the response in any dorm.

23   They are trained -- you don't ever want to go into a

24   situation where you are outnumbered or even the

25   potential that you could lose, because if you lose,

1  then you're in bad shape, I mean, if you get -- if

2  the advantage goes to the inmates.  So we always

3  train them to call for backup first.

4      Q    And then you said that team, was it ICS?

5      A    It's instant command system.  It's a way of

6  having a response team.  They call it different

7  things, but it's the first level responders.

8          On every shift there are five or six guys

9  usually, or ladies, who are part of that team and

10  they have jobs that allow them to leave and respond

11  quickly should something happen.

12         And then there is a second level response

13  that while this first team is responding, that's

14  preparing their area so that, like if they have got

15  inmates out, they need to secure them, they should

16  lock them up, so that if the first level is overtaken

17  or starting to have problems, that they are

18  immediately available to reinforce them.

19         And the whole system is built on a pyramid

20  like that.

21     Q    Now, I understand from your report that

22  there are areas of the officer's station that are

23  lower visibility or where it's harder to see into the

24  bathroom or the shower area, is that correct?

25     A    Yes.

James Upchurch
June 28, 2017                                              72

1    Q    And we talked a little bit about that

2  already in terms of the back areas of the dorm, for

3  example, we spoke about it when we were discussing

4  the floor plan?

5    A    Right.  Some of it is associated, you know,

6  it's a combination of just not being your location

7  within here where you may be.  If you're sitting or

8  you're standing or you're over here talking to

9  somebody over here looking in here to get as full a

10  view as you can get or whatever you're doing, then it

11  has implications for what you can see in the other

12  area.  Does that make sense?

13    Q    Right.  So it depends on where you are

14  inside the officer's station?

15    A    There's a big difference in what you can

16  see, depending if you're standing or sitting and

17  depending on what location you're at inside of that

18  building, that control center.

19    Q    And you don't know where in the officer's

20  station Officer Kiser was during R.W.'s attack,

21  right?

22    A    I don't have any idea.

23    Q    Now, Inspector General Investigator Weeks

24  wrote in his report that anyone sitting anywhere in

25  the officer's station would have a clear view of any

1   activity going on in this area?

2       A    I disagree with that totally.

3       Q    Okay.  And tell me why?

4       A    Because it's just not -- to me it's not

5   true.

6       Q    Why do you think he wrote that?

7       A    I don't know why he did that.  I wonder why.

8   I think, you know, as I said before, I think it's

9   designed to optimize, but optimization doesn't

10  necessarily mean perfection or even close to

11  perfection.  And I think he means -- he must have

12  been thinking if you're moving around and you're

13  going and looking, then you can see.

14          And I can't -- you know, I just know, and

15  that's another reason I wanted to go down there and

16  that's another reason I wanted to take pictures is

17  because I have been in enough of them, I know that if

18  you're -- you just can't see like he describes it.

19  He makes it sound like that you're in this perfectly

20  round glass bubble and you just turn and everything

21  is there.  And even then, he's right, you can see,

22  but it depends on which direction you're looking.

23  And if you're involved in something else, are you

24  looking in the direction something may be happening.

25          So I don't know, unless it's just an over-

James Upchurch
June 28, 2017                                                     74

1   simplification or something, I don't know, I don't

2   know what he meant.

3       Q    Well, I think Captain Boyd said that you

4   could see clearly what's going on in the bathroom and

5   the shower area from the officer's station, do you

6   agree with that?

7       A    No.

8       Q    And why do you --

9       A    Well, clearly in terms of compared to not

10  being able to see anything, yes, and I think you can

11  see -- you can see better than in the past the way it

12  used to build them.  I mean, the showers were totally

13  covered and a lot of them had shower curtains hanging

14  on them, crazy stuff that you couldn't see what was

15  going on.

16          So I think it's improved over time, but I

17  don't -- I just didn't get the impression -- if you

18  go to this area, which is right in front of the

19  viewing window into the shower or bathroom area, even

20  standing there, there are things or areas here by

21  these back two toilets, maybe even three, and in the

22  back behind this corner of this wall, that you're

23  going to have a very difficult time seeing.  Now,

24  this wall was elevated by about eight, I think it's

25  one block, eight inches or so.

James Upchurch
June 28, 2017                                                    75

1    Q    Now, what you are referring to is when you

2    walk into the bathroom area, that privacy wall on the

3    right?

4    A    On the right.

5         And I think -- that did not -- while it

6    didn't obliterate the view, I think there were always

7    privacy walls there because we have female staff that

8    work in there from time to time, but still,

9    regardless of that, to hide here, you would have had

10   to have been tucked down pretty much on the floor on

11   your hands and knees in order to do something, but

12   back here, I don't think that's the case.

13   Q    Back --

14   A    In the rear.

15   Q    In the rear, just on the floor plan, it's

16   the area right adjacent to the mechanical room?

17   A    And more close to the plumbing chase.

18   Q    That's what you are referring to in terms

19   of --

20   A    Yes, the plumbing wall, that corner.

21   Q    That's the hidden area?

22   A    Yes.  That and the lower --

23   Q    The urinals in the back there?

24   A    No, not the urinals, these are toilets.

25   These are urinals (indicating).

1    Q    Oh, okay, I see.  But that back wall, the

2    back two toilets, you said back two, maybe three?

3    A    Yes, depending on exactly where you're

4    looking.

5    Q    Now, in your work over the years with the

6    Florida Department of Corrections, did you have

7    occasion to review other inspector general reports?

8    A    Oh, yeah, yes.

9    Q    You say that like there were a lot of them?

10   A    There were quite a few.

11   Q    What types of incidents did these cover?

12   A    Oh, gosh, assaults, claims of excessive

13   force, actual excessive force, just inappropriate

14   conduct by staff, contraband introduction, all kind

15   of things.

16   Q    Okay.  Why would you review them?

17   A    Why would I review them?

18   Q    Yeah.

19   A    Generally when they would make it up to my

20   level, there was a question by those at a lower level

21   or some discussion or some disagreement and I was

22   kind of resolving the disagreement.

23   Q    And what position were you in when you were

24   doing that?

25   A    When I was Assistant Secretary, when I was

James Upchurch
June 28, 2017                                                      77

1    over all the prisons is when I did it.  And all of

2    them weren't for that reason.  Some of them were

3    because I asked to see them.  If I heard about

4    something, I wanted to see it.  But that didn't

5    happen too much because I didn't have time.  These

6    investigative reports, these are comparatively short

7    ones, even not including the, you know, the

8    transcribed conversations.  I don't recall ever -- I

9    don't know if I ever looked at one that had all

10   the -- it would take a lot of time.

11      Q    And in this case, the investigator

12   identified possible administrative issues related to

13   Officer Kiser's performance?

14      A    I saw that.

15      Q    What does that refer to?

16          MR. ANGELL:  Form.

17      A    I think -- I don't know that I have ever

18   seen a finding that said possible there may be

19   administrative issues.  I'm not sure what he meant

20   unless he meant that -- which they would have done,

21   to my knowledge, they would have reviewed the report,

22   the warden, you know, the facility, the

23   administration, and that they may consider whether

24   Officer Kiser had violated his post order or his

25   procedure, hadn't done what he should have done, and

James Upchurch
June 28, 2017                                              78

1    that would be administrative, some kind of

2    administrative action.

3    BY MS. HASKELL:

4        Q    Well, I'll read you actually what it said

5    was, "Possible administrative issues were discovered

6    during the course of this investigation pertaining to

7    the lack of action taken by Officer Kiser while on

8    duty in F dorm when the attack occurred."  I'm not

9    sure exactly how the sentence ends.  So he is

10   referring to the lack of action or possible lack of

11   action, I guess?

12       A    It sounds like he is saying he is -- I don't

13   recall that specific reading of it, but regardless,

14   it sounds like the investigator is saying that -- or

15   implying that he believes that Officer Kiser knew

16   what happened, but I didn't -- one of the comments, I

17   didn't take it that way.  I thought it was more

18   administrative in the sense of maybe not doing rounds

19   the way he should have or doing something

20   administrative, some procedural administrative issue

21   and not -- that's just my interpretation.

22       Q    Okay.  I'm going to show it to you just

23   to --

24       A    Okay, I would like to see it.

25       Q    Yeah, just to make sure we're on the same

1   page, because I was just reading that from my notes.

2   That's on page 14 of 16 of the I.G. report.

3      A    That's what it says.  I thinks he is

4   implying that --

5         MR. ANGELL:  Hold on, what was the question?

6      I want to know what the question was so I can

7      object.  I thought you just asked him to read it.

8         THE WITNESS:  Oh, okay, I'm sorry.

9   BY MS. HASKELL:

10     Q    You know, it was so long ago that I have

11   lost track, but I think the initial question was, you

12   know, what do you make of that?

13     A    Like I said before, I think it's the same

14   thing.  I think he is implying that -- the thing

15   that's difficult for me is if he believed that

16   Officer Kiser knew about this and didn't do anything,

17   I don't think he would say -- or really believed or

18   really thought that it was true or factual, that he

19   would say possible administrative issues were

20   discovered.  I don't understand the use of that, you

21   know, if he really believed that Kiser saw this going

22   on and didn't do anything.  So that's not -- I'm not

23   sure -- I have never read one that said anything like

24   that.

25     Q    Could it be that the investigator felt

1  uncomfortable making the claim that there were

2  administrative issues?

3        MR. ANGELL:  Objection.

4     A   Are you implying that he felt pressured not

5  to do it, is that what you're saying?

6  BY MS. HASKELL:

7     Q   As a possibility.

8        MR. ANGELL:  Form.

9     A   In the inspector general's office, for the

10  years that I am directly familiar with it, no, I

11  don't think that.

12  BY MS. HASKELL:

13    Q   What about under Mr. Beasley?

14    A   I don't think that.  I personally think that

15  Mr. Beasley got a lot of bad rap, bad press, and I

16  think, yeah, I never found him to be anything but

17  straight and above board and to do what's right and I

18  think that's why the current sheriff hired him.

19    Q   Now, if you were a warden and you received a

20  report from an investigator of the I.G.'s office with

21  this statement about possible administrative issues,

22  what would you do, if anything, in response to that?

23    A   I would likely have reviewed the report and

24  when I saw that, then I would go look and take a look

25  at what information is provided in here and what

1   evidence there was supporting this possible

2   administrative action.  And if in fact there was

3   evidence that he had done this, then I would have

4   taken action.

5          And that's part -- that's another part of

6   why I am not confident nor do I believe there's

7   factual support to affirm that Officer Kiser did

8   know.  I think that -- I can't say for certain

9   because I don't even know who the warden was at the

10  time or who the assistant wardens were or who the

11  chief of security was and I can't say for certain

12  even if they were provided a report to review.  But

13  in common practice as I recall it, they would have

14  had that opportunity and they would have reviewed it

15  and considered everything in there and they would

16  have made a decision as to whether administrative

17  action was in fact indicated.  And as I understand

18  it, there was none taken.

19          And, you know, without some factual evidence

20  to support that possibly they were also in collusion,

21  which I don't believe or have no basis to believe,

22  then I think they made the judgment they thought was

23  appropriate.  There's a lot of if's in there and a

24  lot of things I don't know, but I know how it worked

25  in practice.

James Upchurch
June 28, 2017                                          82

1      Q    And you have reviewed the surveillance video

2  in this matter?

3      A    Yes, I did.

4      Q    And what were your impressions of what you

5  saw on the video?

6      A    Well, first of all, I'm sure you have

7  reviewed it?

8      Q    Yes.

9      A    It really gives a distorted view, unless --

10  I mean, I have tried, I had my computer tech neighbor

11  come over to help me arrange my -- make sure I wasn't

12  messing up, because I'm not technologically

13  sophisticated, but when you look at the video,

14  because of the angle and because the camera is

15  located up near the ceiling, very high up on the wall

16  and looking down, it really distorts what you see.

17  Those footlockers look like they are about that tall

18  and the wall looks like it's about that tall

19  (indicating).

20      Q    So the footlockers look like they are

21  shorter than they actually are?

22      A    Oh, yeah, and the wall looks like it's

23  shorter than it actually is.  It just distorts it and

24  if you look over here at these two bunks, they look

25  very short.

James Upchurch
June 28, 2017                                                    83

1     Q    Well, they look short, but there are also

2   people walking by that add some perspective, I would

3   say.

4     A    They add some, but they're still -- the

5   perspective also applies to them.  The difference is

6   they are closer.

7         But, regardless, if that -- it appeared to

8   me if that wall was that short as it appeared there,

9   that there would be a lot more being seen there.

10    Q    Well, how tall was the wall?

11    A    I'm not sure exactly in inches.

12    Q    Okay.  Well, how tall are you?

13    A    I am 5'11".

14    Q    And was it about like waist high?

15    A    No, no, no, it's higher than that.

16    Q    And are we talking about -- we're talking

17  about the wall as it currently is, correct?

18    A    No.  No.  The wall as it currently is is

19  about, if I'm not mistaken, was about to here and the

20  wall before was about to here (indicating).

21    Q    Okay.  So first you're pointing at just

22  under your shoulder?

23    A    You could see over either one of them.

24    Q    Well, I have here the pictures that were

25  taken.  I don't think I need all of them.  These are

James Upchurch
June 28, 2017                                                    84

1   the pictures that we were provided that were taken

2   during your visit to Sumter.  I'm going to mark them

3   as Exhibit 4 so we can talk about some of them.

4         (Deposition Exhibit No. 4 was marked for

5   identification.)

6   BY MR. ANGELL:

7     Q   All right.  So the one that's marked DEF12,

8   is that you --

9     A   Yes.

10    Q   -- standing next to the wall we're talking

11  about?

12    A   Yes, that's me.  And as I said, it came to

13  about right here as it is there (indicating).

14    Q   That's just below your shoulder currently?

15    A   Yes.  And then previously about mid back.

16    Q   Okay.  Well, going back to the video, did

17  anything other than the perspective strike you or

18  stand out?

19    A   I don't know -- what do you mean?

20    Q   Well, what about -- let me ask you a more

21  specific question.

22        What about the number of people going in and

23  out of the bathroom, did that strike you as unusual?

24    A   It didn't, because I'm not sure what usual

25  is.  You know, can I regress just for a second?

1    Q    Sure.

2    A    When I started working in corrections, they

3    used to talk to me, the old timers, they would say,

4    well, I wonder what the temperature on the yard is

5    today and I always wondered what the heck, they've

6    got a thermometer, why are they judging the

7    temperature on the yard.  And finally I got one of

8    them to explain it to me.  He said you spend enough

9    time there that you're able to see how people are

10   together and what kind of movement is going on and

11   who is doing this and who is doing that and then all

12   the sudden you go out there one day and they are not

13   doing it, they're all doing different things,

14   everything has changed.  Sometimes that kind of thing

15   that can be an indicator that you need to investigate

16   a little further, that is the temperature on the yard

17   and it makes sense to me.

18        It may be that, just like I believe R.W.

19   said he was going in there to wash up, I believe, if

20   you have got 40 people on that side, they could be --

21   I didn't try to freeze-frame the picture of every

22   inmate going in and out, but it looked like to me

23   there were a large number of that 40-something that

24   went in and out and some of them didn't go all the

25   way out and some -- I mean all the way in and some

James Upchurch
June 28, 2017                                                  86

1    came out and went back, but I'm not sure whether

2    that's normal or not.  I don't know if that would be

3    an abnormal number or not.

4         I was disturbed from a personal standpoint

5    and I'm not sure that -- and I feel confident,

6    hopefully, that Officer Kiser didn't see this and it

7    wouldn't be difficult, because the guy was walking

8    away from him coming out of the thing, but these guys

9    coming out of there laughing, that bothered me, but

10   I'm not sure that he could see that.

11   Q    And why did that bother you?

12   A    Well, the way, the laugh, bothered me.

13   Q    If you had been in the dorm at that time as

14   an officer and seen that, it might have raised your

15   suspicions?

16   A    If I had seen it.  And as I say, he was

17   coming out of the thing and the officer's station is

18   over here.  Whether he saw it or not, I don't -- see,

19   I don't believe that these inmates were doing all of

20   this or could be doing all of this -- they could very

21   well have, as is my experience, have had people

22   watching to see where Officer Kiser was, watching to

23   see when he might be looking.  In fact, there was one

24   of the inmates who testified in here, I think his

25   name, I can't remember, Hernandez, he said that the

1    inmates -- he was just giving his description of what

2    happened and he said that the inmates were -- there

3    was this big fight or assault and he says whenever

4    the officer would look, they would stop, and then

5    they would go back to the assault.

6           So I think that my experience has been that

7    if the inmates were going to do this test of heart or

8    do some kind of thing where they hurt someone or

9    something that could get them in trouble, I don't

10   think they would just blatantly do it.  I think they

11   would have some people watching where Officer Kiser

12   was, see what he was looking at.  And, like I said

13   before, the fact that hopefully he can see out pretty

14   well, it even makes him more visible to them.

15          In fact, we considered at one time putting

16   one way stuff on the glass so that the inmates could

17   not see where the officer was, but it kind of got

18   overridden.  I'm not going to tell you that the fact

19   that the only air conditioned place in the building

20   is the control room does not have a motivation on

21   possibly less than active officers to spend more time

22   in the control room than they should.

23     Q    Going back to that one way glass and that

24   idea being overridden, am I understanding correctly

25   that that's because there is a benefit to the

James Upchurch
June 28, 2017
88

1   prisoners --

2      A   Yes.

3      Q   -- being able to see that the officer can

4   see them?

5      A   That's exactly right, that's part of it.

6   And the other part is that when the staff enters, the

7   supervisors, they can't see what's going in there

8   either.  So there's a couple of other reasons,

9   there's a lot of reasons we decided not to do it.

10     Q   Did you see evidence on the surveillance

11  video of a prisoner standing lookout?  I mean, did

12  you actually see or were you able to identify that

13  person?

14     A   Did I identify anybody that I thought was

15  doing it?

16     Q   Right.

17     A   I saw several that I thought could have been

18  doing it.  The other thing is that the camera does

19  not go around to -- the camera pretty much stops

20  right here (indicating) and then if there was going

21  to be somebody observing, they would be back in here.

22  They could have been here looking through this

23  window, they could have been somewhere over here

24  looking or standing out here looking or using hand

25  signs (indicating).

James Upchurch
June 28, 2017                                    89

1      Q    So they wouldn't have necessarily been in

2   view of the camera?

3      A    No, not necessarily.

4      Q    Because you can see -- let's see, this

5   window in the officer's station that looks out over

6   the toilets, the bathroom area, someone could be back

7   there towards the back of that room and see into the

8   officer's station, so towards the back of the toilets

9   area?

10     A    Yeah, you could see through there and tell

11  if it's movement in there, anything like that.  I

12  would suspect, though, that they were out here

13  (indicating) --

14     Q    Out in the dorm?

15     A    -- so they could see more.

16          For example, the one inmate that I recall

17  specifically that was out there washing the windows,

18  washing the windows of the control station, he would

19  have been an excellent warning person.  And, I mean,

20  I'm just -- you know, I don't know that for a fact,

21  but I am not -- I know in my career, lots of times

22  when inmates are doing that kind of stuff, they would

23  have a lookout.  They had some way to keep from

24  getting caught.

25     Q    In your capacity as a warden or in your

James Upchurch
June 28, 2017                                          90

1   other jobs with the Department of Corrections, have

2   you ever known a dormitory officer to request that

3   additional staff be stationed on a dorm?

4      A   Have I ever known them to?

5      Q   Yes.

6      A   Oh, yeah.

7      Q   Okay.  How would that request be made?

8      A   Well, it depends.  Usually they would just

9   make it to their supervisor.  I mean, if they were

10  adamantly -- if they were afraid for their own

11  safety, for example, in the extreme case, they could

12  take it all the way up to the warden, ask to see the

13  warden and talk to him, but that doesn't happen a

14  lot.  They usually make it either through their

15  sergeant or possibly the shift commander when they

16  came around, to let them know that they needed help.

17  I have known people to do that.

18     Q   Did that happen when you were a warden at

19  Franklin?

20     A   Oh, yeah.  Yeah, I remember one specific

21  instance where we were on the graveyard shift, which

22  is --well, you know what that is.  And we were

23  feeding breakfast in the morning and I remember I was

24  out there, it was about 5:00, 5:30 in the morning,

25  and this female officer, she came up to me and she

1  said would you walk out here with me and I said sure.

2  And we walk out there and she says you see that one

3  officer standing over there and all those inmates

4  coming out of there that's by himself and she says

5  how are we supposed to keep up with all those guys

6  like that.  So I took -- I created two overtime posts

7  to provide more coverage to make sure they could do

8  it.  And I have had other occasions like that, too, I

9  mean, that's not terribly unusual.

10     Q    What are the FDC performance appraisals?

11     A    It's a way of assessing, gauging how well an

12  officer is doing his job or her job.

13     Q    How are they used?

14     A    Well, at one time they were associated with

15  pay raises, but that's a thing of the past.

16     Q    The pay raises?

17     A    Yeah.  Well, we got -- I think we got one

18  this year.

19          They can impact a person's ability to be

20  promoted.  They are assessed when the person is going

21  up for promotion.  If you're going to be -- if an

22  officer, which happens quite frequently, decides they

23  want to live in a different place, they want to

24  transfer, the receiving -- person going to receive

25  them would review them to see what kind of staff

James Upchurch
June 28, 2017                                        92

1   person they are, what kind of officer, what kind of

2   job they do.  Just in that vein to assess how they do

3   their job, how well they do it.

4       Q    And who completes an officer's performance

5   appraisal?

6       A    Generally it's either a captain or a

7   lieutenant is the person that does the -- signs off

8   on them.  They would do it based on their knowledge

9   of them as the supervisor, but because we have

10  supervisors who have so many people working for them,

11  they also usually talk to the person, like the

12  sergeant if they worked in a particular building or

13  someone else who might have more insight, but they

14  would sign off on it.

15      Q    And you relied on Officer Kiser's

16  performance appraisals in formulating your opinion?

17      A    I relied on it as part of my assessment of

18  whether I thought that he was capable of doing that

19  or whether that was something that he was likely to

20  do, yes, in that sense I did.

21      Q    So you value these performance appraisals?

22      A    I do, surely.

23      Q    And did they give you -- did you -- do you

24  think that they gave you a full opinion of Officer

25  Kiser?

James Upchurch
June 28, 2017                                          93

1     A    They didn't, no, not a full opinion.  The

2  fact that he only had that one disciplinary action,

3  which was for missing too many days of work, and that

4  was early in his career.  And I think if you went

5  back to about a significant percentage of the younger

6  officers, when they first start working, there will

7  be a number of them with some kind of notation about

8  calling in and missing work, and we were so desperate

9  for staff then that we would hold them accountable if

10  they didn't show up.  But other than that, I didn't

11  see, I mean, there was no disciplinary action on him

12  whatsoever.

13     Q    In your experience, is it typical for a

14  corrections officer to be with the department for 10

15  years and still be in the same position?

16     A    Um-hum, yes.

17     Q    Not to move up the ranks?

18     A    I've seen lots of correctional officers

19  retire as correctional officers and do so by choice.

20  I mean, I guess I would have to ask if they applied.

21  Some people don't, it's not their thing to.

22     Q    Sure.  You may recall this from Officer

23  Kiser's deposition, but Officer Kiser, I'll convey to

24  you, testified in deposition that he had stepped away

25  from his post in F dorm for approximately four hours

1    on the day of this incident and had been a rover, I

2    think is the term he used, and that someone else had

3    stepped into the dorm?

4         MR. ANGELL:  Form.

5    BY MS. HASKELL:

6      Q    Is that sort of staffing change typical in

7    your experience?

8         MR. ANGELL:  Form.

9      A    We didn't used to do that much when we had

10   eight hour shifts, but when we had people on 12 hour

11   shifts, particularly if we were working, you know,

12   relatively frequently overtime, that kind of stuff,

13   we tried to break up the day.  Like, particularly

14   comes to mind is people on perimeter patrol, because

15   we didn't want them to get too laid back.

16   BY MS. HASKELL:

17     Q    Right.  The lifeguards at the pool by my

18   house rotate around, too.

19     A    Rotating staff like that is a good idea and

20   the fact that they -- I'm not familiar with rotating

21   housing officers like that, but I would not be

22   surprised that they would do it.  It's like when he

23   talked about, I think during his deposition he was

24   talking about he would come in and he might work

25   here, he might work there.  Before, when we were on

James Upchurch
June 28, 2017                                                    95

1   eight hour shifts, everybody had a -- their days off

2   and their shift was assigned to the post, but when we

3   went to 12 hour shifts, which there's arguments both

4   ways, but we let the shift supervisor assign them on

5   a day-to-day basis, so they might work a lot of

6   different places.  It's good for cross training, if

7   you have people call in or sick, you have got people

8   you can move, so there's advantages.  It does happen.

9      Q    And if they move away from a post and go to

10   another post, that would be reflected on the dorm

11   logs?

12     A    Should be.  Should be a name change.

13     Q    A name change indicating that one officer of

14   a particular name stepped in and the other officer

15   stepped out?

16     A    I would certainly think so.  Because the

17   notation out there about the things they have done

18   would be different or should be different.

19     Q    Right.  On the dorm log where they're

20   initialing to the right that they have done

21   something, it would be a different person's initials?

22     A    Should be, yeah.

23     Q    Now, in your capacity at the DOC, have you

24   ever known an officer to encourage prisoners to

25   fight?

1    A    I have not known specifically.  I have heard

2   about it that some do, but we definitely don't

3   condone it and if we find out that people are doing

4   it and we prove that they are doing it, then they

5   don't work for us.

6    Q    Has that happened where you have had to fire

7   folks because of that?

8    A    Not recently, not within the timeframe that

9   I can remember, since I was in the position over the

10   prison.  When I was security operations, I didn't

11   necessarily get involved in that kind of stuff

12   involving individual officers in the prisons.  I was

13   not in the chain of command for that kind of thing.

14    Q    But would you have heard those stories of

15   folks?

16    A    Yeah, I would have heard about it.  And I'm

17   trying to think, I have heard allegations about it

18   that were investigated, not frequent, but I do recall

19   some allegations of that.

20    Q    Allegations of officers encouraging

21   fighting?

22    A    Yes.

23    Q    What about officers maybe not encouraging

24   the fight actively, but ignoring fights that they

25   knew were happening, have you heard of that?

1    A    Have I heard of it in my 40 years?

2    Q    Yes, sir.

3    A    Yes.

4    Q    Why do you think that happens that some

5 officers do that?

6    A    Because they make a mistake, they do the

7 wrong thing.  Anytime they choose to act outside the

8 established parameters for what they are supposed to

9 do and allowing or encouraging inmates to fight or

10 allowing them to fight one another is totally outside

11 the parameters of their job and they are violating

12 what they said they will do, which is if you see a

13 fight, you break it up, you don't encourage fighting,

14 you don't condone it, you don't allow it.

15    Q    But is it just a mistake in all these cases

16 or in any case is it poor training, poor supervision,

17 are there other reasons?

18    A    I think --

19        MR. ANGELL:  Objection.

20    A    I think you're mischaracterizing when I said

21 mistake.  When I mean mistake, I mean they shouldn't

22 have done it.  I didn't mean that it was just a

23 mistake in judgment.  They violated what they were

24 supposed to do.  I didn't mean to minimize that.

25 It's very serious.

1        If they are doing it and it can be

2   established, then they are going to be subject to

3   disciplinary action.  And if they are still employed,

4   depending if they were on probation or whatever, then

5   they probably wouldn't have a job, they would lose

6   their job, but if they were a tenured employee and

7   all these circumstances, individual considerations,

8   they might sustain a suspension of some sort, some

9   retraining, some changes, whatever, I'm not sure, it

10  would depend on the individual case.

11  BY MS. HASKELL:

12    Q    And I'm not trying to push you here to

13  necessarily answer a question you haven't thought of

14  before, but I am really trying to get at in your 43

15  years in corrections, you know, have you thought

16  about and come up with a theory for why some officers

17  do this?  I mean, for example, are they just

18  malicious people, the ones that let this thing

19  happen, are they lazy, are they disinterested, do

20  they not care?  And I'm not trying to put words in

21  your mouth, I'm just trying to explain my question.

22  Have you thought about why this happens, that some

23  officers ignore or encourage fights?

24      MR. ANGELL:  Form.

25    A    You know -- can I regress one more time?

1  BY MS. HASKELL:

2      Q    Please.

3      A    When I started, I can remember going to a

4  prison camp, now, this is a long, long time ago, and

5  two inmates would be arguing, carrying on, you know,

6  and they would yell out, they would say Cap, that's

7  what called the officer, Cap, I need five minutes

8  with old so and so.  And the inmates would go out and

9  make a big circle and these two inmates would go in

10  there and they would fight it out and then they would

11  shake hands and be gone.  Different time.

12         Was it the right thing to do, no, it wasn't

13  the right thing to do.  People could have got hurt

14  real bad, I mean, it was not a good thing to do at

15  all.

16         Some officers have the same -- I mean, they

17  are people just like inmates are people and they are

18  brought up and they, you know, believe that you get

19  into an argument or disagreement, then you settle it

20  and it's over with, I mean, you fight.  And I guess

21  even though it's wrong, don't get me wrong, I'm just

22  trying to explain in response to your question why

23  they might do it.  I don't see them -- unless maybe

24  they are doing it for sport or if they are doing it

25  maliciously because they want to see somebody get

1   hurt, I mean, there are a variety of reasons why they

2   could do it.  That's the only answer I know to give

3   you.

4       Q    Is it possible that it's a way to maintain

5   control in a dorm?

6       A    It's certainly not an acceptable way to do

7   that.

8       Q    But it's possible that it could be viewed as

9   a way to maintain control of the dorm?

10      A    It would be -- I don't -- I can't follow the

11  rationale that would view that as a way, unless what

12  you're talking about is saying that you have got

13  inmates who are going to beat up on other inmates

14  because the officer wants them to so they can keep

15  them in line.

16      Q    Right, to maintain some kind of hierarchy in

17  the dorm?

18      A    That's the way it was done back in the

19  fifties and I'm not aware of that happening in I

20  can't even remember how long.  Last time I think I

21  saw it was Brubaker.

22      Q    I'm close to done.

23      A    I didn't have any lunch.

24      Q    Oh, I'm sorry.

25      A    That's all right, that's my fault.

1    Q    I'm just taking one more look at your file

2    to make sure there's nothing else I want to follow up

3    on here.

4         I'm looking at the notes that you made on

5    the complaint and just wondering, on page 14,

6    paragraph 64, does it say Kendra.

7    A    Oh, yeah, Kendra.

8    Q    Who are you referring to?

9    A    The department's PREA coordinator.

10    Q    We haven't really talked about PREA.  Why

11    did you make that note?

12    A    Because I was -- what's that section -- I

13    was going to call her, and I did, and ask her --

14    really, you know, what's referenced here, is that

15    throughout FDC victims of attack are typically held

16    in confinement following their assault, despite the

17    Prison Rape Elimination Act.

18         You know, the Prison Rape Elimination Act

19    encourages you to not house them in confinement if

20    you can, but on the other hand, if you have to remove

21    them from danger and you have an investigation going

22    on and you have interviews and all this kind of stuff

23    going on, if you move them, it makes the

24    investigation more difficult to follow if you try to

25    move them and you have got to find a place that you

1  can move them where the issue may not follow and put

2  them at risk.

3       And I don't know what was in effect in 2013,

4  but I can tell you that the majority of all cases

5  where, regardless of what it is, if there is an

6  investigation, they will go into administrative

7  confinement and they will go there, there are

8  parameters set in rule on times and how you get in

9  there and how long you stay.  So PREA would be no

10 different, I mean, in terms of the investigation.

11       I'm not sure that the people who said not to

12 put them there really understood what they were

13 saying.  I mean, they would really be upset if you

14 didn't put them in administrative confinement and you

15 put them out there and another inmate got word to the

16 other inmate where you put them and that so and so is

17 snitching, then we would really have trouble.  So

18 it's one of those, you know, if you do and if you

19 don't.

20       So what Kendra told me is they are making

21 every effort to not do it.  I mean, they give them --

22 they look for options, places to place them.  They

23 give them things that, I think they use some kind of

24 form now that they can sign that they feel

25 comfortable going to a certain place.  There's

1    certain things they can do.

2          But the bottom line is a lot of them, if you

3    make that claim, until it's been investigated and

4    they have made some kind of reasonable determination

5    that you're not at risk, then they are going to put

6    you in administrative confinement.

7    Q    Other than Kendra, did you talk to anyone

8    else in the department about this --

9    A    No.

10   Q    -- case?

11   A    Well, Wes.

12   Q    Kirkland?

13   A    Yes.  Basically it was just asking him to

14   get me that stuff.  That was the biggest thing was

15   his getting me that information.  And, you know, I

16   talk to -- Wes worked for me for years and Kendra

17   worked for me.  I talk to them on occasion just to

18   hear from them and we talk about a lot of things.

19   Q    Did you notice when you were at Sumter if

20   there were any other cameras on F dorm that would

21   have captured the bathroom area?

22   A    I didn't notice, but I am certain that there

23   weren't.

24   Q    Why is that?

25   A    Because the same PREA stuff would not let

1    you put cameras in the bathroom.

2       Q    Well, what is your understanding, if you

3    have any, as to why the privacy wall was elevated at

4    Sumter?

5       A   I'm sure that somebody made the

6    determination or suggested that it needed to go up a

7    little bit.

8       Q    Do you know if it was increased at other

9    dorms other than F dorm?

10      A    I don't know for sure, but I would not be

11    surprised if it was.  We've been going through PREA

12    compliance audits for quite a while now.  In fact,

13    since I've been gone, they continue to do it.

14         MS. HASKELL:  Okay.  If we just take a quick

15      break, I think we'll be able to wrap up.

16         (Brief recess taken.)

17    BY MS. HASKELL:

18      Q    Mr. Upchurch, other than the opinions that

19    we have discussed today, do you have any other

20    formulated opinions regarding this case?

21      A    Other than the ones that we discussed today

22    and the ones that are in my report.

23      Q    That's it?

24      A    That's it.

25      Q    You don't have an opinion as to the degree

1    or the amounts of suffering that R.W. has endured as

2    a result of this attack, correct?

3        A    I have no knowledge of that.

4        Q    Do you anticipate doing any additional work

5    in this matter prior to testifying at trial?

6        A    None that I can think of.

7        Q    Is there anything that you would have liked

8    to do or liked to review before completing your

9    report that you didn't have a chance to?

10       A    Not that -- I mean, the more information,

11   the better, but, no, I can't think of anything.

12       Q    Well, any documents that you would have

13   liked to have reviewed prior to completing your

14   report?

15       A    That might have changed it?

16       Q    Yes.

17       A    No, not that I am aware of.

18       Q    How about any information that you might

19   receive in the future that could change your opinion,

20   is there anything that you anticipate would change

21   your opinion?

22       A    That I anticipate?

23       Q    Yes, sir.

24       A    No.

25       Q    Any --

James Upchurch
June 28, 2017                                    106

1    A    But that's -- as I stated in my written

2    report, I mean, there may be things that I don't know

3    about, but I don't anticipate it.

4    Q    All right.  So anything in your testimony

5    here today that you would like to change before we

6    finish?

7    A    As if I could remember everything.  No.

8        MS. HASKELL:  Okay, then I don't have

9    anymore questions.

10       MR. ANGELL:  And I have nothing and we'll

11   read if you guys order.

12       MS. HASKELL:  And we are going to order.

13       THE COURT REPORTER:  Do you want to order a

14   copy of the transcript?

15       MR. ANGELL:  I don't know if we need a copy

16   just yet.  Actually, you know what, yeah, we'll

17   take a copy.

18       THE COURT REPORTER:  Okay, thank you.

19       (Deposition concluded at 4:20 p.m.)

20                * * * * *

21

22

23

24

25

1

2          CERTIFICATE OF ADMINISTERING OATH

3

4   STATE OF FLORIDA:

5   COUNTY OF LEON:

6          I, TERRY WILHELMI, Certified Court

7   Reporter and Notary Public in and for the State of

8   Florida at Large:

9          DO HEREBY CERTIFY that on the date and

10  place indicated on the title page of this transcript,

11  an oath was duly administered by me to the designated

12  witness (s) before testimony was taken.

13          DATED THIS 10th day of July, 2017.

14

15

16

17          _____
            TERRY WILHELMI
18          COMMISSION #FF130338
             EXPIRES JUNE 18, 2018
19          CERTIFIED COURT REPORTER

20

21

22

23

24

25

1

2              CERTIFICATE OF REPORTER

3

4   STATE OF FLORIDA:

5   COUNTY OF LEON:

6          I, TERRY WILHELMI, Certified Court

7   Reporter do hereby certify that the foregoing

8   proceedings were taken before me at the time and

9   place therein designated; that my shorthand notes

10  were thereafter translated under my supervision; and

11  the foregoing pages numbered 1 through 106 are a true

12  and correct record of the aforesaid proceedings.

13         I FURTHER CERTIFY that I am not a relative,

14  employee, attorney or counsel of any of the parties,

15  nor relative or employee of such attorney or counsel,

16  or financially interested in the foregoing action.

17         DATED THIS 10th day of July, 2017.

18

19

20         _____
            TERRY WILHELMI, CCR
21          Certified Court Reporter

22

23

24

25

1          ERRATA SHEET

2       I have read the foregoing transcript of my
   deposition, pages _____ through _____ and hereby
3   subscribe to same, including any corrections and/or
   amendments listed below.

4

5   _____    _____
   DATE          JAMES R. UPCHURCH  (6-28-17)
6

7
   PAGE/LINE           ERROR OR AMENDMENT
8   _____  _____

9   _____  _____

10  _____  _____

11  _____  _____

12  _____  _____

13  _____  _____

14  _____  _____

15  _____  _____

16  _____  _____

17  _____  _____

18  _____  _____

19  _____  _____

20  _____  _____

21  _____  _____

22  _____  _____

23  _____  _____

24  _____  _____

25      REPORTED BY TERRY WILHELMI, CCR

**Exhibits**

EX 0001 James Upchurch PLTF 062817
EX 0002 James Upchurch PLTF 062817
EX 0003 James Upchurch PLTF 062817
EX 0004 James Upchurch PLTF 062817

---

**$**

$1,000  7:14 29:11
$1,200  8:13
$150  8:10
$300  8:12
$500  8:13

---

**-**

--well  90:22

---

**1**

1  11:1,2
10  16:21 38:22 93:14
100,000  60:12
11:00  35:18
12  21:8 55:6 94:10 95:3
12-hour  34:1 35:10
14  13:12 21:8 79:2 101:5
144  39:15,19 40:1,4 65:18
144's  41:7

150  48:14
16  79:2
18  18:19
1950s  11:18
1982  13:8
1990s  22:9

---

**2**

2  33:9,16
20  5:3 20:23
20,000  60:11
20-something 21:9
2009  16:21
2013  102:3
2015  17:4,6,7
21  18:20
24  35:23,24 36:3
24-hour  35:9
25  5:3

---

**3**

3  48:19,22
30  53:9,12,13 58:3
30th  17:6
31st  17:6,15
3:00  35:17

---

**4**

4  84:3,4
40  27:14 41:13 42:2,6 55:16 67:10, 11 85:20 97:1
40-something 85:23
43  98:14
45  53:14,15
4:20  106:19

---

**5**

5'11"  83:13
500  48:14
56  60:11
5:00  90:24
5:30  90:24

---

**6**

60s  11:18
62  17:12
64  101:6
69  12:6 45:12
6:00  34:2,3 35:7,8
6th  10:24

---

**7**

7/2/12  33:12 36:12 37:5
70  25:5
70s  13:3
72  12:7 39:15
75  12:16

---

**8**

8/20/13  33:13 36:12 37:5
80  40:24 41:4,11,13 42:2 67:12

---

**9**

96  18:4 21:21
97  18:4

---

**A**

a.m.  34:2,3 35:7,8

ability  91:19
abnormal  86:3
abreast  70:9
absolutely  6:2 8:20 38:25
accept  62:23
acceptable  100:6
account  21:1
accountable  93:9
accounting  51:22
accrediting  19:12
accurate  28:24
accused  46:12
act  97:7 101:17,18
acting  56:10
action  78:2, 7,10,11 81:2, 4,17 93:2,11 98:3
active  24:25 87:21
actively  96:24
activities  8:11
activity  18:22 34:8 35:12 73:1
actual  15:11 53:19 76:13
adamantly  90:10
add  45:18,22 83:2,4
added  6:3,8 24:11
addendums  34:6
addition  9:16 20:3

additional
  6:3,7 8:25
  54:12 90:3
  105:4
address  34:4
addressing
  60:18
adjacent
  75:16
adjust  36:17
adjusted
  36:20
administration
  77:23
administrative
  77:12,19
  78:1,2,5,18,
  20 79:19
  80:2,21 81:2,
  16 102:6,14
  103:6
admissions
  37:23
adult  63:5,16
  64:7
adults  41:24
  63:12
advantage
  71:2
advantages
  95:8
advertise
  24:15 26:8
advertisements
  28:12
affirm  81:7
affirmatively
  58:10
afraid  90:10
afternoon
  4:16,17 35:18
agency  19:4,
  12
agent  15:21
  16:19
agitated  46:5

agree  15:22
  74:6
ahead  10:25
air  87:19
allegations
  96:17,19,20
allocated
  34:4
allowing
  97:9,10
alternate
  64:25
amendment
  28:1
amounts  105:1
amped  63:21
analysis
  19:8,9
Angell  6:23
  42:12,15
  58:15 77:16
  79:5 80:3,8
  84:6 94:4,8
  97:19 98:24
  106:10,15
Angell's
  26:20 31:11
angle  82:14
angry  46:5
announced
  23:13
annual  18:5
  35:1
answering
  51:23,24
anticipate
  105:4,20,22
  106:3
anymore  14:4
  18:1 36:16
  55:19,21 61:5
  106:9
Anytime  97:7
apologize
  7:16
apparently
  7:2

appealed
  13:25
appeared  46:6
  54:1 83:7,8
applicable
  4:6
applied  13:9
  93:20
applies  83:5
appointed
  16:5
appraisal
  92:5
appraisals
  91:10 92:16,
  21
approach
  59:17
approaching
  28:16
approximately
  5:2 24:4
  39:15 41:13
  53:2 60:11
  93:25
April  9:3
  10:24
area  71:14,24
  72:12 73:1
  74:5,18,19
  75:2,16,21
  89:6,9 103:21
areas  14:15
  20:1,18,23
  21:6,8 26:22
  38:15 47:11
  50:7,11,19,21
  62:4,7 71:22
  72:2 74:20
arguing  99:5
argument  69:9
  99:19
argument's
  68:5
arguments
  95:3
Arizona  13:7,

  11,16
arouse  54:11
arrange  82:11
assault  26:5
  87:3,5 101:16
assaulted
  25:22
assaults
  63:25 76:12
assess  18:12
  20:20,25 92:2
assessed
  91:20
assessing
  91:11
assessment
  19:3 21:10
  92:17
assign  95:4
assigned
  34:17 35:6
  40:10,13 95:2
assignment
  46:14
assistance
  18:11 20:5
assistant  7:3
  11:17 12:11
  13:17,22
  15:1,10 42:9,
  14 44:3 60:25
  76:25 81:10
associate
  12:24
assume  5:4
Aticca  19:23
attach  48:19
attack  46:16
  58:20 59:9
  66:10 68:8
  69:5 72:20
  78:8 101:15
  105:2
attacked  69:8
attacks  66:7
  67:17

attention
  23:16 52:6
  53:25
attract 53:24
audit 14:11,
  13 18:8,23
  19:3 20:19,25
  21:22,23,24
  22:8,13,16,24
  23:3,9,18
auditors
  22:18,23 23:8
audits 14:12
  18:15 21:19
  22:2,15 62:3
  104:12
auspices
  19:17
authorized
  40:7
aversion
  24:14
avoid 52:17
aware 59:9
  100:19 105:17

_____

**B**

back 7:17
  11:18,24
  12:7,8 13:21
  16:5,11
  19:21,23 22:4
  25:4 48:3
  49:14,15
  50:8,21,24,25
  52:4,7 66:8
  68:17 72:2
  74:21,22
  75:12,13,23
  76:1,2 84:15,
  16 86:1 87:5,
  23 88:21
  89:6,7,8 93:5
  94:15 100:18
background
  19:14 22:21

backup 68:14
  70:18 71:3
bad 60:13
  71:1 80:15
  99:14
baddest 61:8
  63:9,13
banged 60:6
base 59:21
based 13:8
  41:21 42:7,8
  45:19 59:2,4,
  11,12 92:8
basically
  11:8 12:2
  14:7 18:8
  24:17 28:12
  47:2 64:16
  103:13
basics 65:3
basis 58:10
  81:21 95:5
bathroom
  50:25 68:7
  71:24 74:4,19
  75:2 84:23
  89:6 103:21
  104:1
Beasley
  80:13,15
beat 100:13
bed 35:19
  40:1,8 48:6
  52:2
behalf 24:20
behaviors
  70:2
believed 33:1
  79:15,17,21
believes
  78:15
bench 27:22
beneficial
  17:24
benefit 18:14
  87:25

big 16:21
  20:21 72:15
  87:3 99:9
bigger 39:25
  65:24
biggest 51:20
  103:14
billed 9:1
bit 7:17 21:5
  25:4 49:25
  59:3 72:1
  104:7
blatantly
  87:10
block 74:25
board 80:17
boom 48:4
bother 86:11
bothered
  86:9,12
bottom 103:2
Boyd 56:20
  74:3
break 5:16
  7:21 69:3
  94:13 97:13
  104:15
breakfast
  90:23
Brer 15:24
Briar 15:25
bring 5:20
  6:11 18:17
bringing 8:6
brooms 62:10,
  16
brought 5:22
  12:21 15:19
  16:5,11 99:18
Brubaker
  100:21
bubble 66:7
  73:20
budgets 14:9
build 48:6
  74:12

building
  36:15 48:10
  49:1 72:18
  87:19 92:12
built 48:12
  71:19
bulldogging
  61:12
bunch 68:6
bunks 49:24
  82:24
bureau 13:24
  14:6 15:4,5,6
  19:17 22:12
bureaus 15:9
Bus 16:9
business 18:2
  26:9,10
Buss 16:9,13
busy 26:12
butted 16:13

_____

**C**

call 12:3
  23:1 26:10
  34:23 52:7
  66:9 68:14,
  15,25 71:3,6
  95:7 101:13
called 4:12
  12:4 13:23
  14:25 16:5
  32:15 67:19
  68:17 99:7
calling 70:17
  93:8
calls 51:23
camera 82:14
  88:18,19 89:2
cameras
  103:20 104:1
camp 99:4
Cap 99:6,7
capable 92:18
capacity
  12:14 39:16,

24 40:1,23
41:12 56:11
89:25 95:23
**captain** 22:20
56:20 74:3
92:6
**captains** 23:4
33:24
**captured**
103:21
**care** 98:20
**career** 89:21
93:4
**carefully**
22:21
**Carrabelle**
16:1
**carries** 66:4
**carry** 66:5
**carrying** 99:5
**case** 6:12
8:9,21,25
10:17 24:10
25:18,23,25
26:14,16
27:16 28:8,21
29:10,17
31:12 32:4,22
34:1 43:21
46:14,18
49:21 52:11
56:16 57:19
59:25 70:21
75:12 77:11
90:11 97:16
98:10 103:10
104:20
**cases** 6:3
24:12,25
25:1,7 27:19,
25 28:4 29:1,
2 40:4 52:5
97:15 102:4
**catch** 23:20
**caught** 69:20
89:24
**CD** 8:1

**ceiling** 82:15
**cellmate**
25:22
**center** 72:18
**central** 13:20
14:15 23:7,11
**certified**
27:21
**chain** 96:13
**chance** 105:9
**change** 15:21
16:18 36:14,
17,18 37:19,
25 94:6
95:12,13
105:19,20
106:5
**changed** 5:24
85:14 105:15
**charge** 56:1,
11,13,22,25
57:2,5,6,7,10
**chart** 6:20
40:6,15,16,19
56:5
**charts** 32:6,
16 36:13,22
**chase** 50:24
75:17
**check** 52:5
69:25
**checking**
55:17
**chief** 13:24
14:6 33:24
81:11
**choice** 93:19
**choices** 41:3
**choose** 37:11
97:7
**chow** 69:16,17
**circle** 99:9
**circumstances**
98:7
**circumvent**
28:14

**cited** 31:22
**claim** 80:1
103:3
**claims** 76:12
**Classification
s** 15:6
**classroom**
18:22
**clean** 47:22
**cleaning**
62:16
**clear** 48:20
72:25
**close** 73:10
75:17 100:22
**closed** 64:14
**closely** 64:8,
10
**closer** 7:23
83:6
**closet** 62:16,
18 63:3
**cognitive**
27:6
**collapsed**
21:7
**college** 12:1
**collusion**
81:20
**combination**
72:6
**combined** 46:9
**comfortable**
45:1,25
102:25
**command** 71:5
96:13
**commander**
90:15
**comments**
78:16
**Commission**
12:21
**commitment**
29:12
**common** 63:5,
14 67:15

81:13
**communication**
51:24
**comparatively**
77:6
**compared** 74:9
**compensation**
8:8
**complaint**
6:16 29:25
101:5
**complement**
35:2
**complete**
31:19
**completed**
60:24
**completely**
36:15
**completes**
92:4
**completing**
105:8,13
**complex**
13:16,18
**compliance**
104:12
**compound** 70:7
**computer**
82:10
**concern** 21:18
**concluded**
106:19
**conclusively**
58:13
**conditioned**
87:19
**condone** 96:3
97:14
**conduct** 76:14
**conducted**
22:15
**confident**
81:6 86:5
**confidential**
60:23

confinement
  21:13 47:16
  101:16,19
  102:7,14
  103:6
confirm  7:1
  32:25
confrontation
  66:12
congregate
  54:5
congregating
  54:10
considerations
  98:7
considered
  81:15 87:15
constantly
  65:1,12
construct
  48:11
consultant
  6:6
consulting
  6:8 18:2
contacted
  26:18
contemplated
  38:17 41:17,
  19
content  28:11
context  56:24
continue
  104:13
continued
  11:23
contraband
  76:14
contributed
  59:7
contributing
  20:10
control  21:3
  42:19 49:4,13
  58:8 62:4
  64:24 65:7,10
  66:8 72:18

87:20,22
  89:18 100:5,9
conversation
  44:21 45:15
  46:3 59:5,12
conversations
  59:22,23 77:8
convey  93:23
convince  58:1
coordinator
  101:9
copies  6:24
copy  6:16,19
  10:3 32:12
  33:9 51:16
  106:14,15,17
corner  52:4
  74:22 75:20
correct  4:23
  55:2 71:24
  83:17 105:2
correction
  62:20
correctional
  16:2 20:6,7
  93:18,19
corrections
  11:13,14,15,
  16 12:17,19,
  21 13:12
  14:23 18:7
  19:10,11,25
  20:17 22:5
  26:15,19,25
  27:2 30:20
  33:25 76:6
  85:2 90:1
  93:14 98:15
correctly
  87:24
counsel  6:1
  42:11
country  18:19
County  25:10,
  14
couple  9:18
  18:8 27:25
  88:8

court  5:5
  23:22 106:13,
  18
courts  27:16
cousin  11:16,
  21
cover  34:18,
  25 76:11
coverage  35:9
  91:7
covered  21:7
  34:22 74:13
Covering
  35:25
Covers  36:1
crazy  74:14
created
  19:21,22
  21:24 38:15
  91:6
creating
  12:17
criminal
  60:22
cross  37:22
  95:6
Cruz  13:10
culture  68:2
current  33:5,
  6 80:18
curtains
  74:13
cut  21:5
  36:19

_____

D

dad  11:21
Dakota  20:7
Dan  16:10
danger  101:21
date  33:12
  37:1
dated  10:24
dates  37:2
day  7:10

8:13,14
  18:22,24 19:2
  34:11,12
  35:11,15 55:7
  56:22,23
  57:1,2 69:7,
  12 85:12
  94:1,13
day-to-day
  95:5
days  8:13
  9:18,19 11:25
  34:22,25 93:3
  95:1
deal  14:18
  34:4 40:24
  61:1
dealing  16:15
deals  23:7
  27:9
death  31:1
decide  41:3
decided  88:9
decides  91:22
decision
  81:16
declined
  27:24 29:10
decreased
  16:22
DEF12  84:7
defendant
  4:22
defender
  17:22
definition
  57:5
definitive
  24:1
degree  12:10
  104:25
deliberately
  46:22 58:25
Delta  12:1,9
denied  58:19
denies  57:25

denying  58:23
department
  12:17,19
  13:11 14:8,23
  22:5 24:20,
  21,22 26:15,
  19 29:6 32:18
  37:19 38:4
  39:10,11 48:4
  60:5 76:6
  90:1 93:14
  103:8
department's
  23:17 28:14
  101:9
departments
  14:15 18:18
depend  54:1,
  22 98:10
depending
  10:8 37:25
  72:16,17 76:3
  98:4
depends  22:17
  36:14 72:13
  73:22 90:8
deposed  6:4
deposition
  4:2,7 8:12
  9:9,11,14,15,
  17,21 10:15,
  16 11:2 32:1
  33:16 48:22
  53:4 84:4
  93:23,24
  94:23 106:19
depositions
  4:25
deputy  14:25
  16:10
describe
  30:13
describes
  33:22 73:18
description
  14:20 87:1
design  39:17
  40:14 48:25

49:13 65:3
designation
  56:13
designed
  40:15 50:15
  65:16 73:9
desk  65:14
desperate
  93:8
determination
  29:14,18
  46:15 103:4
  104:6
determine
  45:16 46:20
  57:22
determined
  40:24
developed
  14:13
developing
  14:16 32:8
diagram  32:11
difference
  23:10 31:4
  40:16 64:5
  72:15 83:5
differences
  30:17 63:17
difficult
  42:4 66:16
  67:6,12,14
  74:23 79:15
  86:7 101:24
dining  70:7
direct  15:12
  65:5,8
direction
  73:22,24
directly
  19:18 43:7
  80:10
director
  14:25 16:6
  23:2 60:25
  61:1

Directors
  15:11
disagree  73:2
disagreed
  30:24
disagreement
  76:21,22
  99:19
disband  68:24
disciplinary
  93:2,11 98:3
discourage
  69:3
discovered
  78:5 79:20
discovery  4:4
discretion
  38:3,5
discussed
  104:19,21
discussing
  72:3
discussion
  43:22 76:21
discussions
  42:8 46:7
disinterested
  98:19
distance  14:2
distorted
  82:9
distorts
  49:24 82:16,
  23
disturbance
  19:22
disturbed
  86:4
divide  18:20
  20:24
dividing  51:3
DOC  17:4 22:9
  48:1 95:23
document  8:10
  33:20 40:22
documents  7:9
  9:4,5 29:13

31:16,24
  32:1,3 43:4
  105:12
dominate
  61:23
dorm  7:9
  32:11 35:5
  36:5 37:13
  39:2,7 40:3,
  10,12,13,23
  41:5,12 42:3,
  18 47:8,18
  48:2 50:9,17
  51:15,23
  52:12,22
  53:23,24
  54:18 55:1,7,
  22 62:10,21
  64:14,15,20
  65:21 67:11
  70:20,21,22
  72:2 78:8
  86:13 89:14
  90:3 93:25
  94:3 95:10,19
  100:5,9,17
  103:20 104:9
dormitories
  39:8
dormitory
  90:2
dorms  35:22
  36:1 39:12,
  13,14,16,19
  40:12 42:1,6
  47:12,14 48:1
  64:6,7 65:21,
  24 104:9
doubled  64:16
draft  11:7,8
drafted  12:6
driving  14:2
DROP  17:9,12,
  23,25
duck  70:12
duly  4:12
duty  40:6
  78:8

**E**

earlier  6:1
early  48:3
  93:4
easy  48:10
Ed  16:9
education
  12:22 21:16
  38:15
effect  102:3
effort  5:9
  102:21
eight-hour
  35:5
elderly
  37:20,21
elevated
  13:22 74:24
  104:3
Elimination
  101:17,18
email  6:21
  10:7
emergency
  68:16
employed  98:3
employee  98:6
employees
  32:17
encompassing
  20:21 57:5
encounter
  14:18
encourage
  95:24 97:13
  98:23
encourages
  101:19
encouraging
  96:20,23 97:9
end  13:5
  17:14 34:19
  35:2 37:22
  49:4 55:6
  65:14

ended  41:4
  42:17
ends  49:16
  78:9
endured  105:1
enjoy  24:25
enters  88:6
entrance
  49:14
environments
  63:22
equipment
  14:10 51:23
  62:22
establish
  46:24
established
  21:22 63:12,
  16 97:8 98:2
establishes
  23:3
establishing
  39:24
evaluation
  7:8 31:15
evaluations
  45:5
evasive  69:19
evening  35:16
evenings  36:9
evidence  4:4
  29:8 81:1,3,
  19 88:10
examination
  4:3,14
examined  4:13
excellent
  89:19
excessive
  28:22 29:8,9
  76:12,13
excluded
  60:22
excuse  33:6
executive
  33:22

Exhibit  11:1,
  2 33:9,16
  48:19,22
  84:3,4
expect  54:18
  55:6,18,19
expectation
  55:10
expected  53:5
expenses  8:14
experience
  27:12 46:21
  55:16 63:24
  86:21 87:6
  93:13 94:7
experienced
  17:22
experiences
  63:19
expert  4:23
  6:6,8 9:16
  23:23 24:4,6,
  9,13,15,19,24
  26:23,24
  27:4,9,11,16,
  17,21 28:4,20
  30:19
expertise
  14:14
explain  33:19
  85:8 98:21
  99:22
extended
  34:12
extent  21:25
  30:2 67:8
  70:4
extra  35:19
extreme  90:11
extremely
  47:21
eye  52:11
  69:20
eye-to-eye
  15:20
eyes  52:13

**F**

face  17:17
facet  21:11
facilities
  15:7 21:20
  54:24 63:5,6,
  15,16
facility
  12:19 26:2,3
  27:13 33:1
  55:1 57:1
  77:22
fact  13:8
  14:1 29:3
  41:25 69:6
  81:2,17 86:23
  87:13,15,18
  89:20 93:2
  94:20 104:12
factor  34:23,
  24
factors  20:11
factual  57:22
  58:1,10 79:18
  81:7,19
fair  38:23
  68:1
fairly  46:20
  49:13
falls  19:17
familiar  5:5
  16:20 17:9
  43:11 46:20
  56:1,2,8
  61:19 68:2
  80:10 94:20
fast  49:1
father  11:15
fault  100:25
FDC  91:10
  101:15
fee  8:15,19
feeding  90:23
feel  25:3
  45:1,6,24

86:5 102:24

**feeling** 45:25

**felt** 29:7
40:25 41:1
68:23 79:25
80:4

**female** 75:7
90:25

**fenced** 38:15

**field** 15:24
22:19 30:19

**fifties**
100:19

**fight** 68:22
70:16 87:3
95:25 96:24
97:9,10,13
99:10,20

**fighting** 67:3
96:21 97:13

**fights** 63:8,
24 67:15,22
96:24 98:23

**figure** 34:21
70:13,14

**file** 6:11,13
9:6 31:14,19,
25 59:5 101:1

**filed** 25:12

**fill** 34:8

**filled** 34:7
41:12

**finally** 85:7

**find** 27:17
31:9 56:21
96:3 101:25

**finding** 77:18

**finish** 106:6

**finished**
12:15

**fire** 96:6

**firm** 26:20
31:12

**fit** 49:16

**fittest** 63:23

**flammable**
21:4 62:6

**flexibility**
35:13

**flippant**
59:17

**floating**
36:10

**floor** 39:9
43:1 48:19
65:12,14 66:4
72:4 75:10,15

**Florence**
13:16

**Florida** 13:6,
17,21,22
14:23 15:14
21:20,21,22
22:3,5,9
24:21,22
37:14 76:6

**fluctuates**
22:17

**focus** 21:15

**focused** 20:16

**folder** 32:1
33:3

**folks** 96:7,15

**follow** 60:20
100:10 101:2,
24 102:1

**footage**
39:20,22

**footlockers**
52:9 66:24
82:17,20

**force** 20:25
28:21 29:2,8,
9 76:13

**forced** 17:20

**forget** 31:14

**form** 23:5
58:15 77:16
80:8 94:4,8
98:24 102:24

**formulated**
104:20

**formulating**
92:16

**found** 28:21
29:3 80:16

**frames** 60:7

**Franklin**
16:2,8 90:19

**frankly** 45:7

**freeze-frame**
85:21

**frequent**
96:18

**frequently**
51:25 91:22
94:12

**friend** 13:14

**front** 44:8
74:18

**full** 4:20
72:9 92:24
93:1

**function**
20:22

**functions**
42:17

**future** 105:19

---

**G**

**gap** 53:15

**gaps** 34:8

**gate** 34:17

**gates** 34:18

**gathered**
61:14

**gauge** 44:24

**gauging** 91:11

**gave** 6:1
15:23 53:22
92:24

**general** 14:20
37:22 39:12
44:19,21 64:4
72:23 76:7

**general's**
29:24 30:1
56:17 60:19
80:9

**generally** 5:4
16:12 25:18
35:11 50:14
53:12 76:19
92:6

**gentleman**
16:10

**genuine** 30:18

**give** 19:14
24:1 27:21
35:19 92:23
100:2 102:21,
23

**giving** 87:1

**glass** 73:20
87:16,23

**goal** 24:23

**good** 4:16,17
22:20 30:15,
18 32:8 51:7
60:13 94:19
95:6 99:14

**goodhearted**
30:18

**gosh** 51:16
76:12

**governing** 4:6

**governor**
11:22

**graduated**
12:23

**graveyard**
90:21

**great** 23:16

**group** 16:4
18:20 54:10

**guard** 12:4

**guess** 5:3
9:14 26:10
27:22 31:4
33:14 38:22
40:2 46:23,24
54:22 57:21
61:13 64:12,
18 78:11
93:20 99:20

**guessing** 24:2

guy   86:7
guys   71:8
  86:8 91:5
  106:11

H

half   22:22,25
  23:11 52:24
hall   70:8
hand   88:24
  101:20
handled   21:1
hands   75:11
  99:11
hands-on
  18:21
handwritten
  6:24
hang   54:5,8
hanging   52:3
  74:13
happen   67:18
  68:9 70:16
  71:11 77:5
  90:13,18 95:8
  98:19
happened
  12:22 16:20
  19:23 59:1
  60:16 78:16
  87:2 96:6
happening
  20:12 45:17
  46:23 53:10
  57:24 58:9,
  11,14 60:13,
  15 68:12
  73:24 96:25
  100:19
happy   5:17
hard   13:2
  41:3
harder   71:23
Harris   25:13
Haskell   4:15,
  18 6:20 7:6,7

11:4 33:18
  48:24 57:15,
  17 58:18 78:3
  79:9 80:6,12
  94:5,16 98:11
  99:1 104:14,
  17 106:8,12
hazing   61:11
  67:20
head   19:4
  60:7
heads   16:14
hear   15:25
  26:14 40:21
  60:3 103:18
heard   59:25
  60:4,5 61:6
  77:3 96:1,14,
  16,17,25 97:1
heart   60:1
  61:13,17,23
  67:17 68:8
  87:7
hearts   63:4
Heather   10:21
heck   85:5
held   101:15
helps   20:15
Hernandez
  86:25
hesitate
  39:10
hidden   75:21
hide   75:9
hiding   46:6
hierarchy
  100:16
high   34:8
  82:15 83:14
higher   8:21
  83:15
hired   24:9
  28:20 80:18
history   11:12
hitting   67:1
HO4   65:25

HO5   65:25
hold   14:22
  39:14,19 79:5
  93:9
holiday   35:1
Holmes   10:21
home   31:20
honestly   13:8
hour   8:10,12
  34:6 52:24
  55:7 94:10
  95:1,3
hours   35:13,
  14,23,24 36:3
  42:24 47:4
  93:25
house   10:6
  94:18 101:19
houses   37:20
housing   35:21
  36:2 65:5,18
  94:21
huge   50:4
Huh-uh   44:2
hundred   48:13
hundreds
  39:12 48:1
hurt   87:8
  99:13 100:1

I

I.G.   6:17
  30:4 79:2
I.g.'s   80:20
ICS   68:15
  71:4
idea   41:20
  57:23 64:17
  66:3 72:22
  87:24 94:19
ideally   64:8
  65:17 66:12
identification
  11:3 33:17
  48:23 84:5

identified
  77:12
identify
  88:12,14
if's   81:23
ignore   45:17
  98:23
ignoring
  96:24
immediately
  66:9 68:11
  71:18
impact   91:19
implications
  72:11
implying
  78:15 79:4,14
  80:4
important
  69:16
impression
  59:19 74:17
impressions
  47:18,24 82:4
improved
  74:16
in-class   19:8
inappropriate
  17:2 76:13
inches   74:25
  83:11
incident   6:18
  33:14 36:24
  43:20 59:16
  94:1
incidents
  76:11
include   23:17
including
  20:25 28:13
  67:5 77:7
increased
  104:8
indicating
  6:13,17 42:10
  50:22 51:2
  75:25 82:19

83:20 84:13
88:20,25
89:13 95:13
**indication**
17:19 45:11
**indicator**
85:15
**indifferent**
46:22 59:1
**indirect** 65:6
**individual**
60:16,17
96:12 98:7,10
**informal**
45:14
**information**
29:7 58:1
80:25 103:15
105:10,18
**initial** 9:16
10:2 29:13
60:17 79:11
**initialing**
95:20
**initially**
29:18 69:18
**initials**
95:21
**injuries**
69:10,19,22
**inmate** 25:21
39:23 52:1
65:13 85:22
89:16 102:15,
16
**inmate's**
52:2,9 66:24
**inmates** 15:8
26:6 28:14
35:15 37:20,
21 39:15,16
40:8 42:2
45:12 48:4
51:12,24 54:7
60:12 64:15
65:1,25 66:1
68:21,23
71:2,15

86:19,24
87:1,2,7,16
89:22 91:3
97:9 99:5,8,
9,17 100:13
**inside** 27:10
55:13 72:14,
17
**insight** 92:13
**inspection**
23:12 39:5
**inspections**
14:11
**inspector**
29:24 30:1
56:17 60:19
72:23 76:7
80:9
**instance**
90:21
**instant** 71:5
**Institute**
18:6 19:11,19
20:17
**institution**
16:2 19:2
23:9 37:20
38:6 57:13
60:17
**institution's**
18:13
**institutional**
27:5
**institutions**
13:23 15:10
22:25 23:5
55:18 60:16
63:8 64:1
66:22 67:2
**instruction**
18:25
**instructions**
18:23
**instrument**
18:23 20:19
22:1 23:19
**interact** 65:1

**interacting**
65:13
**interaction**
18:25
**interested**
16:13
**interpret**
57:3
**interpretation**
78:21
**interpretation
s** 45:20
**interrogate**
44:18
**intervene**
45:10
**interviews**
30:4 101:22
**introduction**
19:6 76:14
**invading** 52:2
**investigate**
20:10 53:25
85:15
**investigated**
96:18 103:3
**investigation**
29:22 54:12,
16 60:21,22,
23 78:6
101:21,24
102:6,10
**investigative**
77:6
**investigator**
72:23 77:11
78:14 79:25
80:20
**invited** 18:12
**invoice** 7:12,
15 8:24,25
**involved**
11:13 27:14
32:7 60:6
67:9 68:20
73:23 96:11

**involvement**
28:7
**involves**
61:18
**involving**
68:20 96:12
**issue** 53:8
61:4 78:20
102:1
**issues** 14:17
27:3 28:11
77:12,19 78:5
79:19 80:2,21
**items** 62:6

---

### J

**Jackson** 25:16
26:4
**Jacqueline**
25:13,25
**jails** 18:18
65:9
**James** 4:2,11,
21
**janitor** 63:3
**janitor's**
62:18
**job** 12:16
13:7,10,25
14:1,4,5
44:21 48:17,
18 51:6 91:12
92:2,3 97:11
98:5,6
**jobs** 21:17
71:10 90:1
**Johnson** 25:9,
17
**Johnson's**
25:23
**judge** 27:22
**judging** 85:6
**judgment**
81:22 97:23
**Justice** 19:19

**justify** 46:12
**juvenile** 64:1

### K

**keeping** 26:12
62:6
**Kendra** 101:6,
7 102:20
103:7,16
**key** 62:13,15,
19 63:2
**keys** 21:1
62:22 66:4,5
**kind** 8:11
14:17,19
15:24 21:7
23:6 27:1,6,
7,13 34:8,9
36:10 37:18
38:7 42:3
44:1,9,20,24
45:6,10,11
46:24 52:12
54:6,9 61:9
63:9 64:17
65:2 66:11,
15,20 67:3,7
76:14,22 78:1
85:10,14
87:8,17 89:22
91:25 92:1
93:7 94:12
96:11,13
100:16 101:22
102:23 103:4
**Kirkland**
32:20 36:21
103:12
**Kiser** 7:9
9:17 31:16
32:2 42:10,15
43:17 44:1,4,
8,11,15 45:15
46:3,15 52:23
53:4 57:23
58:25 59:6,8
68:2,6 70:15

72:20 77:24
78:7,15
79:16,21 81:7
86:6,22 87:11
92:25 93:23
**Kiser's** 9:17
10:15 59:4
77:13 92:15
93:23
**knees** 75:11
**knew** 43:11
45:19 47:3
49:20 58:11
68:7,9,23
78:15 79:16
96:25
**knock** 52:6
**knowledge**
27:15 32:8
61:25 63:2
77:21 92:8
105:3

### L

**laboratory**
12:13
**lack** 78:7,10
**ladies** 71:9
**laid** 39:14
94:15
**large** 48:12,
15 52:19
55:23 85:23
**larger** 48:9
**latest** 17:13
**laugh** 86:12
**laughing** 86:9
**laundry** 34:14
**lay** 46:20
**layout** 39:8,
12 48:2 49:2
**lazy** 98:19
**leads** 23:8
**learned** 69:5,
7

**leave** 17:8
18:6 35:1
52:16,19
54:24 55:4
65:22 71:10
**leaving** 69:1
**left** 13:21
16:18 17:4
**Legal** 28:2,8,
11
**letter** 6:17
**level** 66:1
71:7,12,16
76:20
**levels** 61:1
**lieutenant**
22:20 56:9
92:7
**lieutenants**
23:4 33:25
**lifeguards**
94:17
**lines** 37:16
49:18
**list** 6:8 31:8
**listed** 19:6
27:19
**literally**
39:11
**litigation**
26:24
**live** 91:23
**living** 39:23
**located** 82:15
**location**
72:6,17
**lock** 62:13
71:16
**locker** 54:2
**locks** 52:9
66:23
**log** 53:15
95:19
**logs** 52:22
95:11
**long** 10:8
11:12 19:21

24:24 28:9
30:15 38:8
42:23 49:14,
17 52:17 58:5
79:10 99:4
100:20 102:9
**looked** 8:24
20:22 21:12
32:4 37:16
38:6,18 49:12
54:3 77:9
85:22
**lookout** 88:11
89:23
**lose** 70:25
98:5
**lost** 17:22
79:11
**lot** 12:12
13:9 16:19
17:22,25 20:1
24:25 29:7
41:7 44:6
45:12 48:6
49:21 52:20
55:17,24
60:15 65:9,15
69:24 70:13
74:13 76:9
77:10 80:15
81:23,24 83:9
88:9 90:14
95:5 103:2,18
**lots** 62:8
89:21 93:18
**loud** 5:9
**lower** 8:22
71:23 75:22
76:20
**lunch** 100:23
**lying** 58:2

### M

**macho** 61:9
63:9 67:22
**made** 7:4
16:17 38:14

42:8 81:16,22
90:7 101:4
103:4 104:5
**maintain**
100:4,9,16
**maintaining**
51:22
**Maintenance**
15:6
**major** 22:20
**majority** 19:5
24:18 39:13
40:4 47:9
102:4
**majors** 23:4
**make** 5:9
16:16 29:14,
18 33:9 45:18
46:14 58:20
68:25 72:12
76:19 78:25
79:12 82:11
90:9,14 91:7
97:6 99:9
101:2,11
103:3
**makes** 50:2
67:2 73:19
85:17 87:14
101:23
**making** 23:16
31:8 41:2
80:1 102:20
**malicious**
98:18
**maliciously**
99:25
**manage** 38:1,5
67:6
**managed** 14:8
21:18 27:14
**management**
15:7 20:22
23:1 55:23
**managing** 13:1
27:10 42:2
65:5

**mandates** 38:4
**march** 17:6,15
70:8,10
**mark** 10:25
33:8 84:2
**marked** 11:2
33:16 48:22
84:4,7
**master's**
12:10
**matter** 4:19,
23 10:22,25
11:6 82:2
105:5
**Mcandrew** 9:14
30:11,24
**Mcandrew's**
9:21 10:2
32:2
**means** 56:24
73:11
**meant** 74:2
77:19,20
**mechanical**
75:16
**medical** 12:13
27:8
**meet** 44:11
**Melissa** 25:9,
17,23
**member** 65:10
**memory** 37:15
38:7
**mentioned**
62:3,21
**mercy** 5:7
**messing** 82:12
**method** 49:1
**methodology**
18:15
**mid** 13:3
84:15
**military**
12:12
**mind** 25:20
64:13 94:14

**mine** 13:14
17:15
**minimize**
97:24
**minimum** 8:12
**minimums**
39:22
**minute** 53:12,
14
**minutes** 53:9,
13,16 58:4
99:7
**Miriam** 4:18
**mischaracteriz**
**ing** 97:20
**missing** 93:3,
8
**missions**
37:19
**Mississippi**
11:17 12:18
**mistake** 97:6,
15,21,23
**mistaken**
83:19
**misunderstood**
9:20
**modeled** 21:25
22:1
**module** 65:10
**money** 16:19,
24 40:18
**months** 16:3
**mops** 62:10,15
**morning** 40:7
90:23,24
**motivation**
87:20
**mouth** 26:8
98:21
**move** 37:21,23
64:19 70:6
93:17 95:8,9
101:23,25
102:1
**moved** 19:19
38:24 64:14

68:11
**movement**
85:10 89:11
**movements**
54:8
**moving** 15:8
52:20 65:12,
15 73:12
**multiple**
68:20,21
**multiply**
34:24
**murdered**
20:7,8
**mutual** 17:2
**myriad** 51:19

---

**N**

**names** 42:20
**narrow** 56:3
**National** 18:6
19:11,19
20:16
**necessarily**
15:20 21:6
73:10 89:1,3
96:11 98:13
**needed** 13:24
40:20 90:16
104:6
**neighbor**
82:10
**News** 28:2,8,
11
**NIC** 18:15
20:9 21:25
22:2
**night** 12:9
40:9
**NIJ** 19:18
**nineties** 48:3
**normal** 54:8,
14 55:11
68:19 86:2
**notation** 93:7
95:17

note  53:19
  101:11
noted  45:5
notes  6:24
  79:1 101:4
notice  4:3
  30:6 52:8
  103:19,22
novice  27:21
number  7:10
  20:13 24:1
  34:3 48:12,15
  68:18 84:22
  85:23 86:3
  93:7

O

object  79:7
Objection
  80:3 97:19
obliterate
  75:6
observation
  59:22,23
observe  68:12
  69:18
observed
  57:23 69:10,
  15,19
observing
  65:11 88:21
obvious  66:10
occasion  76:7
  103:17
occasions
  91:8
occurred  33:7
  58:6 78:8
occurring
  58:4,5
occurs  27:10
offender  56:4
  63:5,7,11,25
  66:19 70:9,20
offenders
  38:14,23

41:21 42:3,6
  68:7
offer  20:11
offered  4:22
  12:15 16:8,9
  27:16
offerings
  27:7
office  14:15
  23:7,11 49:5
  60:20 80:9,20
officer  7:9
  9:17 12:2,3,
  11 20:6,8
  31:16 34:13,
  17 36:2,4
  40:2 41:5,9,
  14 42:4 43:25
  44:1,4,9
  46:15 51:9,
  11,15 52:12,
  23 53:4,18
  54:6,19,24
  55:2,7,11,19,
  25 56:11,12,
  22,25 57:5,6,
  10,23 58:25
  59:4,5,8
  62:20,21
  64:19,21
  65:21 66:1,2,
  4,7 68:1,6
  69:15,17
  70:15 72:20
  77:13,24
  78:7,15 79:16
  81:7 86:6,14,
  22 87:4,11,17
  88:3 90:2,25
  91:3,12,22
  92:1,15,24
  93:14,22,23
  95:13,14,24
  99:7 100:14
officer's
  50:5,8,11,14,
  15 53:24
  54:19,25
  55:4,8,9,12,

13,23 65:22
  66:2 71:22
  72:14,19,25
  74:5 86:17
  89:5,8 92:4
officers
  33:25 34:7,12
  40:6,7 42:16
  56:19 57:9
  60:11 65:19
  70:1 87:21
  93:6,18,19
  94:21 96:12,
  20,23 97:5
  98:16,23
  99:16
OIC  56:1,2,4,
  7,22
older  14:3
  64:2
Ole  12:1
one-on-one
  68:22
open  46:7,17
  52:19 54:2
  63:3 64:20
operate  10:6
  37:24 41:8
  42:1
operating
  27:10
operation
  21:15
operational
  27:2
operationally
  20:12
operations
  13:25 14:5,6,
  25 15:5 16:6
  22:13 26:25
  27:1,2 57:13
  96:10
opinion  45:7,
  8 58:25 59:8,
  10,21 92:16,
  24 93:1
  104:25

105:19,21
opinions
  30:17,22
  57:19 104:18,
  20
opportunity
  15:23 16:8,9
  21:11 81:14
opposed  31:1,
  2 49:3
optimization
  73:9
optimize  73:9
optimum  49:9
options
  102:22
oral  4:3
order  7:10,
  17,19 32:7,9
  51:17 75:11
  77:24 106:11,
  12,13
orderly  47:22
ousted  11:22
  16:4
outnumbered
  70:24
over-  73:25
overdone  25:3
overridden
  87:18,24
overtaken
  71:16
overtime  91:6
  94:12

P

p.m.  34:2
  35:7,8 106:19
paid  13:8
paragraph
  101:6
parameters
  97:8,11 102:8
Parchman
  11:17,19

12:18,20
**pardon** 9:13
**parents** 14:3
**part** 16:18
  19:16 29:11,
  22 54:14
  55:23 58:4
  71:9 81:5
  88:5,6 92:17
**part-time**
  11:21,23,25
**participated**
  20:2
**parting** 17:2
**parts** 50:16
**past** 6:25
  74:11 91:15
**Patch** 15:25
**patrol** 94:14
**pay** 23:16
  40:18 91:15,
  16
**payment** 7:11
**penalty** 31:1
**pending** 5:17
**people** 12:22
  17:22,25 20:9
  23:19 30:16
  34:10,14,21,
  25 36:3 39:19
  40:17,18
  45:21 61:12
  64:22 65:4,
  11,17 66:12
  68:18,25 70:6
  83:2 84:22
  85:9,20 86:21
  87:11 90:17
  92:10 93:21
  94:10,14 95:7
  96:3 98:18
  99:13,17
  102:11
**percentage**
  93:5
**perfect** 7:19
**perfection**

73:10,11
**perfectly**
  73:19
**performance**
  7:8 77:13
  91:10 92:4,
  16,21
**perimeter**
  94:14
**period** 24:24
  33:6 36:22,23
  44:23
**periods** 34:8
**permission**
  18:5
**permitted** 4:5
  65:22
**perpetrated**
  26:5
**Perryville**
  13:11
**person** 30:18
  35:6,7,10,17,
  19,22,24 40:1
  45:7 46:21
  56:12 57:12
  60:17 65:11
  88:13 89:19
  91:20,24
  92:1,7,11
**person's**
  56:11 91:19
  95:21
**personal**
  45:20 86:4
**personally**
  80:14
**personnel**
  15:3 31:15,
  19,25 45:3
  59:5
**perspective**
  21:2,17 28:5,
  17,18,19
  83:2,5 84:17
**pertaining**
  78:6

**phase** 21:14
**phone** 51:23
**photographs**
  8:3 43:3
**phrase** 60:1
**physical** 61:9
**physically**
  61:12
**physician's**
  12:11
**pick** 25:1
  34:15 45:13,
  23
**picked** 47:21
  69:21
**picture** 43:2
  49:23 85:21
**pictures**
  49:12 73:16
  83:24 84:1
**pilfering**
  54:3
**pin** 48:16
**place** 22:8
  36:18 87:19
  91:23 101:25
  102:22,25
**places** 95:6
  102:22
**plaintiff**
  4:19 10:21
  24:13 25:8
  26:6 28:25
**plaintiff's**
  24:10
**plan** 33:1,23
  39:9 43:1
  48:19 72:4
  75:15
**planning** 7:8
**plenty** 31:7
**plumbing**
  50:24 75:17,
  20
**point** 5:16
  70:18

**pointing**
  50:5,23 83:21
**poisonous**
  21:4
**policies**
  23:17 38:4
**pool** 94:17
**poor** 97:16
**population**
  15:7 36:17
  37:22,25
  41:22 48:4
  64:16 65:13
  66:15,18,19
  67:5
**position**
  43:12 68:12
  76:23 93:15
  96:9
**positions**
  14:22 34:4
  36:20
**positive**
  42:24
**possibility**
  46:25 80:7
**possibly**
  45:10 47:25
  81:20 87:21
  90:15
**post** 6:20
  7:10 32:6,7,
  9,16 34:11,22
  40:6,14,16,19
  42:21 51:17
  56:5 77:24
  93:25 95:2,9,
  10
**posts** 34:6,20
  91:6
**posture** 18:13
**potential**
  20:10 70:25
**practically**
  37:13
**practice**
  65:13 81:13,
  25

practiced
  65:8
PREA  101:9,10
  102:9 103:25
  104:11
preclude
  20:12
preliminary
  29:15
preparation
  8:11 9:2,8
  37:8
prepared
  10:24 11:5,7
  14:9
preparing
  71:14
presentations
  19:9
press  80:15
pressured
  80:4
presuming
  68:5
pretty  20:20
  21:6,14 31:3
  32:8 51:7
  75:10 87:13
  88:19
previously
  10:1 84:15
primarily
  36:23
primary  21:15
print  10:9
prior  59:25
  105:5,13
prison  12:8,
  25 13:10,16
  20:7,22 26:25
  27:2,11 28:1,
  8,11 33:23
  43:13 47:11
  49:7 64:2
  65:5 96:10
  99:4 101:17,
  18

prisoner
  88:11
prisoners
  53:23 54:10
  88:1 95:24
prisons  14:13
  15:12 19:9,18
  20:20 21:15
  22:22 48:16
  60:11 77:1
  96:12
privacy  75:2,
  7 104:3
probability
  46:25
probation
  98:4
problematic
  52:10
problems
  71:17
procedural
  78:20
procedure
  77:25
procedures
  23:17
PROCEEDINGS
  4:1
process  22:14
  23:2 60:21
  62:1
program  14:8,
  21 17:10,12,
  23,25 18:8,16
  19:5,7,8
  21:22,23 27:7
  34:12,16
  38:16 68:16
programming
  27:5
programs
  14:16,17
  18:11 20:4,5
  21:17 29:5
promoted
  12:24 13:3
  91:20

promotion
  91:21
prone  63:8
proper  62:9
protocol
  43:14 62:9
prototype
  48:8,9
prove  67:24
  96:4
provide  29:13
  91:7
provided
  6:21,23 14:14
  30:3 43:3
  80:25 81:12
  84:1
providing
  19:24,25
proving  61:8,
  14,15
provision
  19:25
psychologist
  10:21
public  17:21
pull  33:2
Purnell  25:16
  26:4
purpose  48:25
purposes  4:4,
  5 26:24 66:3
pursuant  4:3
push  98:12
put  6:4,5
  7:16 22:8
  36:8 41:3,5
  47:23 54:21
  57:20 60:7
  98:20 102:1,
  12,14,15,16
  103:5 104:1
putting  38:13
  49:3 66:25
  87:15
pyramid  71:19

---

Q

qualified
  27:17
qualify  27:11
question  5:17
  6:19 7:10
  17:17 20:14
  43:21 46:17
  64:17 76:20
  79:5,6,11
  84:21 98:13,
  21 99:22
questions
  5:13 51:24
  64:12 106:9
quick  48:11
  69:21 104:14
quickly  48:7
  68:19 71:11
quote  56:20
quoted  31:22

---

R

R.W.  45:9
  46:16 58:20
  59:1,9 69:8,
  10,20 85:18
  105:1
R.w.'s  72:20
Rabbit  15:25
radio  51:24
  68:13 70:18
raised  86:14
raises  91:15,
  16
ramble  20:14
ran  21:13
rank  22:19
ranks  93:17
rap  80:15
Rape  101:17,
  18
rate  8:9,22

**ratio** 40:2
**rationale**
  100:11
**Ray** 4:21
**read** 10:9
  46:9 78:4
  79:7,23
  106:11
**reading** 4:6
  61:14 78:13
  79:1
**real** 99:14
**realistic**
  55:21
**reality** 49:25
**rear** 75:14,15
**reason** 5:8
  29:11 36:18
  38:11 42:22
  51:11 66:24
  73:15,16 77:2
**reasonable**
  14:2 103:4
**reasons** 69:25
  70:6 88:8,9
  97:17 100:1
**recall** 9:25
  29:2 41:23
  43:5,10 44:5
  77:8 78:13
  81:13 89:16
  93:22 96:18
**receive** 9:21
  30:3,9 31:18
  32:16 91:24
  105:19
**received** 6:18
  9:13,18
  32:12,13 45:6
  80:19
**receiving**
  91:24
**recently**
  24:11 96:8
**recess** 57:16
  104:16
**recession**

16:22
**recognition**
  67:8
**recognize**
  70:1
**recognized**
  67:12,13
**Recognizing**
  52:17
**recollection**
  28:10 31:21,
  23 39:2 41:21
  61:4
**recollection-**
**wise** 32:9
**record** 4:20
  45:2,3,19,24
  46:10,11
  57:15
**recreation**
  34:16
**recurring**
  61:3
**redacted** 30:8
**reduce** 40:19
**reductions**
  16:15,16,18,
  25
**refer** 61:7
  77:15
**reference**
  56:7
**referenced**
  101:14
**referred**
  56:21
**referring**
  41:10 48:20
  75:1,18 78:10
  101:8
**reflected**
  67:7 95:10
**refresh** 37:15
  38:7 39:1
**region** 23:5,
  13

**regional**
  15:11 23:2
  60:25 61:1
**regress** 84:25
  98:25
**rehabilitation**
  27:6
**reinforce**
  71:18
**relate** 28:1
**related** 28:21
  58:7 61:10
  77:12
**relationship**
  30:13
**relied** 92:15,
  17
**relief** 34:23,
  24
**remember**
  10:4,10,19
  16:21 20:23
  28:23 29:19
  38:11,13
  42:16,20,22
  43:18,22,23
  44:5 51:8
  60:14 61:3
  86:25 90:20,
  23 96:9 99:3
  100:20 106:7
**remove** 101:20
**renovations**
  64:14
**rephrase** 5:14
  69:8
**report** 6:17,
  19 8:11 9:3,
  16,23,24
  10:2,13,20,24
  11:10 19:3,6
  25:12,15
  29:24 30:2,5
  31:23 32:3
  37:9 45:5
  49:8 56:17
  57:20 58:24
  61:10 71:21

72:24 77:21
  79:2 80:20,23
  81:12 104:22
  105:9,14
  106:2
**reporter** 5:6
  106:13,18
**reports** 11:5
  24:4,6 30:7
  58:22 76:7
  77:6
**represent**
  4:18
**request** 32:21
  39:5 90:2,7
**require** 54:12
  64:6
**requirements**
  23:18
**requires**
  54:15
**resolving**
  76:22
**respond** 70:3
  71:10
**responders**
  71:7
**responding**
  71:13
**response**
  68:16,19
  70:19,22
  71:6,12 80:22
  99:22
**responsibiliti**
**es** 51:14,20,
  21 55:25
**responsibility**
  12:25 62:23
**responsible**
  13:1 14:7,21
  15:8 57:12
  60:10,18
  62:22 63:1
**rest** 34:5
**result** 19:22
  48:11 64:5
  105:2

**resume** 5:23,
   24 6:3 14:20
   15:13 27:19,
   25
**retained** 6:7
   10:21 24:12
   25:11,14
**retainer** 7:14
   29:12
**retire** 17:8,
   15 93:19
**retired**
   17:15,18
   24:17,19
**retraining**
   98:9
**revenues**
   16:22
**review** 8:10
   10:12,20 23:1
   29:14,17,20
   31:18 45:19,
   24 59:4 60:24
   76:7,16,17
   81:12 91:25
   105:8
**reviewed** 9:3,
   5,11,18 10:1,
   10,17 29:19
   45:2 77:21
   80:23 81:14
   82:1,7 105:13
**reviewing** 9:2
**reviews** 55:17
**risk** 66:1
   69:4 102:2
   103:5
**role** 42:20
   46:13
**Ron** 9:14
   30:11,15 67:5
**Ronay** 16:10
**room** 7:9
   43:16 49:4,13
   58:8 64:24
   75:16 87:20,
   22 89:7

**rotate** 40:11
   94:18
**rotating**
   41:6,14
   94:19,20
**round** 53:12,
   19 73:20
**rounds** 52:23
   53:15,20 55:2
   78:18
**rover** 94:1
**rule** 52:1
   102:8
**rules** 4:6 5:5
   28:15
**run** 64:24
**Rutherford**
   25:10

——————————

**S**

**safety** 90:11
**sake** 68:5
   69:9
**Santa** 13:10
**saving** 16:19
**scenario**
   64:23
**schedule**
   8:16,19
**school** 11:24
   12:9,15
**secretaries**
   15:18
**secretary**
   13:23 15:1,10
   16:3,4,7,13
   36:19 76:25
**section** 14:11
   37:23,24
   101:12
**secure** 71:15
**secured** 62:12
**security** 6:20
   13:25 14:5,6,
   7,10,11,12,
   13,14,17,21

15:5 18:8,13,
   15,23 19:2
   20:19,21
   21:2,16,18,
   22,23 22:8,
   13,16,21
   23:3,7,9,17
   27:2 28:5,17,
   18 33:24
   34:13 56:5
   62:3 66:3
   81:11 96:10
**segregation**
   21:12
**selected**
   22:18,22
**selective**
   25:1 29:4,6
**send** 20:9
**senior** 56:25
**sense** 72:12
   78:18 85:17
   92:20
**sentence** 78:9
**separate**
   65:10
**sergeant**
   35:21 40:9,11
   41:5,15 56:8
   65:19 90:15
   92:12
**sergeants**
   33:25
**served** 15:14,
   17 24:9
**set** 102:8
**settle** 63:19
   99:19
**seventies**
   19:23
**shake** 99:11
**shape** 71:1
**sheets** 36:11
**sheriff** 80:18
**shift** 35:6,
   11,16 36:8
   54:20 56:10

62:24 71:8
   90:15,21
   95:2,4
**shifts** 34:1
   35:10 94:10,
   11 95:1,3
**short** 44:23
   77:6 82:25
   83:1,8
**shortages**
   41:9
**shorter**
   82:21,23
**shoulder**
   83:22 84:14
**show** 53:15
   78:22 93:10
**shower** 71:24
   74:5,13,19
**showers** 74:12
**shown** 32:6
**shows** 36:8
**shut** 36:16
**sick** 45:8,16
   95:7
**side** 24:10
   39:16 41:13
   49:24 70:12
   85:20
**sides** 51:25
**sight** 37:16
   49:18
**sign** 69:21
   92:14 102:24
**signal** 45:11
**significant**
   31:4 57:21
   93:5
**significantly**
   16:23 55:14
**signing** 4:7
**signs** 88:25
   92:7
**simplification**
   74:1
**sir** 24:7
   26:17 97:2

105:23
**sit** 43:6
  44:14
**sitting** 52:1
  65:14 72:7,
  16,24
**situation**
  68:10 70:24
**size** 39:20
**slow** 25:5
**small** 48:8
  52:18
**smaller** 39:17
**Smith** 25:13,
  25
**snitching**
  102:17
**socks** 67:1
**solicit** 24:16
**sophisticated**
  82:13
**sort** 21:25
  27:20 46:13
  48:25 54:6
  61:9 94:6
  98:8
**sorts** 16:12
  30:23 67:20
  70:2
**sound** 73:19
**sounds** 78:12,
  14
**South** 20:7
**space** 38:16
  39:23 48:6
  52:3,16,18,19
**speak** 43:19,
  20 48:8
**specific**
  27:5,7 38:11
  56:3 70:19
  78:13 84:21
  90:20
**specifically**
  32:21 59:14
  89:17 96:1

**speculate**
  38:10 39:11
  61:5
**spend** 42:23
  47:7 54:19
  85:8 87:21
**spending** 44:6
**spent** 47:4
  55:7
**spoke** 43:14
  72:3
**sport** 99:24
**square** 39:20,
  22
**staff** 34:3
  45:13 65:9
  75:7 76:14
  88:6 90:3
  91:25 93:9
  94:19
**staffed** 40:5,
  15
**staffing**
  14:8,9 15:22
  16:15 19:7,9
  33:1,23 41:8,
  18,24 94:6
**stand** 61:15
  84:18
**standard**
  65:18
**standards**
  14:13 21:23,
  24 23:15,18
**standing** 50:3
  72:8,16 74:20
  84:10 88:11,
  24 91:3
**standpoint**
  86:4
**start** 17:13
  31:8 93:6
**started** 7:5
  11:20 12:8
  16:24 17:12
  18:2,7 19:24
  85:2 99:3

**starting**
  71:17
**starts** 33:23
  70:12
**state** 4:19
  12:2,10 13:16
  15:19 16:22
  18:12 20:8
  22:7 48:5,16
  58:24 60:12
**stated** 106:1
**statement**
  58:20 80:21
**states** 19:6
**station** 50:6,
  8,12,14,16
  54:19,25
  55:4,8,9,12,
  13,23 65:7,22
  66:2 69:1
  71:22 72:14,
  20,25 74:5
  86:17 89:5,8,
  18
**stationed**
  90:3
**stay** 102:9
**stayed** 13:20
**stays** 66:1
**stepped** 93:24
  94:3 95:14,15
**stop** 69:21,25
  87:4
**stops** 88:19
**stories** 96:14
**storing** 62:10
**story** 15:25
**straight**
  25:19 59:20
  80:17
**straightforwar
d** 46:8
**strike** 84:17,
  23
**stuff** 12:13
  14:16,19
  15:21 18:24

21:14 27:1,7
  28:12 29:20
  34:9 44:20
  54:9 60:8
  63:10 65:2
  70:8 74:14
  87:16 89:22
  94:12 96:11
  101:22
  103:14,25
**style** 48:1
**subject** 20:18
  62:2,4 98:2
**submitted**
  7:12 25:11
**substantiated**
  29:9
**sudden** 37:21
  70:11 85:12
**suffering**
  105:1
**sufficient**
  58:10
**suggested**
  104:6
**suggestions**
  20:11
**suicide** 26:1
**summary** 33:23
**Sumter** 37:8,
  18 38:9,24
  39:7 42:23
  43:6 47:5
  52:8 55:1
  56:4 57:2
  84:2 103:19
  104:4
**superintendent**
  11:17 12:20
**supervise**
  65:2
**supervised**
  64:9,11
**supervision**
  64:6 65:6,8
  97:16
**supervisor**
  90:9 92:9

95:4
**supervisors**
15:12 88:7
92:10
**supplemental**
9:23,24 10:12
11:9 32:3
**supplies**
34:14
**support** 34:11
46:11 57:22
66:9 68:14
81:7,20
**supported**
11:21
**supporting**
81:1
**supposed**
49:5,10,11
53:9 65:4
69:24 91:5
97:8,24
**surely** 92:22
**surprise**
23:12 61:20
**surprised**
63:10 94:22
104:11
**surprising**
23:19
**surveillance**
6:18 8:5 82:1
88:10
**suspect** 89:12
**suspension**
98:8
**suspicion**
54:11
**suspicions**
86:15
**sustain** 98:8
**swing** 36:8
**sworn** 4:13
**system** 71:5,
19
**systems** 19:10

---

**T**

---

**TA's** 18:10
**taking** 5:6
69:4 101:1
**talk** 5:9
42:19 43:7,13
44:14,15 65:1
67:4 84:3
85:3 90:13
92:11 103:7,
16,17,18
**talked** 20:4
31:25 39:9
43:9 44:18,19
46:7 59:3
67:3 72:1
94:23 101:10
**talking** 36:19
39:4 41:7
45:12 54:4
57:11 58:21
59:16 72:8
83:16 84:10
94:24 100:12
**tall** 82:17,18
83:10,12
**target** 66:5
**task** 46:18
**teach** 18:14
**team** 20:24
23:3,6,8
68:17 71:4,6,
9,13
**teams** 18:17
22:23
**tech** 82:10
**technical**
18:10 20:5
**technological
y** 82:12
**tells** 34:1,19
**temperature**
85:4,7,16
**Ten** 24:8

**Tennessee**
25:10
**tenure** 15:17
**tenured** 98:6
**term** 31:15
56:1 60:14
61:6,7,11
94:2
**terms** 39:20,
24 48:2 52:10
57:11 64:10
72:2 74:9
75:18 102:10
**terrible** 67:2
**terribly** 91:9
**test** 60:1
61:13,17,23
63:4 67:17
68:8 87:7
**testified**
4:13 6:5
23:22 52:24
86:24 93:24
**testifying**
105:5
**testimony**
8:12 27:22
106:4
**testosterone**
63:21
**theft** 52:10,
11
**theory** 98:16
**thermometer**
85:6
**thing** 34:5
35:22 51:8
58:23 61:9
69:16 79:14
85:14 86:8,17
87:8 88:18
91:15 93:21
96:13 97:7
98:18 99:12,
13,14 103:14
**things** 10:7
15:22 18:9
20:11 21:4

23:20 30:17,
23 31:5,7
34:15 38:16
47:24 49:16,
22 57:7
60:12,13,15,
16 61:2,13
62:8,22 63:1,
14,20 66:15,
20 67:3 71:7
74:20 76:15
81:24 85:13
95:17 102:23
103:1,18
106:2
**thinking** 41:4
73:12
**thinks** 79:3
**thought** 17:1
51:9 65:20
78:17 79:7,18
81:22 88:14,
17 92:18
98:13,15,22
**threaten**
61:12
**three-and-a-
half** 19:2
**tidy** 47:19,21
**time** 16:20
18:5 19:21
24:24 28:9
30:16,21,22
33:6 35:12
36:5,22
37:14,17
40:3,8,25
41:9 43:20
44:6,7,23
47:7,9 51:9,
10,11 52:8
53:11,19
54:18,21
55:7,8,20
58:4 60:7,13
74:16,23 75:8
77:5,10 81:10
85:9 86:13
87:15,21

91:14 98:25
99:4,11
100:20
**timeframe**
96:8
**timers** 85:3
**times** 18:17
23:25 60:7
89:21 102:8
**title** 22:11
**titles** 15:2,3
**today** 5:21
6:22 85:5
104:19,21
106:5
**today's** 9:9
**toilets** 51:3
74:21 75:24
76:2 89:6,8
**told** 40:17
43:24 65:18
102:20
**tool** 21:3
62:4
**top** 67:24
**topics** 20:16
**total** 35:2
36:3
**totally** 52:16
73:2 74:12
97:10
**toughest**
63:23
**tour** 8:4
32:14 42:8,15
43:4,8
**touring** 42:23
**track** 79:11
**train** 71:3
**trained** 12:12
70:1,4,23
**trainer** 20:18
**training**
19:24 20:1,3
70:13 95:6
97:16

**transcribed**
77:8
**transcript**
4:7 9:21
10:16 32:2
106:14
**transcripts**
9:12 10:16
30:3
**transfer**
91:24
**travel** 8:13,
14
**treated** 45:9
**trial** 105:5
**trouble** 64:2,
3 87:9 102:17
**true** 73:5
79:18
**trusses** 48:10
**tucked** 75:10
**Tucker** 16:11
**turn** 73:20
**turned** 17:12
**twelve** 24:8
**type** 27:6
61:4 64:6
68:15
**types** 76:11
**typical** 8:19
93:13 94:6
**typically**
42:6 53:5
61:17 62:17
101:15

---

**U**

**ultimate**
46:14
**Um-hum** 5:12
9:7 31:17
93:16
**unable** 57:22
**unannounced**
23:12

**unattended**
52:16
**uncomfortable**
80:1
**understand**
5:13 17:21
40:22 46:19
71:21 79:20
81:17
**understanding**
41:25 42:5
53:7 87:24
104:2
**understood**
102:12
**unit** 13:11,
18,19,20 35:5
63:11 65:5
70:9
**units** 12:25
21:13 63:25
**unusual** 84:23
91:9
**unwork** 58:7
**up-to-date**
5:23
**Upchurch** 4:2,
11,21 5:20
11:12 57:18
104:14
**updated** 36:13
37:4
**upset** 102:13
**urinals** 51:5
75:23,24,25
**usual** 84:24
**Utilities**
34:14
**utilization**
14:9
**utilized**
23:15
**utilizing**
22:23

---

**V**

**vaguely** 38:12
43:12
**Valez** 42:10,
14 43:15 44:3
**valuable**
45:22
**vantage** 68:13
70:18
**variations**
15:3
**variety** 100:1
**variously**
14:25
**vast** 24:18
**Vehicle** 34:17
**vein** 92:2
**version** 6:1
**versus** 25:10,
13
**victims**
101:15
**video** 6:18
8:5 82:1,5,13
84:16 88:11
**Vietnam** 12:6
**view** 46:13
50:16 51:7
72:10,25 75:6
82:9 89:2
100:11
**viewed** 100:8
**viewing** 65:7
74:19
**violated**
77:24 97:23
**violating**
52:1 97:11
**visibility**
49:6,9 71:23
**visible** 87:14
**visit** 47:20
84:2
**visitation**
21:2

**visited**  37:8

---

**W**

---

**waist**  83:14
**waived**  4:8
**walk**  49:25
  50:1,6,7,15
  51:12 64:25
  66:6 75:2
  91:1,2
**walked**  44:17
**walking**  44:6,
  16,17 51:13
  55:17,20 83:2
  86:7
**wall**  50:24
  74:22,24
  75:2,20 76:1
  82:15,18,22
  83:8,10,17,
  18,20 84:10
  104:3
**walls**  51:2,3
  75:7
**wanted**  15:21
  16:16 17:1
  32:25 37:12,
  15 38:6 39:1,
  3 45:1,6,20,
  22 73:15,16
  77:4
**war**  12:6
**warden**  12:24
  13:7,10,15,
  18,19 15:14,
  24 16:1 42:9,
  14 43:9,11,
  14,19 44:3
  60:18,19,22
  77:22 80:19
  81:9 89:25
  90:12,13,18
**wardens**
  13:18,19 38:2
  81:10
**warning**  89:19

**wash**  85:19
**washing**
  89:17,18
**Washington**
  20:8
**watching**  65:8
  66:8,11 86:22
  87:11
**ways**  16:24
  17:3 65:4
  95:4
**weapon**  67:2
**weapons**
  61:18,22 62:2
**website**  24:15
**week**  22:24
  34:22
**weeks**  6:25
  72:23
**wellness**
  34:16
**Wes**  32:20
  103:11,16
**whatsoever**
  93:12
**whichever**
  15:1
**willingness**
  61:15
**window**  50:3
  52:6 74:19
  88:23 89:5
**windows**
  89:17,18
**wishes**  59:9
**wondered**  85:5
**wondering**
  101:5
**wood**  48:9
**wooden**  48:10
**word**  26:8
  102:15
**words**  45:16
  49:8 98:20
**work**  11:23
  18:6 24:16,
  18,19 27:13

  31:11 34:8,11
  35:11,14
  44:19 58:7
  65:16 75:8
  76:5 93:3,8
  94:24,25 95:5
  96:5 105:4
**worked**  11:24,
  25 12:10,13
  13:12,15,20
  15:10 20:17
  27:12 68:4
  81:24 92:12
  103:16,17
**working**  11:20
  12:8,9 15:2
  18:7 25:8
  60:4 85:2
  92:10 93:6
  94:11
**works**  27:23
**wrap**  104:15
**written**  24:5
  106:1
**wrong**  11:22
  45:21 97:7
  99:21
**wrote**  72:24
  73:6

---

**Y**

---

**Y.O.**  63:14
  64:6
**yard**  85:4,7,
  16
**year**  18:17
  22:22 23:1,10
  25:5 91:18
**years**  13:13
  17:14 19:20
  22:18 27:14
  32:7,10 38:22
  45:12 46:21
  55:16 76:5
  80:10 93:15
  97:1 98:15
  103:16

**yell**  99:6
**young**  63:18
**younger**  93:5
**youthful**
  38:14,23
  41:20 42:3,6
  56:4 63:5,7,
  11,25 66:19
  68:6 70:9,20